UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

        - versus -

   15-cr-49 (MJD/FLN)

HAMZA AHMED, et al.,

               Defendants.

---

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION TO DISMISS THE MATERIAL SUPPORT COUNTS IN THE
INDICTMENT ON GROUNDS OF UNCONSTITUTIONAL
OVERBREADTH AND VAGUENESS**

## Preliminary Statement

The Defendants are charged with attempted provision of, and conspiracy to provide, material support to the Islamic State of Iraq and the Levant ("ISIL"), knowing ISIL to be a designated foreign terrorist organization, and/or engaged in terrorism or terrorist activity, in violation of 18 U.S.C. § 2339B.  The specific form of material support at issue is "personnel" – namely the Defendants themselves.  The government's case is that the Defendants planned and attempted to travel to Syria to join ISIL.

The provision of personnel is prohibited by § 2339B only when an individual knowingly attempts or agrees "to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct [its] operation." 18 U.S.C. § 2339B(h).  Thus, the statute prohibits neither independent acts of advocacy nor mere membership of ISIL.[1]  The facial and evidentiary sufficiency of the indictment are challenged in a separate motion to dismiss (Docket #33, as amended, Docket #199).

This motion addresses additional infirmities – that the material support statute is overbroad and void for vagueness as applied to the Defendants.  It is well-established that a law may be invalidated as overbroad if a substantial number of its applications capture protected activity.  A statute is void for vagueness when it fails to give sufficient notice of the actual conduct that is prohibited, or permits arbitrary or selective enforcement.

Here, the definition of "engage[ment] in terrorist activity," as defined in the relevant statute (the Immigration and Nationality Act), is overbroad because, in direct contradiction to the Supreme Court's holding in *HLP*, it penalizes independent advocacy and mere membership in a terrorist organization.  This definition is also void for vagueness because it covers any conduct that would be illegal in the 50 states of the

---

[1] *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18, 24 (2010).

United States or under federal law, regardless of whether such conduct is legal in the country where it is performed.

In addition, the definition of "terrorism" in the relevant statute (the Foreign Relations Authorization Act) is ambiguous in the context of ISIL – an organization with the territory, population, and structure that are the indicia of an actual state.  It is notable that many scholars and commentators describe ISIL as a "pseudo-state" and "quasi-state."[2]  A high-level official in the Obama Administration noted last year that ISIL has become "more than just a terrorist organization."[3]  ISIL's efforts to control the narrative regarding its title and status are particularly significant given the youthful (and immature) nature of its primary international support.  Indeed, in June 2015, Prime Minister David Cameron of Britain criticized the BBC's use of the phrase "Islamic State," noting the reference gives undue credibility to the "poisonous death cult" that is "seducing" young Britons to support the terrorist organization in Syria and Iraq.[4]

Finally, and relatedly, ISIL's quasi-governmental status renders the definition of "personnel" in the material support statute ambiguous.  That statute only prohibits personnel support that is provided under the "direction or control" of the challenged organization.  But when the outlawed organization controls territory to which an individual might travel, control by the organization is inherent in mere presence.  Thus, where presence effectively becomes support, the material support statute

---

[2] *See* Ariel Ahram, *The Middle East Quasi State System*, Washington Post, May 27, 2014, available at http://www.washingtonpost.com/blogs/monkey-cage/wp/2014/05/27/the-middle-east-quasi-state-system/.

[3] Penny Starr, *State Dept. Official: ISIS No Longer a Terrorist Group But "A Full-Blown Army,"* CNSNews.com, July 23, 2014, available at http://cnsnews.com/news/article/penny-starr/state-dept-official-isis-no-longer-terrorist-group-full-blown-army.

[4] *See BBC to Review Use of "Islamic State" After David Cameron Rebuke,* Independent, June 30, 2015, available at http://www.independent.co.uk/news/uk/politics/bbc-to-review-use-of-islamic-state-after-david-cameron-rebuke-10355065.html.

unconstitutionally collapses First Amendment expressive activity (in the form of freedom of expression, travel and association) with activity criminalized under federal law.

## Facts

A.     The Islamic State in Iraq and the Levant ("ISIL")

On June 29, 2014, The Islamic State of Iraq and the Levant ("ISIL"), the group behind an insurgency that had seized a large swath of oil-rich territory in Iraq and Syria, formally declared the establishment of a "caliphate."[5]  A caliphate is a sovereign state led by a caliph or holy leader – a person believed by many Muslims to be the successor to the Prophet Mohammed and the political and religious leader of the entire Muslim community.  ISIL renamed itself "Islamic State," and declared its leader, Bakr al-Baghdadi, the caliph.  Announcing ambitions ultimately to control the territory stretching from the Mediterranean to the Persian Gulf, the group – engaging in sophisticated use of social media and specifically targeting young people – demanded the allegiance of the world's Muslim population.

