UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case File No. 15-CR-49 (MJD/FLN)

United States of America,

       Plaintiff,

v.

Zacharia Yusuf Abdurahman,

       Defendant.

**POSITION OF DEFENDANT
ZACHARIA YUSUF ABDURAHMAN
WITH RESPECT TO SENTENCING
FACTORS**

Defendant Zacharia Yusuf Abdurahman, by and through his attorneys Jon M. Hopeman and Marnie E. Fearon of Felhaber Larson, respectfully submits this Position Pleading to the Court, pursuant to 18 U.S.C. §3553(a) and Rule 83.10(c) of the Local Rules of the United States District Court.

## BACKGROUND/STATEMENT OF FACTS

### A.    Zacharia Abdurahman.

Zacharia Abdurahman is 21 years old.  During the timeframe of the conspiracy, he was between 18 and 19 years old.  He is the oldest of seven children.  Mr. Abdurahman grew up in the Minneapolis area.  Mr. Abdurahman is a United States citizen, born in Minneapolis.  He is a member of the Somali community and he is a Muslim.  Growing up as a second generation immigrant posed challenges for him.  He described having an "identity crisis" of sorts.  He did not identify fully as "American" and did not identify fully as "Somali."  He was occasionally bullied by others as a result of being a Muslim.

His father recalls a time at a McDonald's restaurant where Mr. Abdurahman was spit at and told by strangers to go back where he came from.

Before his parents divorced in 2010, Mr. Abdurahman lived in neighborhoods that were rife with poverty and gang violence. During the time period of the events in this case, Mr. Abdurahman was living in Columbia Heights with his mother and his siblings. His father lived in Minneapolis. He had a close relationship with his family, often taking care of his younger siblings –



helping them with their homework and taking them to the park. He essentially acted as head of household.

Mr. Abdurahman has no prior meaningful involvement with the criminal justice system. He has two traffic citations. He was not a troublemaker in school. He recalls one or two fights in school related to sports.

Mr. Abdurahman enjoys reading, playing basketball and spending time with family. He has also always enjoyed volunteering and helping people. Mr. Abdurahman spent time volunteering with his father while growing up. They did things like work on a Habitat for Humanity project and work with refugees.



2

Mr. Abdurahman also helped his father with the Somali children's books his father is writing.  There is a need for children's books in the Somali language.  Some of those books are designed to help Somali children integrate into Western society.



Mr. Abdurahman went to high school at Heritage Academy in Minneapolis, an all-Somali public school.  Following his graduation from high school, he enrolled as a student at Minneapolis Community and Technical College where he was attending classes until his arrest.  His goal was to work in computer sciences.  At the same time he was working as a security guard at a women's shelter.  He is a practicing Muslim and attended services at a number of local mosques.

**B.      The Offense.** [1]

Mr. Abdurahman has been friends with some of his co-defendants for years.  They grew up together, went to school together and played basketball together.  Others he met through his friends.  Mr. Abdurahman has always had an intellectual curiosity and is an

---

[1] Mr. Abdurahman adopts the description of the offense reflected in the "Offense Conduct" section of the Presentence Investigation Report.

avid reader.  He started reading about the Syrian conflict when it began in late 2010 and was troubled by the atrocities being committed against the Sunni people, especially women and children, by the Assad regime.  Over time, he decided that he wanted to help. He felt a duty to come to the aid of his fellow Muslims.

Early on, Mr. Abdurahman was not interested in any particular organization.  He began talking with his friends about the issues and seeking out information on the internet.  In March of 2014, Hanad Mohallim left for Syria.  After that time, Mr. Abdurahman began meeting more regularly with his co-defendants.  In May of 2014, Abdi Nur successfully left for Syria.  It was Mr. Nur's departure that solidified Mr. Abdurahman's resolve to join ISIS.

Mr. Abdurahman actively participated with his co-defendants in making plans to travel to join ISIS.  They met regularly to discuss their plans.  They discussed plans for obtaining money and passports, travel routes and how to conceal their efforts.  Mr. Abdurahman watched ISIS propaganda and videos both alone and with his co-defendants. In November of 2014, Mr. Abdurahman and three of his co-defendants took a bus to New York and then attempted to board a plane in an effort to get to Syria.  Mr. Abdurahman was turned away when he attempted to check in for his flight.  He then traveled to Chicago where he spent a couple of days with extended family and Abdirizak Warsame before returning to Minnesota.

When Mr. Abdurahman returned to Minnesota, he and his parents were visited at his mother's home by FBI agents.  He was given a target letter.  At that time he lied to the FBI agents about his recent travel.  He also lied to his parents and continued to take steps

to conceal his actions from his parents.  After that visit, he took a short break and then resumed planning with his co-defendants.  They discussed alternative means of travel. They also discussed obtaining fake passports.  By this time Mr. Bashir was recording his interactions with the defendants so many of the conversations were on tape.  Having already received target letters, the defendants were feeling more desperate.

Ultimately they decided to get fake passports from Mr. Bashir's contact, who was an undercover FBI agent.  Mr. Abdurahman provided his photograph to Mr. Bashir for his passport along with $100 for Mohamed Farah's passport.  Mr. Abdurahman asked for his photograph back when he started feeling as though they may get caught.  Mr. Abdurahman was arrested in April of 2015, at approximately the same time that Guled Omar and Mohamed Farah were arrested in San Diego.

Mr. Abdurahman acknowledges that he took significant steps in furtherance of the conspiracy to travel abroad and join ISIS.  However, it is also important to outline what Mr. Abdurahman did not do.  Mr. Abdurahman provided ideas and active participation but he was not elected or appointed emir of the group.  He never possessed a weapon or fired a gun.  Mr. Abdurahman has never made any threats against law enforcement, despite his frustration with their surveillance.  Mr. Abdurahman never discussed committing any acts of terrorism on U.S. soil and did not plan any acts of domestic terrorism.  He did not attempt to recruit others to the cause.  He did not send any money abroad to support ISIS, he did not send any equipment to ISIS, and he did not purchase combat gear, tactical vests, boots or weapons.  Mr. Abdurahman did not pledge allegiance to ISIS.