1.     History

ISIL's origins lie in an organization called Jama'at al-Tawhid w'al-Jihad, founded in Iraq in 2003 by Jordanian Abu Musab al-Zarqawi, in the wake of the U.S. invasion.[6]  In 2004, al-Zarqawi's organization was renamed al- Qaeda in Iraq (AQI) when Zarqawi joined forces with Osama bin Laden.[7]  AQI played an instrumental role in the Iraqi insurgency against the U.S. operations in Iraq.  Zarqawi, who styled himself as an "emir"

---

[5] *ISIS Declares the Establishment of a Sovereign State*, Financial Times, June 29, 2014, available at http://www.ft.com/cms/s/0/6ec4fd4c-ff5c-11e3-8a35-00144feab7de.html#ixzz3h9s6I6yq.
[6] Bobby Ghosh, *ISIS:A Short History*," The Atantic, August 14, 2014 ("Ghosh 2014"), available at http://www.theatlantic.com/international/archive/2014/08/isis-a-short-history/376030/.
[7] *Id.*

or "insurgent commander,"[8] advocated three core, interconnected, ideas, that find expression in modern-day ISIL: "ideology understood through tactics; anti-Shi'aism; and, foreign recruitment."[9]  Zarqawi was killed in a United States airstrike in June of 2006.[10] Thereafter, AQI was renamed the Islamic State in Iraq ("ISI").[11]  AQI's influence declined in 2007, but gained traction in 2010 when Abu Bakr al-Baghdadi – reputedly in possession of a doctorate in Islamic studies[12] – took control of the group.[13]  At the time, AQI consisted mainly of Iraqi Sunni Muslims, many of whom had served in the military under Saddam Hussein.[14]

In late 2011, Baghdadi expanded operations into Syria to establish Jabhat al-Nusra (or the Nusra Front), which quickly came to be recognized as one of the strongest rebel groups battling President Bashar al-Assad's forces.[15]   In April 2013, Baghdadi announced the merger of his forces in Iraq and Syria and the creation of the Islamic State in Iraq and the Levant (ISIL).[16]

ISIL captured the Iraqi city of Mosul in early June 2014.  Shortly thereafter, the group formally declared the establishment of a "caliphate" - a state governed in accordance with Islamic law, or Sharia, by a caliph.[17]  It demanded that Muslims across the world swear allegiance to its leader - and migrate to territory under its control.

---

[8] *Id.*

[9] Isaac Kfir, *Social Identity Group and Human (In)Security: The Case of Islamic State in Iraq and the Levant (ISIS)*, September 8, 2014, available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2493209.

[10] Ghosh 2014.

[11] *Id.*

[12] Terrence McCoy, *How ISIS Leader Abu Al Baghdadi Became the World's Most Powerful Jihadi Leader*, Washington Post, June 11, 2014, available at http://www.washingtonpost.com/news/morning-mix/wp/2014/06/11/how-isis-leader-abu-bakr-al-baghdadi-became-the-worlds-most-powerful-jihadi-leader/.

[13] Ghosh 2014.

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *See* n. 5 above.

4

Underscoring its nation-building aspirations, in a 16-point communiqué, ISIL declared "[p]eople tried secular forms of government: republic, Baathist, Safavids ... It pained you. Now is time for an Islamic state."[18]

2.  Structure

ISIL's rule has been characterized by shocking brutality – including public beheadings, burnings, drownings, crucifixions, abductions, mass killings, repression and killing of gay people, and the sexual enslavement of captured girls and women.  It has been roundly condemned by the international community as a terrorist organization.  No state or international entity has recognized ISIL's self-proclaimed sovereign status.  On May 14, 2014, the U.S. Department of State announced the amendment of the designation of AQI as a Foreign Terrorist Organization (FTO) to add the alias ISIL as its primary name.[19]

But, as several scholars and commentators have pointed out, the terrorist label is an imperfect fit given other aspects of ISIL's structure, territory and stated goals.  While the group has adopted harshly violent and repressive tactics, and engages in military and insurgency attacks against the Syrian and Iraqi armies, it has also embarked on a systematic process of civilian governance over the eight to ten million people within the territory it controls.[20]  As Boaz Ganor explains:

> [I]mmediately after taking over a city or town, the Islamic State imposes Shari'a (Islamic) law, which it enforces with extreme and terrifying violence to ensure compliance; at the same time, it provides essential

---

[18] Thanassis Cambanis, "The surprising appeal of ISIS," Boston Globe, Jun. 29, 2014. Available at http://www.bostonglobe.com/ideas/2014/06/28/the-surprising-appeal-isis/l9YwC0GVPQ3i4eBXt1o0hI/story.html.

[19] See Terrorist Designations of Groups Operating in Syria, U.S. Department of State Media Note, May 14, 2014, available at http://www.state.gov/r/pa/prs/ps/2014/05/226067.htm.