5

### C.     Post-Arrest.

Following Mr. Abdurahman's arrest, he has remained incarcerated.  As a result, he has had a significant amount of time to reflect on his offense.  At first, Mr. Abdurahman found it very difficult to see the truth about ISIS and its activities.  It was initially difficult to give up the beliefs that he held so strongly for the year prior to his arrest.  However, Mr. Abdurahman spent a lot of time reading and talking to his family and others and came to see ISIS for who they truly are.  Mr. Abdurahman is ashamed of his actions and feels like he betrayed his family and community.

While incarcerated, Mr. Abdurahman has sought out reading materials, specifically books about individuals who have joined terrorist organizations, served time and have since successfully rejoined the community.  He started with <u>Radical: My Journey Out of Islamic Extremism</u>, by Maajid Nawaz.  It was difficult to locate other autobiographies specifically involving terrorism so Mr. Abdurahman requested books regarding other criminals that have served time and successfully re-entered society, e.g., <u>Manchild in the Promised Land</u>, by Claude Brown, <u>In the Place of Justice</u>, by Wilbert Rideau, and <u>Down These Mean Streets</u>, by Piri Thomas.  In addition, although there is limited programming in jail, Mr. Abdurahman took advantage of the opportunity to attend several anger management classes and independently engaged in interfaith dialogue with other inmates.  Mr. Abdurahman has expressed that the interfaith dialogue, in particular, has helped open his eyes to other ways of thinking.

Following his guilty plea, Mr. Abdurahman made the decision that he did not want to testify at the trial of his co-defendants.  He did offer to participate in a debriefing by

the government and agreed to share everything he knew, but the prosecutors were understandably busy preparing for trial and the meeting did not take place. Notwithstanding, Mr. Abdurahman did not simply plead guilty and sit back to wait for sentencing. Rather, after taking time to critically reflect over the past year and a half, he has decidedly taken a stance against ISIS and what it stands for. One way he did that was to authorize his counsel to file an affidavit regarding the activities of Sheikh Hassan Jami. Dkt No. 394. Hassan Jami was a member of Mohamed Farah's defense team. Hassan Jami was aware that Mr. Abdurahman and co-defendant Adnan Farah intended to plead guilty. Prior to the guilty plea, Hassan Jami met with Mr. Abdurahman's father and Mr. Farah's father in an attempt to try to get them to convince their sons not to plead guilty. He said that no defendant should plead guilty, all defendants should stick together and go to trial and, if they did, good things would happen. Mr. Abdurahman and his family stood strong despite the pressure and Mr. Abdurahman pled guilty the following day. However, to Mr. Abdurahman's surprise, Hamza Ahmed and Adnan Farah, who both intended to plead guilty with Mr. Abdurahman, suddenly decided not to do so.

Some months later, the Government raised the issue of Hassan Jami having a conflict of interest in assisting in the representation of Mohamed Farah. The Government filed a motion for inquiry regarding the issue. Dkt No. 384. Various defendants responded to the motion with some requesting severance as a result of his involvement in the case. See e.g., Dkt Nos. 390, 395. In response to the Government's motion, Mr. Abdurahman authorized his attorney to file the affidavit with the Court to provide the Court with additional information regarding Hassan Jami's activities. Dkt No. 394. The

7

following day, the firm associated with Hassan Jami withdrew from their representation of Mohamed Farah.  Shortly after Hassan Jami's participation in the case ended, both Hamza Ahmed and Adnan Farah pled guilty.

Mr. Abdurahman was no passive observer when the issue of Sheikh Hassan Jami was raised.  When he learned of the issue he contacted his attorneys, who then visited him at the jail.  He informed them that he had received information from his father which proved that Sheikh Hassan Jami had approached both his father and Adnan Farah's father the day before his guilty plea and interfered with their respective decisions to plead guilty.  Mr. Abdurahman advised his attorneys of his surprise on the day he pled guilty to learn that Hamza Ahmed and Adnan Farah were not there to also plead guilty.  He advised his attorneys that the three of them had agreed to plead guilty, that it was Adnan Farah who convinced him to plead guilty, and that he hoped both Mr. Ahmed and Mr. Farah would be permitted to plead guilty to a fifteen year cap, the deal they were offered earlier.  Mr. Abdurahman urged his attorneys to interview his father to gather all information possible, and to give that information to the government and to the court.  His attorneys then did so.

Another way that Mr. Abdurahman has taken a stand against ISIS is his support of the anti-ISIS message in the Somali community. Following the trial in this case, many in the Somali community still believe that terror recruitment is not a problem, rather the defendants in this case were entrapped.  That narrative is harmful to efforts to combat the terror recruitment problem because those members of the community refuse to believe that there is a problem.  Mr. Abdurahman testified publicly at his plea hearing that he

understands what entrapment is and that he was not entrapped.  Tr. Sept. 17, 2015, p. 41-42.  In addition, he has supported United States Attorney Andrew Luger's efforts to reach out to the community with the same message.  When his family was asked to participate in a panel discussion at the U.S. Attorney's office with community members to combat that narrative, Mr. Abdurahman begged his family to do so.  Mr. Abdurahman's mother and sister, in particular, were apprehensive about speaking out in front of other community members.  But they decided to do so as a result of Mr. Abdurahman's requests.  See *Family of man who pleaded guilty in Minnesota ISIL case says radicalization is a reality in Twin Cities*, StarTribune, June 21, 2016 (http://www.startribune.com/family-of-man-who-pleaded-guilty-in-recruitment-trial-say-radicalization-is-a-reality-in-twin-cities/383888311/).