[20] See What is Islamic State?, BBC News, June 29, 2015, available at http://www.bbc.com/news/world-middle-east-29052144.

welfare, education, and religious services (Da'wa) to the citizens who have come under its control.[21]

These governmental actions, Ganor concludes, "make the Islamic State a 'hybrid terrorist organization' – that is, an organization that operates simultaneously in the (illegitimate) military-terrorist sphere and in the (pseudo-legitimate) civilian sphere."[22]

Audrey Kurth Cronin of George Mason University's School of Policy, Government and International Affairs, writing in the March/April issue of Foreign Affairs, takes the position that ISIL is "not really a terrorist organization at all."[23]  She explains:

> Terrorist networks, such as al Qaeda, generally have only dozens or hundreds of members, attack civilians, do not hold territory, and cannot directly confront military forces. ISIS, on the other hand, boasts some 30,000 fighters, holds territory in both Iraq and Syria, maintains extensive military capabilities, controls lines of communication, commands infrastructure, funds itself, and engages in sophisticated military operations. If ISIS is purely and simply anything, it is a pseudo-state led by a conventional army.[24]

This pseudo-state, she points out, has a complex, hierarchical administrative structure, which it has modeled on that of typical government.[25]  As well as a military command structure, there is "a civilian bureaucracy, supervised by 12 administrators who govern territories in Iraq and Syria, overseeing councils that handle matters such as

---

[21] Boaz Ganor, *Four Questions on ISIS:A "Trend" Analysis of the Islamic State*, Perspectives on Terrorism, June 2015, at 58, available at http://www.ict.org.il/Article/1424/Four-Questions-on-ISIS.
[22] *Id.*
[23] Audrey Kurth Cronin, *Isis Is Not a Terrorist Organization* (hereafter "Cronin 2015") Foreign Affairs, March/April 2015, available at https://www.foreignaffairs.com/articles/middle-east/2015-02-16/isis-not-terrorist-group.
[24] *Id*.
[25] *Id*.

finances, media, and religious affairs."[26]  Aymenn al-Tamimi, a researcher at the

Philadelphia-based think tank Middle East Forum, points out that ISIL's system of

governance mirrors that of modern states, with "the conventional ministries and state

departments you recognize in governments around the world."[27]  Indeed, according to

one journalist, "[f]rom education curriculum and textbooks, to fishing regulations and

fines for littering ISIS has laws and by-laws that are more detailed than some recognized

states."[28]  Stephen M. Walt, a professor of international affairs at the John F. Kennedy

School of Government at Harvard, describes ISIL as "a revolutionary state-building

organization."[29]  In a recent study in Foreign Affairs focused on ISIL's evolving legal

system, based on an austere interpretation of Islamic law and modeled on seventh century

practices, Andrew F. March, a professor of political science at Yale, and graduate student

Mara Revkin, write that over time the Islamic State "could become an increasingly

'normal' state, in which the simplicity of rules and institutions plucked out of early

Islamic history gives way to bureaucratic administration and positive law."[30]

       The effect of these institutions and law and their swift and severe enforcement has

"helped ISIS maintain control and keep out competing Islamist groups, as well as

bringing a 'sense of order.'"[31]  As analyst and author Hassan Hassan puts it, on the

---

[26] *Id.*
[27] Rebecca Collard, *What We Have Learned Since ISIS Declared a Caliphate One Year Ago*, Time Magazine, June 25, 2015 (hereafter "Collard 2015"), available at http://time.com/3933568/isis-caliphate-one-year/.
[28] *Id.*
[29] Tim Arrango, *ISIS Transforming Into Functioning State That Uses Terror as Tool*, New Yotk Times, July 21, 2015 ("Arrango 2015"), available at
http://www.nytimes.com/2015/07/22/world/middleeast/isis-transforming-into-functioning-state-that-uses-terror-as-tool.html?_r=0.
[30] *Id*.
[31] Collard 2015.

ground there was a "logic of savagery."[32]  If people avoid any sign of dissent, he said, they can largely go about their lives.[33]  They feel like there is a functioning state."[34]

Another notable aspect of ISIL that distinguishes it from the traditional terrorist model is that it has built "a self-sustaining financial model unthinkable for most terrorist groups."[35]  Its wealth comes primarily from key oil producing operations in Iraq and Syria, which generate revenue of between $1M to $3M per day.[36]  In addition to oil, ISIS receives money from foreign supporters, ransoms, the collection of taxes and even the sale of antiquities.[37]  Cronin concludes that "ISIS is clearly a highly diversified enterprise whose wealth dwarfs that of any terrorist organization."[38]

The recognition that ISIL's status has evolved beyond its extremist insurgency beginnings is not just confined to scholarly and journalistic commentary.  Pointing out that ISIL "is no longer simply a terrorist organization," Brett McGurk, deputy assistant secretary for Iraq and Iran at the U.S. Department of State told a House Foreign Affairs Committee hearing on July 23, 2014, "[i]t is now a full-blown army seeking to establish a self-governing state through the Tigris and Euphrates Valley in what is now Syria and Iraq."[39]

---

[32] Arrango 2015.
[33] *Id.*
[34] *Id.*
[35] Cronin 2015.
[36] *See* Council on Foreign Relations Backgrounder, *The Islamic State*, at 3, available at http://www.cfr.org/iraq/islamic-state/p14811.
[37] Cronin 2015; Collard 2015.
[38] Cronin 2015.
[39] Penny Starr, *State Dept. Official: ISIS No Longer a Terrorist Group But "A Full-Blown Army,"* CNSNews.com, July 23, 2014, available at http://cnsnews.com/news/article/penny-starr/state-dept-official-isis-no-longer-terrorist-group-full-blown-army.