Mr. Abdurahman remains close to his family.  They have continued to provide support and have visited him at least weekly since his arrest in April of 2015.  In excess of a dozen family and community members wanted to speak with Mr. Koehler in support of Mr. Abdurahman, they included: Ayan Abdurahman, Yusuf Abdurahman, Ridwan Abdurahman, Ikraan Abdurahman, Khader Abdurahman, Ikran Salat, Anab Abdi, Abdirashad Jama, Mohamed Adan, Lul Adan, and Alice Dillon.  Ultimately only Ayan, Ridwan, Ikraan and Yusuf Abdurahman were able to speak to Mr. Koehler.  Mr. Abdurahman feels ashamed about what he has done.  He believes he has disgraced his family and his community.  He now has to live with the stigma of being labeled a "terrorist" and the fear and shame that comes with that label.  At some point in the future, when he has the opportunity, Mr. Abdurahman wants to mentor children and help ensure

they do not take the same path he chose.  Several months ago, Mr. Abdurahman had a conversation with his sister that she recorded.  Mr. Abdurahman had a message for the community.  He said, in part, that one thing he would like to do when he is released is "go back to my community with all the things I've learned and also make a big impact."

## OBJECTIONS TO THE AMENDED PRESENTENCE INVESTIGATION REPORT

Mr. Abdurahman's objections to the Presentence Investigation Report ("PSR") were largely resolved with the amendment.  There is one remaining point of clarification.  On Page 22, Paragraph 81, there is a description of the video Upon the Prophetic Methodology which provides that the video depicts the execution of Shia Muslims.  It is more accurate to say "Shia Muslim soldiers."

Mr. Abdurahman has several remaining objections to the Addendum drafted by Daniel Koehler.  Those objections are addressed in the "Daniel Koehler" section below.

## DANIEL KOEHLER [2]

Mr. Abdurahman met for less than 1.5 hours with Mr. Koehler in April of 2016.  This was their only meeting.  Mr. Abdurahman's father, mother and two of his siblings (Ridwan and Ikraan) met with Mr. Koehler for a combined total of 1.5 hours.

---

[2] Mr. Abdurahman objects to the statement at Pages DK.3 and DK.4 of Mr. Koehler's addendum.  The paragraph that leads from page DK.3 to DK.4 reads, in part, "[T]he defendant claims to have stopped watching ISIL videos and distanced himself from the conspiracy.  Both claims have been disproven through other testimonies and the defendant's own plea agreement."  According to counsels' notes taken during Mr. Abdurahman's meeting with Mr. Koehler, Mr. Abdurahman told Mr. Koehler he took a short break and then got back with his co-defendants.

Mr. Koehler has assessed Mr. Abdurahman as having a medium to high risk of future offending.  Mr. Koehler was clear this was a "qualitative analysis."  In other words, Mr. Koehler's analysis is subjective, based solely on a comparatively short interview with Mr. Abdurahman, meetings with Mr. Abdurahman's family, meeting with Probation, interviews with the prosecutors, reviewing evidence from the trial, reviewing social media and reading media accounts.

Mr. Koehler testified that it was important to meet with the defendant before doing anything else, so that his opinions were untainted.  He called it a "grounded theory" which involves putting "the interviews, the data collection, first before you do any research or literature review or look at the documents to assure, as far as you can, objectivity and allow the individuals to tell their stories the way they want." Tr. Sept. 20, 2016 at p. 59-62.  However, in Mr. Abdurahman's case, Mr. Kohler not only interviewed family members, he also reviewed media reports and documents provided by probation and pretrial services prior to meeting with Mr. Abdurahman and determining his "risk." Id. at p. 161-163.

The risk level assigned to Mr. Abdurahman attempts to gauge Mr. Abdurahman's risk of offending in the future.  However, there is really no empirical data to support recidivism rates or degrees of radicalization. Id. at p. 159.  Consequently, what the rating boils down to is one person's attempt to predict someone's likelihood of reoffending after meeting with them for less than 90 minutes with no empirical data to support the conclusion.  Unfortunately, in Mr. Abdurahman's case, Mr. Koehler was unable to meet with Mr. Abdurahman first so Mr. Koehler's impressions of Mr. Abdurahman and his

"risk" assessment is colored by case materials, other interviews and media accounts. Rather than focus on this arbitrary rating, which attempts to forecast the future with no evidentiary support, it is far more informative to focus on the opinions for which Mr. Koehler does have support.

Mr. Koehler has dedicated many years of his life to deradicalization efforts and has at least anecdotal evidence that his methods are effective. Given his experience working with individuals on deradicalization, Mr. Koehler has found that "Mr. Abdurahman has shown the most important requirements for starting an intervention, which are credible remorse and (albeit very small) cognitive openings." He further found that "Mr. Abdurahman shows great commitment to caring for his family, and they in turn display great emotional attachment and willingness to assist in any form of counseling is a factor that needs to be taken into (positive) account." In fact, according to Mr. Koehler, family involvement is critical to successful rehabilitation. Id. at p. 32 ("Actually, successful reintegration, successful counter-radicalization always has to include the family perspective, the community perspective. It does not work without that.").

Mr. Abdurahman's family is particularly well equipped to provide support to him. By way of examples, his father, Yusuf Abdurahman, is a community leader. He speaks five languages. He has traveled the world. Yusuf Abdurahman has embraced the American culture yet maintained his identity as a Somali and a Muslim. He has spoken out at community meetings and to news outlets. See e.g., 60 Minutes, *In God's Name*, aired October 30, 2016 ("We didn't know what was happening at the time. You know, I'm a parent that his kid is in jail now. You know, I'm sorry what he's going through.

But, you know, I'm very glad that he's here. I'm very glad that he was careful, that he was stopped . . . . He's alive.") Mr. Abdurahman's mother works full time and cares for her seven children. She drives children to and from school. Mr. Abdurahman's sister Ikraan is a student at Minneapolis Community and Technical College. She is just as connected as her father. She is on the pulse of issues facing the Somali and Muslim communities and is a leader in numerous organizations.