3.  Use of Sophisticated Propaganda

ISIL has engaged in an international propaganda campaign, featuring glossy online magazines, videos with high production values, and intensive and sophisticated use of social media – propaganda efforts President Obama has acknowledged are "designed to target today's young," especially "those who may be disillusioned or wrestling with their identity."[40]  At its heart, this propaganda markets a seductive ideology of statehood and citizenship.  Writing in the Boston Globe in June 2014, Thanassis Cambanis explains that despite its "repugnant" tactics, ISIL "has gotten one important thing right: It has created a clear – and to some, compelling – idea of citizenship and state-building in a region almost completely bereft of either."[41]

It is this focus on the universal ideal of belonging and statehood that is at the heart of ISIL's appeal – particularly, as President Obama has noted, to disaffected and alienated Muslim youth across the world.  In his remarks at White House Summit on Countering Violent Extremism on February 19, 2015, the President noted:

> [W]e must address the grievances that terrorists exploit, including economic grievances.  As I said yesterday, poverty alone does not cause a person to become a terrorist, any more than poverty alone causes someone to become a criminal . . .
>
> But when people – especially young people – feel entirely trapped in impoverished communities, where there is no order and no path for advancement, where there are no educational opportunities, where there are no ways to support families, and no escape from injustice and the humiliations of corruption – that feeds instability and disorder, and makes those communities ripe for extremist

---

[40] *See* Remarks by the President at the Summit on Countering Violent Extremism, February 19, 2015 (hereafter "President Obama CVE Remarks"), available at https://www.whitehouse.gov/the-press-office/2015/02/19/remarks-president-summit-countering-violent-extremism-february-19-2015.
[41] *See The Surprising Appeal of ISIS*, Boston Globe, June 29, 2014.

9

> recruitment.  And we have seen that across the Middle East
> and we've seen it across North Africa.  So if we're serious
> about countering violent extremism, we have to get serious
> about confronting these economic grievances.[42]

To young impressionable minds, experiencing alienation from the dominant culture around them, ISIL's message – albeit accompanied by tactics that are disturbing to many – offers an opportunity of identity.  As Peter Neumann, Director of the International Centre for the Study of Radicalization in London, argues: "if you are a Brit or a French guy who has no family connection to Syria, you're not wanting to fight for the Syrian people ... The reason you're going there is because you see Syria as essentially the cent[er] of gravity or the potential birthplace for that Islamic state that you're hoping to create."[43]

And ISIL's propaganda campaign has proved to be remarkably successful, causing thousands of young foreigners to flock to its borders.  In May 2015, a senior state department official estimated that the group had attracted more than 22,000 foreign recruits from more than 100 countries.[44]  A number of these – exact statistics are unavailable – have traveled from the United States.[45]

B.     The Superseding Indictment

The Defendants are charged in a superseding indictment with attempted provision of, and conspiracy to provide, material support to the Islamic State of Iraq and the Levant ("ISIL"), knowing ISIL to be a designated foreign terrorist organization, and/or engaged

---

[42] *See* President Obama CVE Remarks.

[43] *See* Agence France-Presse, *ISIL chief poised to become world's most influential militant?*, The National, Jun. 5 2014, available at http://www.thenational.ae/world/middle-east/isil-chief-poised-to-become-worlds-most-influential-militant.

[44] *See* State Department *Background Briefing on Iraq*, May 20, 2015, available at http://www.state.gov/r/pa/prs/ps/2015/05/242665.htm.

[45] *See* Anna Altman, How Many Foreign Fighters Have Joined ISIS?, New York Times, September 16, 2014, available at http://op-talk.blogs.nytimes.com/2014/09/16/how-many-foreign-fighters-have-joined-isis/.

in terrorism or terrorist activity, in violation of 18 U.S.C. § 2339B.  The specific form of material support at issue is that of "personnel" – namely the Defendants themselves.

The crux of the government's case appears to be that the Defendants planned and attempted to travel to Syria to join ISIL.  *See* Government's Opposition to Mr. Ahmed's Motion for Bail, Docket #151 at 1 ("[t]his case arises out of a long-running investigation into young men who have left Minnesota, or have attempted to leave Minnesota, to join the terrorist organization, Islamic State of Iraq and the Levant"); *id.* at 3 ("each defendant made a concerted effort to leave the United States in order to join a terrorist organization of uncompromising violence"); Government's Opposition to Mr. Ahmed's Motion to Dismiss, Docket #46 at 9-10 ("[t]he plain language of the statute . . . require[s] only that the personnel so provided eventually act under the foreign terrorist organization's direction or control – which they will do when they reach their destination and join the organization").