Mr. Kohler believes that Mr. Abdurahman's radicalization process started in 2010 when he began to seek out information about the Arab spring. He was only 15 years old at the time. However, Mr. Kohler notes that Mr. Abdurahman did not initially differentiate the groups fighting (which ultimately included the United States military) in any way. Mr. Kohler also testified that reading about the conflict does not, in and of itself, cause someone to start a radicalization process. Id. at p. 168. He further agreed that the oppression of the Assad regime is universally viewed as a concern. Id. at p. 176.

In Mr. Koehler's report he claims that Mr. Abdurahman currently does not critically reflect upon the ideological goals of ISIS but merely tactical differences. Mr. Koehler testified that some of those ideological views are violence in performing jihad, intolerance of others unlike one's self, and a lack of tolerance for opposing world views. Id. at p. 170-171. However, Mr. Abdurahman's actions evidence that he has started critically reflecting upon ISIS's ideology. He has chosen to engage in interfaith dialogue with other inmates. He remarked that, through that dialogue, he has been able to gain an understanding of other individuals and their views. He expressed that he now has an understanding that he can provide help in forms other than joining an organization like

ISIS.  He believes he can help locally and that the ability to help people is a blessing.  He further described that, although at first it was hard to let go of his commitment to ISIS, after time and reflection he realized it was not what he thought it was.  Moreover, he identified with those individuals who have joined terrorist organizations, served time and resumed normal lives and has sought to read their stories. Id. at p. 171-177.

As a result of his remark that Mr. Abdurahman does not critically reflect on ISIS's ideology, Mr. Koehler concludes that the jihadi narrative must be still very attractive to him and can easily point him to other groups.  Mr. Koehler reaches this conclusion despite the fact that Mr. Abdurahman has not expressed an attraction to any other terrorist organization and has not expressed a continuing interest in the jihadi narrative.  Mr. Koehler's conclusion is particularly confusing in light of his testimony regarding what attracts young people to ISIS in the first place.

> Absolutely, that would be one of the main driving factors, the attraction points why youngsters or adolescents or even adults join the Islamic State or ISIL because, first of all, they think they have a true state.  They have established a real state with a real government with a health system, educational system, with their own license plate, own currency, they control the territory, they have their own taxation system, so they think it is a true state.  They have the caliphate.  **The others never accomplished that.**  That is a very strong attraction point.

Id. at p. 45 (emphasis added).  Given the traits that attract individuals to ISIS in the first instance, it is unlikely that Mr. Abdurahman would turn to any other terrorist organization and his reflections and feelings of betrayal make it unlikely that he would turn back to ISIS.

1717300.v1

Finally, despite Mr. Koehler's belief that Mr. Abdurahman has not yet begun to critically reflect on ISIS's ideology, he still recommends a reduced prison sentence. Mr. Koehler feels so strongly about this recommendation that he believes if it is not possible to provide Mr. Abdurahman with the recommended counseling while in prison, that he be released to a halfway house to serve his sentence. Mr. Koehler's opinion is that Mr. Abdurahman has shown indicators of success for deradicalization. <u>Id.</u> at p. 184. They include clearly present and visible cognitive openings, remorse and strong family and community ties. <u>Id.</u> In fact, Mr. Koehler believes that "in the case of Mr. Abdurahman, there are enough openings for a good counseling plan, a solid counseling plan, and for mentors to work with, so I believe that there would be an end goal – there would be a chance of success with enough time and resources." <u>Id.</u> at p. 185.

## <u>ANALYSIS OF SENTENCING FACTORS</u>

The United States Supreme Court in <u>United States v. Booker</u>, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed. 2d 621 (2005) invalidated 18 U.S.C. §3553(b)(1), thus making the United States Sentencing guidelines advisory. Subsequent to <u>Booker</u>, <u>Gall v. United States</u>, 128 S.Ct. 586 (2007) held that the United States Sentencing Guidelines are only the starting point and the Court should consider "all of 18 U.S.C. §3553(a)'s factors" to determine whether they support either party's proposal. <u>Id.</u> at 596-97. The Court may not presume that a guideline sentence is reasonable but must make its own individual determination. When the Court imposes a sentence outside the guidelines it should consider "the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of variation." <u>Id.</u>

1717300.v1

Title 18, U.S. Code Section 3553(a) requires the Court to impose a sentence that is "sufficient, but not greater than necessary" to achieve the goals of sentencing.  The range at best reflects only a "rough approximation" of what "might achieve Section 3553(a)'s objectives." <u>Rita v. United States</u>, 551 U.S. 338, 350 (2007).  A downward variance has always been permitted if there are "mitigating circumstance[s] of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission." U.S.S.G. §5K2.0.

The Court now "may vary [from the Guideline ranges] based solely on policy considerations, including disagreements with the Guidelines." <u>Kimbrough v. United States</u>, 552 U.S. 85, 101 (2007)(quotations and citations omitted).  The judicial determination of reasonableness controls over the Guidelines or any specific policy directive of Congress that may call for harsher sentences. <u>Id.</u> at 108-09.

The court, in determining the particular sentence to be imposed, shall consider, among other things:

    (1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

    (2)    the need for the sentence imposed –

        (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

        (B)    to afford adequate deterrence to criminal conduct;

        (C)    to protect the public from further crimes of the defendant; and

        (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

16

(3)     the kinds of sentences available;

* * *

(6)     the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)     the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a); see also Booker, 125 S.Ct. at 757 (Booker requires courts to fashion an appropriate sentence, considering: the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to advance institutional integrity, provide deterrence, protect the public, and rehabilitate the defendant; and the kinds of sentences available, including the guidelines range).

Sentences varying from the guidelines range . . . are reasonable so long as the judge offers appropriate justification under the factors specified in 18 U.S.C. § 3553(a). Id.; see also United States v. Gatewood, 438 F.3d 894, 896 (8th Cir. 2006).  Here, there are appropriate and reasonable justifications under §3553(a) to vary the sentence downward from the guidelines range.