## **Argument**

### **THE INDICTMENT'S MATERIAL SUPPORT CHARGES ARE VOID FOR VAGUENESS AND OVERBREADTH**

A.    Applicable Standard

The Fifth Amendment provides that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law."  This guarantee is violated where a person's life, liberty or property are taken away "under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement."  *Johnson v. United States*, 135 S.Ct. 2551, 2556 (2015) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357–358 (1983)); *see also Grayned v. City*

*of Rockford*, 408 U.S. 104, 108–09 (1972) (noting "[v]ague laws may trap the innocent by not providing fair warning").  The *Johnson* Court elaborates: "The prohibition of vagueness in criminal statutes 'is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law,' and a statute that flouts it 'violates the first essential of due process.'"  *Id*. at 2557 (*quoting Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926)).

Attacks on statutes on constitutional vagueness grounds can take one of two forms – a "facial" attack or an "as applied" attack.  In a facial attack, a person must "establish that no set of circumstances exists under which [the law] would be valid, ... or that the statute lacks any plainly legitimate sweep*." United States v. Stevens*, 559 U.S. 460, 472 (2010) (internal quotation marks and citations omitted).  Where First-Amendment protected activity is at issue, the Supreme Court has recognized a more relaxed "type of facial challenge, whereby a law may be invalidated as overbroad if "a substantial number of its applications are unconstitutional" in relation to its "plainly legitimate sweep." *Stevens*, 559 U.S. at 472.  A defendant may invoke the overbreadth doctrine on the ground that "the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973).

In *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) (hereafter *HLP*), a case addressing the reach of the material support statute to activities associated with the humanitarian arm of a designated terrorist organization, the Supreme Court rejected a vagueness challenge to the statute on an as-applied basis.  In its decision, the Court made three observations relevant to the instant case.

*First*, the material support statute does not penalize independent acts of advocacy. *See id.* at 24 ("any independent advocacy in which plaintiffs wish to engage is not prohibited by § 2339B"); *see also id.* at 23 ("[t]he statute makes clear that 'personnel' does not cover *independent* advocacy") (emphasis in original); *see also id.* at 26 (the First Amendment left unprotected only the "narrow category of speech to, under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations").

*Second*, the material support statute does not penalize mere membership in an organization. *See id.* at 18 ("Section 2339B does not criminalize mere membership in a designated foreign terrorist organization. It instead prohibits providing 'material support' to such a group"); *see also id.* at 39 ("the statute does not penalize mere association with a foreign terrorist organization").

*Third*, in upholding the statute in *HLP*, the Court was not taking the position that the statute would survive all future as-applied challenges. *See id.* at 39 ("this is not to say that any future applications of the material-support statute to speech or advocacy will survive First Amendment scrutiny").

B.    <u>The Definitions of "Terrorism" and "Terrorist Activity" in the<br>Material Support Statute Are Overbroad and Void for Vagueness as<br>Applied to Efforts to Join ISIL</u>

The Defendants are charged with attempted provision of, and conspiracy to provide, material support to the Islamic State of Iraq and the Levant ("ISIL"), in violation of 18 U.S.C. § 2339B. That statute provides that to violate its provisions, "a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as

defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989)." *Id.* Thus, the statute sets forth three alternative mens rea pre-requisites:

*First*, the defendant knows that ISIL is a designated terrorist organization, as defined under 18 U.S.C. § 2339B(g)(6), which in turn references Section 219 of the Immigration and Nationality Act – the provisions setting forth the procedure for the Secretary of State to designate an organization as a terrorist organization. *See* 8 U.S. Code § 1189.

*Second*, the defendant knows that ISIL has engaged in or engages in terrorist activity as defined under the INA. The INA defines "terrorist activity" as follows:

> (iii)"Terrorist activity" defined. As used in this chapter, the term "terrorist activity" means any activity which is unlawful under the laws of the place where it is committed (or which, if it had been committed in the United States, would be unlawful under the laws of the United States or any State) and which involves any of the following:
>
> (I)     The highjacking or sabotage of any conveyance (including an aircraft, vessel, or vehicle).
>
> (II)    The seizing or detaining, and threatening to kill, injure, or continue to detain, another individual in order to compel a third person (including a governmental organization) to do or abstain from doing any act as an explicit or implicit condition for the release of the individual seized or detained.
>
> (III)   A violent attack upon an internationally protected person (as defined in section 1116(b)(4) of title 18) or upon the liberty of such a person.
>
> (IV)   An assassination.
>
> (V)    The use of any –

14

(a) biological agent, chemical agent, or nuclear weapon or device, or

(b) explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain),

with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property.

(VI)   A threat, attempt, or conspiracy to do any of the foregoing.

See 8 U.S.C. § 1182(a)(3)(B)(iii).