**A.     The nature and circumstances of the offense and the history and characteristics of the defendant.**

Mr. Abdurahman submits that a downward variance from the sentencing guidelines would be reasonable under "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. §3553(a)(1).  The following demonstrates that a downward variance is warranted:

17

1. Mr. Abdurahman's criminal history score substantially over-represents the seriousness of his criminal history and the likelihood that he will commit other crimes. Mr. Abdurahman's criminal history score can serve as grounds for a departure and grounds for a variance. U.S.S.G. §4A1.3(b)(1); See United States v. Shy, 538 F.3d 933, 938 (8th Cir. 2008). Mr. Abdurahman has a criminal history score of 0, resulting in a criminal history category of I. He has two petty misdemeanors on his record. However, because the offense involved a federal crime of terrorism, Mr. Abdurahman's criminal history category is bumped to VI. The enhancement is universally and mechanically applied. There are no offender characteristics taken into account when applying the enhancement. There is no consideration for the fact that Mr. Abdurahman has no history of violence, that he did not use or possess any weapons, that he did not make threats against law enforcement, and that he did not plan acts of domestic terrorism.

2. Mr. Abdurahman was a central figure in the lives of his younger siblings. United States v. Jaroszenko, 92 F.3d 486 (7th Cir. 1996) (court has authority to consider, without limitation, any information about defendant's background, character and conduct). Mr. Abdurahman is the eldest of seven children. The family depended on him to help with the younger children, caring for them while his mother was at work. He also worked at night while going to school, helping his mother financially. The family has suffered a huge loss in Mr. Abdurahman's absence and his inability to contribute has had a profound effect.

3.     Mr. Abdurahman's desire to help youth and give back to his community.  Mr. Abdurahman has had an awakening of sorts.  He has had an opportunity to reflect on ISIS and its activities and is aghast at what he has found.  While he agrees that he certainly should have recognized the atrocities earlier, he did not.  However, soon after Mr. Abdurahman made the decision to plead guilty, he expressed a strong desire to speak against ISIS.  He also desires to one day mentor youths in his community.  Mr. Abdurahman does not want to see others take the path that he chose.

4.     Mr. Abdurahman's age can also serve as grounds for a departure and grounds for a variance. U.S.S.G. §5H1.1; See Jaroszenko, 92 F.3d 486.  There is an in-depth discussion of the development of the adolescent brain in the parties' Joint Defense Sentencing Memorandum.  Dkt No. 703.  The analysis is particularly compelling in cases like this one where the defendant has not shown an underlying propensity for violence, has shown credible remorse and expresses a sincere desire to turn away from such conduct in the future.

**B.     The need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and to protect the public from further crimes.**

A downward variance in the sentence would ". . . reflect the seriousness of the offense, . . . promote respect for the law, and . . . provide just punishment for the offense." 18 U.S.C. §3553(a)(2)(A).  Mr. Abdurahman is a young man that committed a very serious offense.  However, he is a non-violent offender.  He has demonstrated respect for the law and this Court.  Despite the fact that he knew he was being followed

by law enforcement and was frustrated by it, he never made any threats against law enforcement or attempted to take any action against them.  Not only has Mr. Abdurahman never made a threat against law enforcement, he has never made a threat against anybody.  He never expressed a desire to commit an act of domestic terrorism and there is no evidence that he would do so in the future.  In addition, Mr. Abdurahman has expressed credible remorse about his crime and has expressed a desire to take a stand against ISIS and its ideals.  A downward variance is reasonable because a 15 year sentence is not necessary to protect the public from further criminal activity.  18 U.S.C. § 3553(a)(2)(C).

### C.    The kinds of sentences available.

Mr. Abdurahman agrees with the PSR's analysis of the kinds of sentences available in terms of custody, supervised release, probation, fines, and restitution.

### D.    The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

To reduce disparity, the Court is justified in granting a reasonable downward variance from the guideline range.  "Congress' basic statutory goal – a system that diminishes sentencing disparity – depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction." Booker, 543 U.S. 250.

The guidelines range as calculated in the PSR calls for a sentence of 15 years.  The government has provided periodic reporting regarding the sentences imposed against other defendants convicted under 18 U.S.C. §2339.  The most recent iteration expands

the group of defendants but still fails to include convictions for false statements in violation of 18 U.S.C §1001. Dkt No. 663, p. 2.   The government's rationale for excluding false statement cases is the argument that "those cases **can** cover offender behavior that is far removed from the provision of material support to terrorists."   Id. (emphasis added).   However, the statute is not so narrowly tailored as to require consideration of only individuals who have been convicted under the same statue. Rather, it requires consideration of defendants with "similar records" who have been found guilty of "similar conduct."   Many of the defendants convicted of a false statement count have engaged in **conduct** that is similar to the conduct in this case.   Consequently, it is necessary to cast a wider net in reviewing sentences imposed against other defendants.   Where the underlying conduct is similar, the false statement cases should not be excluded simply because the government decided to offer a more lenient plea deal in those cases.

Mr. Abdurahman's counsel located four defendants sentenced for a conviction of a false statement count related to the provision of material support to a designated terrorist organization.   Factual summaries of those cases are included below.   The facts were primarily taken from complaints, indictments and plea agreements.   Also included is a factual summary for a defendant who pled guilty to a single count of violation of 18 U.S.C. §2339B and has an agreed-upon sentence set forth in the plea agreement.   Finally, there are two additional defendants that were sentenced under 18 U.S.C. §2339 subsequent to the government's last submission.

1717300.v1

### *United States v. Ramic*
### **Eastern District of Missouri, 4:15-cr-49**

Jasminka Ramic was convicted of one count of conspiracy under 18 U.S.C. §371. Defendant Ramic facilitated the provision of currency and property to support ISIS. The property included combat boots, military surplus goods, tactical gear and clothing, firearms accessories, optical equipment, range finders, rifle scopes and equipment. Defendant Ramic sought out and identified supporters and coordinated receipt of donations. Defendant Ramic also contributed her own money and facilitated travel for others. On January 5, 2016, Defendant Ramic was sentenced to 36 months in prison and 3 years supervised release.