The INA defines "engage in terrorist activity" as follows:

(iv)"Engage in terrorist activity" defined. As used in this chapter, the term "engage in terrorist activity" means, in an individual capacity or as a member of an organization—

(I)     to commit or to incite to commit, under circumstances indicating an intention to cause death or serious bodily injury, a terrorist activity;

(II)    to prepare or plan a terrorist activity;

(III)   to gather information on potential targets for terrorist activity;

(IV)    to solicit funds or other things of value for—

(aa) a terrorist activity;

(bb) a terrorist organization described in clause (vi)(I) or (vi)(II); or

(cc) a terrorist organization described in clause (vi)(III), unless the solicitor can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization;

(V)     to solicit any individual—

(aa) to engage in conduct otherwise described in this subsection;

(bb) for membership in a terrorist organization described in clause (vi)(I) or (vi)(II); or

(cc) for membership in a terrorist organization described in clause (vi)(III) unless the solicitor can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization; or

(VI) to commit an act that the actor knows, or reasonably should know, affords material support, including a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training—

(aa) for the commission of a terrorist activity;

(bb) to any individual who the actor knows, or reasonably should know, has committed or plans to commit a terrorist activity;

(cc) to a terrorist organization described in subclause (I) or (II) of clause (vi) or to any member of such an organization; or

(dd) to a terrorist organization described in clause (vi)(III), or to any member of such an organization, unless the actor can demonstrate by clear and convincing evidence that the actor did not know, and should not reasonably have known, that the organization was a terrorist organization.

*See* 8 U.S.C. § 1182(a)(3)(B)(iv).

The INA defines as "terrorist organization" as follows:

(vi) "Terrorist organization" defined. As used in this section, the term "terrorist organization" means an organization—

16

(I)     designated under section 1189 of this title;

(II)    otherwise designated, upon publication in the Federal Register, by the Secretary of State in consultation with or upon the request of the Attorney General or the Secretary of Homeland Security, as a terrorist organization, after finding that the organization engages in the activities described in subclauses (I) through (VI) of clause (iv); or

(III)   that is a group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in, the activities described in subclauses (I) through (VI) of clause (iv).

*See* 8 U.S.C. § 1182(a)(3)(B)(v).

Or *third*, the defendant knows that ISIL has engaged in or engages in terrorism, as defined under the Foreign Relations Authorization Act ("FRAA"), which defines terrorism as "premeditated, politically motivated violence perpetrated against noncombatant targets by *subnational groups* or *clandestine agents*."  22 U.S.C. § 2656f(d)(2) (emphasis added).

As more fully set forth below, the definitions of "terrorist activity" and "terrorism under the INA and the FRAA, respectively, are defective under the vagueness and overbreadth doctrines.

a.   The Definition of "Engage[ment] in Terrorist Activity"
     Under the INA is Unconstitutionally Overbroad and Vague

The definition of "engage[ment]" in terrorist activity under the INA is unconstitutionally overbroad because, in direct contradiction to the Supreme Court's holding in *HLP*, it penalizes independent advocacy and mere membership in a terrorist organization.  *See, e.g.,* 8 U.S.C. § 1182(a)(3)(B)(iv)(V) (engaging in terrorist activity

includes the act of "solicit[ing] any individual . . . to engage in conduct otherwise described in this section"); 8 U.S.C. § 1182(a)(3)(B)(iv)(V) (engaging in terrorist activity includes the act merely of "solicit[ing] any individual . . . for membership in a terrorist organization").  In *HLP*, the Supreme Court was clear that acts of independent advocacy related to a terrorist organization and membership of a terrorist organization itself are protected activities under the First Amendment, and cannot come within the ambit of the material support statute.  *See HLP*, 561 U.S. at 24 ("any independent advocacy in which plaintiffs wish to engage is not prohibited by § 2339B"); *see also id.* at 18 ("Section 2339B does not criminalize mere membership in a designated foreign terrorist organization).  Accordingly, the INA's definition of "engage[ment] in terrorist activity" is unconstitutionally overbroad as it encompasses protected activity.  *See Stevens*, 559 U.S. at 473 (a law may be invalidated as overbroad if "a substantial number of its applications are unconstitutional"); *see also Thornhill v. Alabama*, 310 U.S. 88, 97 (1940) (a statute is unconstitutionally overbroad if it "does not aim specifically at the evils within the allowable area of control [by the government] but ... sweeps within its ambit other activities activities that in ordinary circumstances constitute an exercise of freedom of speech").

Particularly troubling are the provisions that penalize the solicitation of funds and members for a terrorist organization, and require the defendant to establish by "clear and convincing evidence" that "*he did not know, and should not reasonably have known*, that the organization was a terrorist organization."  *See* 8 U.S.C. § 1182(a)(3)(B)(iv)(IV) and (V).  Thus, not only is the statute penalizing freedom of speech and association, it subverts the presumption of innocence.