### *United States v. Heather Coffman*
### **Eastern District of Virginia, 3:15-cr-16**

Heather Coffman was convicted of one count of making a false statement under 18 U.S.C. §1001(a). Defendant Coffman was suspected of conspiring and attempting to provide material support to ISIS. Defendant Coffman posted pro-ISIS messages on her Facebook page. Defendant Coffman arranged travel for other individuals using her legitimate contacts overseas. Defendant Coffman engaged in recruiting activities and lied to federal agents about her activities. On May 11, 2015, Defendant Coffman was sentenced to 54 months in prison and 3 years supervised release.

### *United States v. Bilal Abood*
### **Northern District of Texas, 15-cr-256**

Bilal Abood was convicted of one count of making a false statement under 18 U.S.C. §1001(a). Defendant Abood is fluent in Arabic and English. Defendant Abood

22

attempted to fly to join the Free Syrian Army and lied to federal agents about his activities but later admitted he lied.  Defendant Abood continued to watch jihadi videos and a few weeks later he left for Syria.  Defendant Abood stayed in Syria for a period of time before returning to the United States.  He claims that when he was Syria he spent time at a training camp and pledged an oath to ISIL.  Defendant Abood was active on Twitter, posting pro-ISIL messages.  On May 25, 2016, Defendant Abood was sentenced to 48 months in prison and 3 years supervised release.

### United States v. Kodaimati
### Southern District of California, 3:15-cr-1298

Mohamad Saeed Kodaimati was convicted of one count of making a false statement under 18 U.S.C. §1001(a).  Defendant Kodaimati was in Syria and Turkey from approximately 2012 to 2015. 3:15-cr-1298, Dkt No. 1, Complaint at p. 9.  He was denied boarding when he attempted to return to the United States. Id.  Defendant Kodaimati worked for the Sharia Court. Id. at p. 10-11.  Defendant Kodaimati utilized his weapon in fighting while abroad. Id. at 18-23.  On March 14, 2016, Defendant Kodaimati was sentenced to 96 months in prison and 3 years supervised release.

### United States v. Khan
### Northern District of Illinois, 1:14-cr-564

Mohammed Khan was convicted of one count of providing material support to a foreign terrorist organization under 18 U.S.C. §2339B(a)(1).  Defendant Khan planned to join ISIL with two younger siblings who were both minors at the time.  Defendant Khan communicated with ISIL and purchased three tickets to travel abroad.  Defendant Khan was arrested when he went with his younger siblings to the airport and attempted to board

a plane.  Defendant Khan has not yet been sentenced.  However, he entered into a plea agreement with the government that provides for agreement to recommend a term of imprisonment of 60 months and at least 15 years of supervised release.  Defendant Khan is scheduled to be sentenced on November 18, 2016.

### *United States v. Hasan Edmonds*
### **Northern District of Illinois, 1:15-cr-149**

Hasan Edmonds was convicted of two counts of violating 18 U.S.C. §2339B(a)(1). H. Edmonds was a member of the Army National Guard. 1:15-cr-149, Dkt No. 1, Criminal Complaint at ¶11.  He participated in planning an attack against a U.S. Military facility in Illinois. Id. at ¶7.  H. Edmonds had experience with firearms and came up with a strategy for attacking the military. Id. at ¶¶35-36.  H. Edmonds took an oath of allegiance to ISIS and booked tickets to travel abroad. Id. at ¶¶31, 69.  H. Edmonds claimed that either he would make it abroad or bring the flames of war to the heart of this land. Id. at ¶27.  On October 14, 2016, H. Edmonds was sentenced to 360 months in prison and 20 years supervised release.

### *United States v. Jonas Edmonds*
### **Northern District of Illinois, 1:15-cr-149**

Jonas Edmonds was convicted of one count of conspiring to provide material support to a foreign terrorist organization under 18 U.S.C. §2339B(a)(1) and one count of making a false statement under 18 U.S.C. §1001(a).  J. Edmonds participated in planning an attack against a U.S. Military facility in Illinois. Id. at ¶7.  J. Edmonds had a prior felony conviction for which he served time. Id. at ¶29.  J. Edmonds also pledged

allegiance to ISIL. Id. at ¶31.  On October 14, 2016, J. Edmonds was sentenced to 252 months in prison and 20 years supervised release.

The conduct of defendants *Ramic*, *Abood*, *Khan*, *Coffman*, *Wolfe*, and *Conley* is most similar to the conduct in this case.  Defendant Ramic did not attempt to leave the United States.  However, she did facilitate the travel of others. 4:15-cr-49, Dkt No. 2, Indictment at ¶¶2, 13, 17.  She provided money and supplies to support terrorism and she solicited others to do so as well. Id.  She apparently did not pledge an oath of allegiance, make any threats of violence or possess any weapons.  One factor that distinguishes Defendant Ramic from Mr. Abdurahman is that, apparently, she did not express a willingness to fight on behalf of a terrorist organization.  It is not known whether Defendant Ramic had an agreement to cooperate.

Defendant Abood was active on social media, posting pro-ISIS messages, and watched ISIS propaganda. 3:15-cr-256, Dkt No. 33, Superseding Indictment at ¶4.   He also attempted to travel but was prevented from doing so the first time. Id. at ¶3. What differentiates Defendant Abood from Mr. Abdurahman is that the second time he planned to travel he was successful and spent time in Syria, reportedly at a training camp, before returning to the United States. Id. at ¶4.  It does not appear that Defendant Abood had a cooperation agreement.

Defendant Khan had contacts with ISIS and planned to travel abroad to join ISIS. He was prevented from traveling when he arrived at the airport and was arrested. 1:14-cr-564, Dkt No. 81, Plea Agreement at ¶4.  Although little information is available about Defendant Khan, it is known that he attempted to bring his two minor siblings with him

25

to join ISIS. <u>Id.</u> at ¶¶3-4. As noted above, the parties agreed to a recommended sentence of 60 months. <u>Id.</u> at ¶12. However, Defendant Khan has not yet been sentenced so his actual sentence is currently unknown. Defendant Khan has agreed to cooperate. <u>Id.</u> at ¶11.