18

The INA "engage[ment] in terrorist activity" definition also violates the vagueness doctrine both because it is fails to give adequate notice of what is prohibited, and because it permits arbitrary and selective enforcement.  As an initial matter, it is important to note that the INA definition does not match the traditional definition of terrorist activity, i.e., "acts dangerous to human life that violate federal or state law" and appear to be intended "(i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination or kidnapping."  *See* 18 U.S.C. § 2331 (defining international and domestic terrorism).  There is no limitation in the INA cabining the conduct within the sweep of this statute to actions with a political motive.  *See McAllister v. A.G.*, 444 F.3d 178, 188 (3d Cir. 2005) (the "political offense" exception does apply to INA's definition of terrorist activities).[46]

Rather, the definition covers any conduct that would be illegal in the 50 states of the United States or in federal law, *regardless of whether such conduct is legal in the country where it is performed.*  Thus, it would encompass acts performed abroad that are legal under that country's law, including a revenge killing for adultery, the lawful solicitation of payments by crime victims to secure an individual's release from prison, or the act of punishing a thief by cutting off his hands.  Moreover, it does not exclude acts performed as a recruit in a country's military in a time of war.  Nor does it even explicitly permit an individual to rely on the defense of self-defense, much less, that defense as defined by the law to which the individual is subject.  It requires an individual overseas to consult, not just the law of the land in which he is residing or traveling, but also all the

---

[46] In *McAllister*, the Third Circuit found the INA's definition of terrorist activities was not overbroad or vague, but this decision was issued prior to the Supreme Court's decision in *HLP*.

statute books at the federal level as well as in 50 states to determine if a given action is illegal.  The statute therefore leaves an individual with "grave uncertainty," *Johnson*, 135 S.Ct. at 2557, as to what constitutes a crime.

In addition, the broadness of the definition – encompassing, for example, any activity involving "a dangerous device" unless for monetary gain," *see* 8 U.S.C. § 1182(a)(3)(B)(iii)(V)  – with no political dimension, it grants unlimited discretion to agents, prosecutors, judges and juries to target individuals on discriminatory and arbitrary grounds.  As such, the "engage[ment] in terrorist activity" definition in the INA "produces more unpredictability and arbitrariness than the Due Process Clause tolerates." *See Johnson*, 135 S.Ct. at 2558; *see also Grayned*, 408 U.S. at 109 ("[a] vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application").

> b.  The Definition of "Terrorism" Under the FRAA is
>     Unconstitutionally Void for Vagueness as Applied to Efforts to
>     Join ISIL

The FRAA definition of terrorism, while closer to the traditional understanding of terrorism as a political act aimed at a government, also suffers from a vagueness problem, as applied to the defendants' alleged conduct.  The FRAA defines terrorism as "premeditated, politically motivated violence perpetrated against noncombatant targets by *subnational groups* or *clandestine agents*."  22 U.S.C. § 2656f(d)(2) (emphasis added).   Merriam-Webster's dictionary defines "subnational" as the adjective of "subnation," which is "a subdivision of a nation often distinguished by community of

culture and interests rather than by administrative dependency."[47]  Collins English

Dictionary similarly defines "subnational" as "of a region within a nation."[48]  The

problem with this definition, as applied to ISIL, is that there is ambiguity and vagueness

about ISIL's status.  It has proclaimed itself a sovereign state, and as noted above,

scholars and commentators have pointed out the disconnect in applying the "terrorist"

label to an entity that controls territory, enforces law, provides services to the population

in its territory and possesses a conventional army.  *See*, pp. 5 to 8, above. Indeed, there is

a strong argument that ISIL's status us closer to that of a nation state than a subnational

group.  Under international law, there are four prerequisite qualities of statehood:

territory, population, government, and recognition.  *See* Andrew Clapham, *Brierly's Law

of Nations*, 7th ed., 2012, 149-157.  ISIL has at the very least a claim to having the first

three qualities.  Moreover, while it has not received recognition from any state or

international entity, it has received recognition from thousands of individuals across the

world.  At the very least, there is ambiguity as to whether ISIL is a "subnational" group,

rendering the terrorist label vague when applied to ISIL.  As such, the material support

statute in the context of individuals' alleged plans to travel to it and join ISIL fails to

"define the criminal offense [.] with sufficient definiteness that ordinary people can

understand what conduct is prohibited."  *Kolender*, 461 U.S. at 357.[49]  The vagueness

concerns in defining ISIL as a terrorist organization are particularly heightened here

given the ages and vulnerability of the defendants.

---

[47] *See* http://www.merriam-webster.com/dictionary/subnation.
[48] *See* http://www.collinsdictionary.com/dictionary/english/subnational.
[49] We submit that the concept "clandestine agent" patently does not apply to ISIL, which has very
publicly assumed control and organization of territory and population in Iraq and Syria.

C.     The Definition of "Material Support" in the Form of Personnel
       is Void for Vagueness as Applied to Efforts to Join ISIL

Section 2339B makes it unlawful to "provide[ ] material support or resources to a

foreign terrorist organization, or attempt[ ] or conspire[ ] to do so...." 18 U.S.C.