Defendant Coffman, similar to Defendant Ramic, did not plan to travel herself. Rather, she arranged for others' travel and put them in touch with her contacts abroad. 3:15-cr-16, Dkt No. 1, Criminal Complaint at ¶15. She posted pro-ISIS Facebook messages on social media. <u>Id.</u> at ¶¶6-13. She engaged in recruiting type activities and lied to federal agents about her activities. <u>Id.</u> at ¶¶15, 21. It does not appear that Defendant Coffman expressed a willingness to fight on behalf of a terrorist organization. She did agree to cooperate.

Defendant Wolfe attempt to travel abroad to join ISIS. He was arrested when he attempted to board an airplane. 1:14-cr-213, Dkt No. 1, Criminal Complaint at ¶29. Defendant Wolfe took significant steps in preparation for his travel. He participated in physical fitness training and practiced military maneuvers. <u>Id.</u> at ¶21. He obtained supplies for his use overseas. <u>Id.</u> at ¶¶10, 21. A significant distinguishing factor for Defendant Wolfe is that he not only planned to travel himself, but he also intended to bring his wife and children. <u>Id.</u> at ¶¶12, 14, 16. It does not appear that Defendant Wolfe had an agreement to cooperate.

Finally, Defendant Conley met a recruiter online. She desired to go to Syria and join ISIS. 14-cr-163, Dkt No. 37, Plea Agreement at ¶3. She was willing to fight for ISIS. <u>Id.</u> at ¶4. In preparation for her travel, she joined the U.S. Army Explorers, took

26

first aid training and firearms training. Id. at ¶¶6, 11. Defendant Conley was arrested at the airport when she tried to board a flight to Turkey. Id. at ¶¶9, 11. It appears Defendant Conley had an agreement to cooperate. Id. at p. 2.

The range of sentences in the above-described cases is 36 to 82 months. The average sentence is approximately 54 months. A departure is warranted in this case to avoid a disparity in sentences of other defendants who have engaged in similar conduct.

Most of the other cases cited by the government involve conduct that significantly differentiates those cases from Mr. Abdurahman's conduct.[3] Not all of those distinguishing factors were included in the government's summaries, consequently, some of those differences are highlighted below.

- *United States v. Nguyen* – Defendant Nguyen traveled to Syria, fought with opposition forces and had a confirmed kill. 2:13-cr-736, Dkt No. 83, Plea Agreement at p. 6.

- *United States v. Mohammed and Said* – Defendants Mohammed and Said were engaged in a conspiracy to recruit individuals to join terrorist organizations. 1:13-cr-20364, Dkt No. 3, Indictment p. 8-9.

- *United States v. Bell* – Defendant Bell recruited a juvenile to go with him and fight for ISIS. 3:13-cr-141, Dkt No. 91, Sentencing Order at p. 8. They created and completed their own training regime before traveling. Id. at 6. They created a

---

[3] This appears true from the materials that were available for review. For some of the cases, very little detail was available for public review. For example, there are not sufficient facts available for counsel to outline the underlying conduct of *Davis, Dandach, Hasbajrami, Young and Dakhlalla*.

promotional video. Id. at 7.  Defendant Bell possessed weapons and fashioned homemade explosives that he tested and refined. Id.

• *United States v. Kabir and DeLeon* – Defendants Kabir and DeLeon did not accept responsibility, rather they were convicted after trial.   They conspired to travel abroad and kill U.S. troops.

• *United States v. Morgan* – Defendant Morgan has a previous conviction for a violent offense. 1:14-cr-194, Dkt No. 12, Factual Basis at p. 1.  He created propaganda. Id. at p. 8.  He was in possession of weapons and he encouraged domestic acts of terrorism. Id. at p. 1-2, 7.

• *United States v. Amin* – Defendant Amin made efforts to convince an 18 year old to join ISIS and facilitated that individual's successful travel. 1:15-cr-164, Dkt No. 7, Statement of Facts at ¶¶9-19  He provided education on ways to provide financial support to ISIS using Bitcoin. Id. at ¶6.

• *United States v. Elfgeeh*  – Defendant Elfgeeh plotted to shoot and kill U.S. armed forces returning from Iraq and Shi'a Muslims in the Western District of New York. 6:14-cr-6147, Dkt No. 1, Criminal Complaint at ¶10.   He purchased weapons, silencers and ammunition. Id. at ¶16.  Defendant Elfgeeh discussed violence in the United States. Id. at ¶22.

• *United States v. Saadeh* – Defendant Saadeh expressed a belief that domestic terrorism is justified and that he was "going to do what he has to do." 2:15-cr-558, Dkt No. 1, Criminal Complaint at ¶¶26, 27.

- *United States v. Teausant* – Defendant Teausant expressed a desire to be a part of America's downfall. 2:14-cr-87, Dkt No. 1, Criminal Complaint at ¶26. He engaged in discussions regarding domestic terrorism. Id. at ¶¶30, 32. In discussing his mother, he said if he needed to kill her, he would kill her. Id. at ¶¶32, 35.

- *United States v. Elhuzayel* – Defendant Elhuzayel did not accept responsibility, rather he was convicted after a trial. Defendant Elhuzayel expressed public support for domestic terrorism. 8:15-cr-60, Dkt No. 1, Complaint at ¶¶16-17.

- *United States v. Brown and Jordan* – Defendant Jordan possessed weapons including an AK-47 and described that he would not be hesitant to use the weapon. 5:14-cr-58, Dkt No. 1, Criminal Complaint at ¶7. Defendant Jordan served as a physical fitness, firearms and tactics instructor. Id. at ¶8. Defendants Jordan and Brown discussed fighting both overseas and in the United States. Id. at ¶7.

- *United States v. Farrokh* – Defendant Farrokh, in a conversation regarding Syria, said he has no patience and wanted to go right away and "chop their heads." 1:16-cr-20, Dkt No. 2, Affidavit in Support of Criminal Complaint at ¶8. Defendant Farrokh pledged an oath of allegiance to ISIS. Id. at ¶23.