§ 339B(a)(1). In 2004, Congress passed the Intelligence Reform and Terrorism

Prevention Act (IRTPA), which amended § 2339B in several key ways, including the

concept of material support in the form of "personnel."  Specifically, to address

vagueness and overbreadth challenges, IRTPA delimited the prohibition on providing

"personnel," by specifying that § 2339B(a) criminalizes the provision of "personnel" to a

foreign terrorist organization only where a person, alone or with others, "[work]s under

that terrorist organization's direction or control or . . . organize[s], manage[s],

supervise[s], or otherwise direct[s] the operation of that organization."  18 U.S.C.

§ 2339B(h).  Section 2339B(h) also states that the ban on "personnel" does not

criminalize the conduct of "[i]ndividuals who act entirely independently of the foreign

terrorist organization to advance its goals or objectives." *Id.*

In interpreting § 2339B, as amended by IRTPA, the Supreme Court made clear in

*HLP* that the "personnel" prong of the material support statute does not encompass acts

of independent advocacy, nor does it cover mere membership of ISIL.  *See HLP*, 561

U.S. at 18, 24; *see also Scales v. United States*, 367 U.S. 203, 220-22 (1961) (person

could not be convicted under statute that prohibited membership in a group advocating

the violent overthrow of the government unless he had knowledge of the group's illegal

advocacy and a specific intent to bring about violent overthrow).  The dividing line,

however, between mere membership and being subject to control and direction is difficult

to demarcate in the context of ISIL.  ISIL proclaims itself a state.  Moreover, there is a

reasonable argument to be made that it is *de facto* a state. At the very least, its status as an actual, transitioning or simply aspiring state is ambiguous and vague. Arguably, any one who "joins" it or even travels within its borders is consenting to its direction and control. As such, mere membership and association (which are not crimes under *HJP* and *Scales*) become "material support" in the form of personnel, which are. Mere travel to Syria, or willingness to "join" ISIL, cannot constitutionally be equated with material support under *Scales* and *HLP*. Accordingly, the material support statute is void for vagueness as applied to the charged conduct.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that their motion to dismiss Counts One through Four of the indictment be granted.

Dated: August 7, 2015                              MURRAY LAW, LLC

                                                   By:  *s/JaneAnne Murray*
                                                   JaneAnne Murray, #384887
                                                   The Flour Exchange Building
                                                   310 Fourth Avenue South, #5010
                                                   Minneapolis, Minnesota 55415
                                                   Telephone: (612) 339-5160
                                                   jm@mlawllc.com

                                                   **ATTORNEY FOR HAMZA
                                                   NAJ AHMED**

Dated: August 7, 2015                              PAUL ENGH LAW OFFICE
                                                   By:  *s/Paul C. Engh*
                                                   Paul C. Engh, #134685
                                                   220 South Sixth Street, # 1225
                                                   Minneapolis, Minnesota 55402
                                                   Telephone: (612) 252-1100
                                                   engh4@aol.com

                                                   **ATTORNEY FOR ADNAN
                                                   ABDIHAMID FARAH**

Dated: August 7, 2015                    DELEON & NESTOR, LLC

                                         By: ___s/Bruce D. Nestor___
                                         Bruce D. Nestor, #0318024
                                         3547 Cedar Avenue South
                                         Minneapolis, Minnesota 55407
                                         Telephone: (612) 659-9019
                                         Facsimile: (612) 436-3664
                                         nestor@dnestlaw.com

                                         **ATTORNEY FOR
                                         ABDURAHMAN YASIN
                                         DAUD**

Dated: August 7, 2015                    FELHABER LARSON

                                         By: ___s/Jon M. Hopeman_____
                                         Jon M. Hopeman, #47065
                                         Marnie E. Fearon, #305078
                                         220 South Sixth Street, # 2200
                                         Minneapolis, Minnesota 55402
                                         Telephone: (612) 339-6321
                                         Facsimile: (612) 338-0535
                                         jhopeman@felhaber.com
                                         mfearon@felhaber.com

                                         **ATTORNEYS FOR
                                         ZACHARIA YUSUF
                                         ABDURAHMAN**

Dated: August 7, 2015                    GASKINS, BENNETT,
                                         BIRRELL, SCHUPP, LLP

                                         By: ___s/Andrew S. Birrell___
                                         Andrew S. Birrell, #133760
                                         Paul C. Dworak, # 391070
                                         333 South Seventh Street, # 3000
                                         Minneapolis, Minnesota 55402
                                         Telephone: (612) 333-9500
                                         Facsimile: (612) 333-9579
                                         abirrell@gaskinsbennett.com
                                         dworak@gaskinsbennett.com

                                         **ATTORNEYS FOR HANAD
                                         MUSTOFE MUSSE**

Dated: August 7, 2015                    MITCHELL, BRUDER &
                                         JOHNSON

                                         By: __s/Glenn P. Bruder_____
                                         Glenn P. Bruder, #148878
                                         7505 Metro Boulevard, Suite 325
                                         Edina, Minnesota 55439
                                         Telephone: (952) 831-3174
                                         Facsimile: (951) 831-3176
                                         gbruder@bruderlaw.com

                                         **ATTORNEY FOR GULED
                                         ALI OMAR**