- *United States v. Pham* – Defendant Pham possessed and carried a Kalashnikov rifle. 1:12-cr-423, Dkt No. 3, Indictment at ¶3. Defendant Pham created online propaganda for al Qa'ida. Id. Defendant Pham took an oath of allegiance to al Qa'ida, obtained training, facilitated communications and provided expert advice and assistance in photography and graphic design of media. Id. at ¶4.

1717300.v1

**E.      The need to provide restitution to any victims of the offense.**

Mr. Abdurahman agrees with the PSR's analysis regarding restitution.

**F.      Additional Grounds for Downward Variance**

**1.      Conditions of Pretrial Confinement.**

Mr. Abdurahman has been in custody since April of 2015.  He does not breathe fresh air.  He has been housed in Elk River and Stillwater.  Both have been accommodating to counsel in its efforts to meet with Mr. Abdurahman and prepare for these proceedings.  However, the facilities are not designed for long-term housing.  They have few programs for inmates and few resources.  By way of example, Mr. Abdurahman's glasses have been broken for months, held together only with scotch tape. It took until October 25th to get Mr. Abdurahman an appointment for an eye examination. The facilities simply are not designed to handle such issues.

The long-term jail time in Stillwater and Elk River is much harder than any prison Mr. Abdurahman is likely to be sent to.  Several judges of this District, e.g., Judge Rosenbaum and Judge Frank, have awarded double credit for that reason.

**2.      Prison Stigma.**

Mr. Abdurahman is a marked man in prison, vulnerable as a result of the national publicity this case has incurred and the nature of the offense.  United States v. LaVallee, 439 F.3d 670,708 (10th Cir. 2006)(downward variance affirmed where defendant's adverse notoriety might cause him danger in the prison setting).  There are few words that instill more fear in the hearts of Americans than the word "terrorist."  Mr. Abdurahman

has already experienced the stigma of that label.  He accepts responsibility for his actions that have resulted in his receipt of that label.  However, he is vulnerable because of it.

### 3.    Assistance.

As discussed in Background/Statement of Facts, Section C, *supra*, Mr. Abdurahman has not provided formal cooperation to the government in terms of testimony at trial.  However, Mr. Abdurahman did provide substantial assistance in the form of (1) the affidavit he authorized his counsel to file regarding the activities of Hassan Jami that ultimately led to Hassan Jami's firm withdrawing from the case and guilty pleas of two additional defendants, and (2) supporting the United States Attorney's efforts to educate the community regarding the realities of terror recruitment in the Twin Cities.

### 4.    Deradicalization/Rehabilitation.

The prison system in the United States is not equipped to specifically address the unique attributes of defendants who are convicted of crimes related to terrorism.  Many of these defendants, like Mr. Abdurahman, are young, non-violent offenders with no criminal records.  There have been few options for rehabilitation and, as a result, some courts have found it necessary to impose sentences at or near the statutory maximum.  However, this Court has invested the time and resources in an attempt to find an alternative which led it to Daniel Koehler.  As discussed in the section entitled "Daniel Koehler," Mr. Koehler has worked on deradicalization for years with some measure of success.  Mr. Koehler recommends a reduced prison sentence for Mr. Abdurahman.  He

makes this recommendation, in part, because Mr. Abdurahman has the strong support of family and the community, essential components of a successful program.

The strength of Mr. Abdurahman's support cannot be overstated. Mr. Koehler remarked that Mr. Abdurahman shows a great commitment to caring for his family and they have a great emotional attachment to him and a willingness to assist in any form of counseling. Their support has been unwavering. Since Mr. Abdurahman's arrest, they have visited him at least weekly. They have participated in meetings with United States Attorney Andy Luger and have spoken out against ISIS at a community meeting he organized. Mr. Abdurahman's father, in particular, has made it his personal mission to help educate the Somali community regarding the dangers of terror recruitment. Mr. Abdurahman had more than 10 members of his immediate and extended family express a willingness and desire to meet with Mr. Koehler on his behalf.

Mr. Abdurahman's community support is also remarkable as evidenced by the release plan submitted on June 12, 2015. At least a dozen members of the Somali community have offered to spend their time working with Mr. Abdurahman and helping him succeed. More recently, Imam Makrem El Amin, has agreed to assist as well. Imam El Amin is from Masjid Am Nur, a mosque located in North Minneapolis. It is not a Somali mosque. Rather it is a heterogeneous mosque which is significant because Mr. Koehler recommends a mixed team of professionals who do not necessarily share the same cultural background as Mr. Abdurahman. Tr., Sept. 20, 2016, p. 95-96. It has a large number of programs and is well equipped to provide resources to Mr. Abdurahman.

Imam El Amin has agreed to mentor Mr. Abdurahman as a condition of his release if provided the opportunity.  Imam El Amin has reviewed Mr. Abdurahman's June 12, 2015 proposed release plan and is willing to provide the services described in the plan that were going to be provided by the Sufi Imam.  Counsel for Mr. Abdurahman is scheduled to meet with Imam El Amin next week to further discuss the proposal.  All other parts of the plea remain the same.

The release plan, with the substitution of Imam El Amin, is further justification for a downward variance in sentence.  The release plan can be implemented following Mr. Abdurahman's release from custody, during a period of supervised release.

## CONCLUSION

Based upon the foregoing, along with the record, pleadings, and argument at sentencing, Mr. Abdurahman grant his motion for downward departure and downward variance based upon the factors set forth in 18 U.S.C. §3553(a).

Dated: November 3, 2016                     FELHABER LARSON


By: *s/ Marnie E. Fearon*
      Jon M. Hopeman, #47065
      Marnie E. Fearon, #305078
220 South Sixth Street, Suite 2200
Minneapolis, Minnesota 55402
Telephone: (612) 339-6321

**ATTORNEYS      FOR      ZACHARIA ABDURAHMAN**