UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
NO. 15-49 (MJD/FLN)

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

ADNAN ABDIHAMID FARAH (3)

        Defendant.

**DEFENDANT ADNAN ABDIHAMID FARAH'S SENTENCING POSITION AND REQUEST FOR DOWNWARD DEPARTURE AND DOWNWARD VARIANCE FROM THE UNITED STATES SENTENCING GUIDELINES**

KENNETH UBONG UDOIBOK, P.A.

/s/Kenneth U. Udoibok
Kenneth U. Udoibok (#0262523)
Flour Exchange Building, Suite 5010
310 Fourth Ave. S.
Minneapolis, MN 55415
Phone: (612)808-6031
Fax: (612)808-6031
k@kenulaw.com

**ATTORNEY FOR DEFENDANT
ADNAN ABDIHAMID FARAH**

I.    **INTRODUCTION**

Defendant Adnan Abihamid Farah (hereinafter "Adnan Farah") by and through his attorney, respectfully submits his Sentencing Memorandum setting forth factors that this Court should consider in determining what type and length of sentence is sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. §3553(a).

Pursuant to the plea agreement and other factors that will be shown below, Adnan Farah moves this Sentencing Court for a departure or variance from the applicable United States Sentencing Guidelines (hereinafter "Guidelines").  He requests that the Court sentence him to serve his term in a halfway house wherein he can undergo counseling and be reintegrated into the general community.  A short sentence will afford him the opportunity to assist the Government in its effort of countering terrorist propaganda and recruitment in the United States.

This memorandum is respectfully submitted to address the fact that a lengthy 15 year sentence of imprisonment would not be appropriate and reasonable for Adnan Farah.  Considering Guidelines USSG §5H1.1, Adan Farah argues that his youthful age, along with other sentencing factors when compared to other terrorism defendants, is relevant in justifying a significant downward departure or variance from the Guideline in his case.

Adnan Farah was less than 16 years old when he began to fall into the spell of foreign terrorist propagandas.  While teenagers like him were playing basketball outside, Adnan Farah had fallen under the emotional control of terrorist propaganda videos.  He

was barely 17 years old when he committed the instant offense. In fact, he was just a week past his 18th birthday when he was arrested on charges related to terrorism. He is the youngest of all the defendants in this case and was easily manipulated by the Islamic State in Iraq, the Levant ("ISIL") propaganda videos, and was misguided by some unindicted adults in this case.

To show his rehabilitation, Adnan Farah met with the Government and provided an extensive proffer of his offense to agents investigating this case. He provided a compelling colloquy at his Change of Plea Hearing. Even at the writing of this memorandum, Adnan Farah ███████████████████████████████ ███████████████████████████

To show his commitment to the truth and his rehabilitation during his current jail term, Adnan Farah has taken the unusual steps of speaking publically about his offense and disavowing ISIL and other terrorist groups. He has publicly explained how he was mistaken in believing ISIL was a legitimate charitable organization. He has explained to the world his path of seeking to travel to Syria. Most off all, without consideration for his safety, he has publically expressed his desire to assist the Government in educating young people against joining ISIL or any other terrorist group.

It is important that this Court give consideration to Adan Farah's age in combination with other factors, such as the fact that his travel overseas was implausible; the presence of ███████████████████ his willingness to plead guilty despite the influence of ██████████████████████████████████ ███████████████████████████████████

3



These factors truly distinguish Adnan Farah from a typical terrorism defendant who has taken significant steps in furtherance and accomplishment of the conspiracy to provide material support to a terrorist organization. Even though Adnan Farah admitted to the offenses, his level of involvement in the conspiracy is not as significant when compared to other 18 U.S.C. §2339B(a)(1) defendants around the country or even this case.

Adnan Farah's youthful age cannot be ignored in this case. Science has already confirmed what every parent knows: that young people express transient rashness, proclivity for risk, and that their inability to assess consequences both lessen a young person's moral culpability and enhances the prospect that, as the years go by and neurological development occurs, his deficiencies will be reformed. Psychology and brain science continue to show fundamental differences between juvenile and adult minds. This makes young people's actions less likely to be evidence of irretrievably

depraved character when compared to adults. When the Court considers these facts, Adnan Farah's offense in this case would give the Court some context for sentencing.

The sample of 18 U.S.C. §2339B(a)(1) terrorism cases around the country is very limited to be used as a statistical model, because kids of Somali descent willing to travel to join terrorist groups overseas is a relatively recent phenomenon in the United States. Nonetheless, a review of other 18 U.S.C. §2339B(a)(1) terrorism cases around the country would show that Adnan Farah's activities in the conspiracy were limited compared to cases where defendants took significant and calculated steps to travel and join terrorist organizations overseas.

Adnan Farah is at a turning point of his radicalization. This sentiment was echoed by this Court's own expert witness Daniel Koehler, who opined that Adan Farah should be a candidate for a reduced prison sentence or be released to a halfway house for an intensive counseling regimen or de-radicalization program. While de-radicalization programs are uncommon in the United States, a notable and appropriate program for the Government to utilize for Adnan Farah is the Heartland Democracy program in Minnesota. This is a culturally competent program that has been successful. The Heartland Democracy program provides instruction that is at the core of Adnan Farah's vulnerability to ISIL exploitation: identity crisis. One of Heartland Democracy's programs train educators (coaches) to use a deliberate Socratic method that lets participants drive the process and find questions and challenges around identity and community. In the end, the students come out of the early sessions with a foundation that can lead them through future work in the program.

## II.    SHORT STATEMENT OF FACTS

1.    Background.

Adnan Farah was born on ███████████ in Minneapolis, Minnesota, to Abdihamid Yusuf and Ayan Farah. (PSR ¶175). Adnan Farah's parents are Somalians who immigrated to the United States. (*Id.*; *see also* PSR DK.1) They are both United States citizens. Adnan Farah's mother operates a food mart, and his father is a school bus driver. (PSR ¶175) Adnan Farah attended Heritage Academy in Minneapolis, and later he attended Minneapolis South High School. Upon graduating from South High School, he enrolled in Minneapolis Community and Technical College. (PSR ¶188-189). He was a normal high school student. However, he experienced enormous discrimination and alienation because of his Islamic faith and Somalian heritage. *See e.g.* http://kstp.com/news/teen-to-terrorist-teen-from-two-worlds/4297192/?cat=1. Though he was born in the United States, his alienation made him feel like he lived in two different worlds: America and Somalia. He emotionally belonged to neither. When ISIL promised him a place to belong and identify with, he fell for their ploy. (Id.)

2.    The Offense.

On May 13, 2015, an eight-count Superseding Indictment was filed against Adnan Farah and other defendants at the Federal District Court, District of Minnesota. (PSR ¶1). Later, on October 21, 2015, a 14-count Second Superseding Indictment was filed against him and the same defendants. (PSR ¶4). On April 14, 2016 Adnan Farah pled guilty to Count 2 of the Second Superseding Indictment (Conspiracy to Provide Material Support to a Designated Foreign Terrorist Organization, in violation of 18

U.S.C. § 2339B(a)(1)). (PSR ¶5). At the Change of Plea Hearing, Adnan Farah provided a detailed, candid and extensive allocution of his involvement in the conspiracy. This Court was very exhaustive in drawing out the historical background of Adnan Farah's evolution from a normal teenager to a young man who hoped to travel to Syria to join ISIL. Adnan Farah's public statements are consistent with his colloquy in Court during his Change of Plea Hearing. *See e.g.,* http://kstp.com/news/teen-to-terrorist-transformation-to-terrorist/4297193/.

3.    Plea Agreement.

Adan Farah and the Government entered into plea negotiations, and the terms of the agreement were reduced into a written plea agreement. (*See* PSR ¶12). The parties agreed that the base offense level pursuant to USSG §2M5.3(a) was 26 and no specific offense characteristics applied. (*Id.*). The parties agreed that a 12-level adjustment based on USSG §3A1.4 also applied. (*Id.*). Since Adnan Farah abided by the plea agreement, the Government is expected to recommend a 3-level reduction for acceptance of responsibility. (*Id.*). The total offense level is therefore 35 (26+12-3). The criminal history category is VI, because an adjustment pursuant to USSG §3A1.4 applies. The Guideline range of imprisonment is therefore 180 months, due to the statutory maximum. (*Id.*).

Considering the plea agreement and other circumstances that will be shown below, Adnan Farah moves this Sentencing Court for a departure or variance from the applicable Guideline ranges.   In sum, it is vital that this Court consider the undue pressures on Adan Farah prior to joining the conspiracy and before his guilty plea. When

the Court takes into consideration Adnan Farah's age, his identity crisis, discrimination, alienation from the general community, and coupled with the manipulating activities of ISIL on young people like him, the Court will be convinced that Adnan Farah was subjected to undue pressures and burdens of herculean proportion.

Adnan Farah showed strength of character when he defied and eloquently rejected ISIL as he pled guilty to providing material support to a terrorist organization. The weight of improper influence on Adnan Farah was witnessed by this Court █████████████ ████████████████████████████████████████████████████████████████ ████████ When he pled guilty, Adnan Farah went against ████████████████ ████████████████████████████████ Without considering his personal safety, he has openly rejected ISIL and other related terrorist organizations.

Adnan Farah is entitled to a downward departure or variance because of his ████████████████████████████████████████████████████████████████ ████████████████████ Adnan Farah proffered about his activities. In the process of proffering, he confirmed his involvement in the conspiracy thereby confirming the ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████

In order to give the Court some more context about the ease in which young people like Adnan Farah can fall prey to ISIL propaganda, the parties have submitted a joint pleading that gives historical contexts of ISIL, Somalians, and Identity Crisis among Somali youths like Adnan Farah for the Court's review.

## III.    ADNAN FARAH'S OFFENSE CONDUCT

Adnan Farah's participation in the instant conspiracy was very limited compared to his co-defendants and many other defendants around the United States. In this particular case, it started with news of suffering of Somalians. Later, the focus was on Syrians being abused by the Syrian government. *See e.g.,* http://kstp.com/news/teen-to-terrorist-transformation-to-terrorist/4297193/.    Adnan Farah fell for ISIL's propaganda and wanted to help suffering people, even to the extent of wishing to die for the course of good for Muslims. (*Id*). When other Somalians started traveling to Somalia and Syria, Adnan Farah was aware of that fact. He was aware of Hadad Mohallim's travel to Syria in March 2014. Adnan Farah knew Hadad Mohallim because Hadad Mohallim "hung out" with Adnan Farah's older brother, Mohamed Farah, a co-defendant in this case. As previously admitted, Adnan Farah wanted to travel to Syria, so he applied for and received an expedited passport in April 2014. The passport's expedited request was a problem for Adnan Farah. It arrived sooner than he expected, and his parents confiscated it when it arrived at their home. (*See* PSR ¶143). The early, unexpected arrival and his parents' seizure of the passport are reasons Adnan Farah is alive today, because he could not travel overseas without his passport. *See e.g.,* http://kstp.com/news/teen-to-terrorist-teen-from-two-worlds/4297192/.    The fact that

the passport was confiscated by his parents is also one of a myriad of reasons that it was impossible for Adan Farah to travel to Syria to facilitate terrorism in the spring of 2014.

Adnan Farah did not have the benefit of counsel when he appeared before the Grand Jury. He was not completely candid when he testified before the Grand Jury about his knowledge of the conspiracy because of fear and the involvement of his older brother in the offense. However, the bulk of Adnan Farah's activity in the conspiracy was basically "talking" and "puffing" about his Syrian connections and ability to procure a false passport from California. (*See* PSR ¶143; *see also* PSR Add. DK.4). After his parents confiscated the passport, he provided Abdirahman Bashir, a Government informant and a cousin of Hanad Mohallim, $100 as a down payment to procure a fraudulent passport. (*See* PSR §107). In retrospect, it seems foolish and infantile to expect that one could successfully purchase a fraudulent passport for only a $100 down payment. Adnan Farah continued with conversations of wanting to travel to Syria to join ISIL. He discussed his seemingly implausible connections to Syria, a country he has never visited. (PSR ¶143).

The Syrian civil war had been a draw to Adan Farah and other Minnesota youths since 2011. Because of abuses of Syrians by Syrian president Bashar al-Assad, various groups have attempted to remove him from power and end his authoritarian rule. (*See* PSR ¶18). A very important group in the conflict is ISIL, who are fighting to wrestle control of Syria away from president Bashar al-Assad and groups loyal to him. (*See* PSR ¶18—19). ISIL has since targeted Minnesota youths for recruitment as soldiers in the guise of asking for humanitarian support. (*See* PSR ¶80-82); *see also*

http://kstp.com/news/teen-to-terrorist-transformation-to-terrorist/4297193/.    The fact
that Adnan Farah knows his co-defendants should not be over stated.    They were
acquaintances and friends of his elder brother Mohammed Farah, who is also a co-
defendant in this case. (*See* PSR ¶20).  Adnan Farah and his co-defendants talked and
tweeted generally about the events in Syria as well as their desire to travel to help victims
of the civil war.

Adnan Farah was in a state of despair because he felt alienated from the general
Minnesota community.  He felt that there was nothing in this world for him.  (*See* PSR
¶110).   Adnan Farah's discussions with his co-defendants intensified when Hanad
Mohallim and Abdi Nur traveled to Syria. (*See* PSR ¶21-22).  While there were specific
plans by others to travel to Syria in 2014, Adnan Farah made no specific, credible or
rational plans to travel.  He had no passport or money.  (*See* PSR ¶21-28).  He expressed
his wish to travel to Syria, but he started having second thoughts about ISIL propaganda.
*See*   *e.g.*,   http://kstp.com/news/teen-to-terrorist-transformation-to-terrorist/4297193/.
Because of these second thoughts, he gave his co-defendants excuses for not having
money.  Much of Adnan Farrah's activities were watching propaganda videos and
commenting through tweets about them with others, including his co-defendants. (*Id.*,
75-84).

By 2014, Adnan Farrah, along with other co-defendants, decided not to travel to
Syria because they did not possess the necessary travel documents.  Adnan Farrah's
collective discussion about traveling to Syria was impractical and implausible.  His
actions showed his age, inexperience and youthful exuberance.  He was the youngest in

the group and did not have the necessary travel documents. (*See* PSR ¶25). By May 30, 2014, Adnan Farrah had successfully acquired a United States Passport because his co-defendant, Abdirizak Warsame, gave him $200. However, that passport was useless for Adnan Farah because his parents would not release it to him. (*See* PSR ¶28).

1.    Adnan Farah's Grand Jury Testimony

By June 2014, the Government's investigation of young Somali men traveling to Syria was intensive. Adnan Farah was under the impression that he committed no offense because he made no credible or successful effort to travel to Syria. When he appeared before the grand jury without the benefit of counsel preparation, he minimized the extent of his familiarity with his co-defendants. (*See* PSR ¶41-42, 72, 81-84). Watching propaganda videos and bantering with the rest of the defendants continued through December 2014, but Adnan Farah's ability to travel to Syria was becoming remote, if not impossible. Adnan Farah puffed that he had contacts in Syria, but he could not even garner money for a plane ticket. (*See* PSR ¶ 41-51, 104-105).

2.    Attempts to Travel to Syria

Other defendants such as Guled Ali Omar, Hanad Mustofe Musse, Abdurahman Yasin Daud, Hamza Naj Ahmed and Adnan Farah's brother Mohamed Farah attempted to travel to Syria via departure from New York City. Yet, Adnan Farah's actions were limited to idle talk, chatter and puffery. (*See* PSR ¶52-64). Nevertheless, in March 30, 2015 he provided a Government informant, Abdirahman Bashir, his own photograph to purchase a fake passport to aid his travel to Syria. (*See* PSR ¶104-110). Even the rest of his co-defendants were concerned about Adnan Farah's youth. He did not have the

12

requisite facility to fully participate in the enterprise: He did not have money, and he was still under the control of his parents who would prevent his travel overseas. (*See* PSR ¶110, 125).

3.    Acceptance of Responsibility and Rehabilitation

Adnan Farah pled guilty on April 14, 2016. During the Change of Plea Hearing, he provided an extensive and compelling allocution of his involvement in the offense to this Court. He admitted that he began meeting with his co-defendants, as acquaintances, around April 2014. At the many meetings with co-defendants, they shared and watched ISIL videos and listened to Anwar al-Awlaki sermons. Consequently, he was "taken by their propaganda." Adnan Farah's radicalization commenced during a period of adolescent religious growth. As his faith grew, he felt stirred by videos showing the suffering of Syrians exposed to chemical weapons. The videos depicted Syrian president Bashar Assad regime's horrendous actions against Sunnis in contrast with positive images of ISIL providing humanitarian assistance to the poor. (*See* PSR ¶150-156).

Unfortunately, Adnan Farah took the sermons of Anwar al-Awlaki and ISIL videos of president Bashir's genocide with an "open heart." While he knew that he might die if he traveled to Syria, he thought it was a good thing to do as a true Muslim aspiring to help the needy. (*Id.*).

4.    Court's Expert Witness Daniel Koehler

According to this Sentencing Court's expert witness Daniel Koehler, Adnan Farah "knows and accepts the consequences of control for his actions, which is an important aspect in a potentially successful rehabilitation." (*See* PSR add. at DK.5).

Based on Daniel Koehler's assessment protocol, he opined that it is clear "that [Adnan Farah] currently can be seen as being at a critical turning point. His situation does warrant a reduced prison sentence or the release to a dedicated and highly specialized halfway house with intensive counseling and mentoring." (*Id.*). Adnan Farah has admitted his wrong doing and explained his path to radicalization. Noteworthy is the fact that he is the least culpable among the defendants. Daniel Koehler believes that Adnan Farah is at a turning point. This turning point is shown by Adnan Farah's public rejection of ISIL and its ideology and his willingness to work with the Government to prevent ISIL recruitment of young people in Minnesota and in the United States in general.

5. 

██████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

## IV.   SENTENCING OPTIONS

The United States Supreme Court has provided courts with direction regarding the federal sentencing regime. *See, Gall v. United States*, 552 U.S. 38 (2007). The result of the *Gall* case reminds all of us that the Guidelines are only advisory. Consequently, sentences are reviewed under a deferential abuse of discretion standard. (*Id.* at 41.) The standard to be applied is whether the sentence is "reasonable." (*Id.*) Mathematical formulas are not to be used. (*Id.*) The sentencing court may not presume that the Guidelines' range is reasonable, but must make an individualized assessment based on the facts presented. (*Id.*)

This Sentencing Court must take the advisory Guidelines into account together with the other sentencing factors enumerated in 18 U.S.C. § 3553(a). *See, e.g., United States v. Gatewood*, 438 F.3d 895, 896 (8th Cir. 2006). The Court may impose a sentence outside the Guideline ranges in order to "tailor the sentence in light of [the] other statutory concerns" in §3553(a). *Id.*

In this case, the statuary provision pursuant to 18 USC § 2339b(a)(1) calls for a maximum sentence range of 180 months or 15 years imprisonment, should there be no downward deviations. (*See* PSR ¶200-201). However, Adnan Farah is entitled to a significant downward departure or a downward variance because many factors such as his age, ████████████████████████████████████████████████

Adnan Farah respectfully requests a sentence consistent with the understanding in the plea agreements and with consideration given to his adolescent age. Even though he did not offer to testify against his co-defendants, one of whom is his older brother, he told the truth about his involvement and the involvement of all defendants in the conspiracy.

1.    General Sentencing Considerations

The Federal Sentencing Reform Act of 1984 that made courts view the Guidelines as mandatory, 18 U.S.C. §3553(b)(1) or relied upon the Guidelines' mandatory nature, 18 U.S.C. §3742(e), is incompatible with the Sixth Amendment of the United States Constitution. *See, United States v. Booker*, 543 U.S. 220 (2005). Accordingly, the U.S. Supreme Court severed and excised those provisions, making the Guidelines effectively advisory. *Id.* As such, instead of being bound by the Guidelines, the Sentencing Reform

Act was revised by *Booker* and requires a sentencing court to consider the Guidelines' ranges. Nonetheless, it permits the court to tailor the sentence in light of other statutory concerns as well. *See* §3553(a); *Booker,* 543 U.S. 220. Under *Booker,* sentencing courts must treat the Guidelines as just one factor among a number of sentencing factors, set forth in 18 U.S.C. §3553(a).

The primary directive in Section 3553(a), is for sentencing courts to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2. Section 3553(a)(2) states that such purposes are:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In determining the minimally sufficient sentence, §3553(a) further directs sentencing courts to consider the following factors:

1)    the nature and circumstances of the offense and the history and characteristics of the defendant. §3553(a)(1);

2)    the kinds of sentences available. §3553(a)(3);

3)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. §3553(a)(6); and

4)    the need to provide restitution to any victims of the offense. §3553(a)(7).

Other statutory sections also give sentencing courts additional direction in sentencing. 18 U.S.C. §3582, the statute states that the imposition of a term of imprisonment is subject to limitations. In determining whether, and to what extent, imprisonment is appropriate based on the §3553(a) factors, the Court is required to recognize that imprisonment is not an appropriate means of promoting correction and rehabilitation.

After *Booker*, sentencing courts must first calculate the advisory Guidelines' sentencing range. *See United States v. Ture*, 450 F. 3d 352, 356 (8th Cir. 2006). Then, the sentencing court must decide whether a traditional departure from the advisory Guidelines' sentencing range is appropriate, based either on Parts H or K of Chapter Five of the Guidelines' policy statements or commentary. *See United States v. Dalton*, 478 F.3d 879, 881 (8th Cir. 2007). The sentencing court then arrives at a final advisory Guidelines' sentencing range. *Id.* The sentencing court must consider the factors set forth at 18 U.S.C. § 3553(a) to determine whether to impose a sentence within or without the final advisory Guidelines' sentencing range. *See Id.*; *United States v. Rouillard*, 474 F.3d 551, 555 (8th Cir.2007). The sentencing court must also impose a sentence tailored to the § 3553(a) factors. *See Booker*, 543 U.S. at 245-46, 125 S.Ct. 738.

In this case, Adnan Farah is not diminishing the seriousness of this offense. However, the events started when he was an impressionable minor. This Court is very familiar with the difference between the brain developments of an adult compared with those of an adolescent. Science has already confirmed what every parent knows in that young people take unnecessary risks and are unable to assess consequences of their risks

18

like adults. Indeed, as the years go by and neurological development occurs, deficiencies will be reformed. Therefore, the age of a youthful offender is an important factor for consideration. *See e.g.*, *Evan Miller v. Alabama*, __U.S.__, 132 S.Ct. 2455, 2475 (2012). Psychology and brain science continue to show fundamental differences between juvenile and adult minds. This makes young people's actions less likely to be evidence of irretrievably depraved character when compared to adults. (*Id.*).

In fact, Adnan Farah was arrested when he barely reached the age of maturity. He has shown respect for the law by pleading guilty █████████████████ ██████████████ He had publically spoken against ISIL and terrorist ideology. This is all evidence that shows that Adnan Farah understands the seriousness of his offense and his respect for the law. The fact that he is still in custody is evidence of the punishment that has already been exacted against him.

The indictment and Adnan Farah's own public statement is a good deterrent for any other youth contemplating travel overseas to commit crimes of terrorism. Indeed, Adnan Farah wishes to travel around the country to educate people about the ills of ISIL and similar groups. His actions would be an effective deterrent to anyone contemplating similar criminal conduct in the future.

During the last hearing, this Court made it clear that its objective in the case is to keep the community safe from terrorism. Adnan Farah could be an effective tool for this Court if he is given the opportunity to protect the public from further crimes. Other than the instant offense, Adnan Farah has no criminal history. He would be an effective

youth ambassador who would discourage other Somali youth from joining terrorist organizations such as ISIL.

To accomplish the goal of 18 U.S.C. § 3553(a), Adnan Farah's sentence must be one that would provide him with needed educational or vocational training. As a young high school graduate, his reintegration into the general society is important. It is important that Adnan Farah be provided with counseling and de-radicalization training as recommended by this Court's expert witness Daniel Koehler. An extensive prison term will not accomplish that goal.

2.    USSG §5H1.1

The Eighth Circuit Court jurisprudence with respect to age is that age alone is not appropriate as the basis for variance because it "is not ordinarily relevant in determining whether a departure is warranted." *See* USSG § 5H1.1; *see also United States v. Maloney*, 466 F.3d 663, 669 (8th Cir. 2006). A sentence within the recommended Guideline range is presumed reasonable, and a sentencing court will act within its broad discretion in rejecting variance based on age alone. *See United States v. Jordan*, 573 F.3d 586, 590 (8th Cir. 2009). Age and youth, as well as other factors, may be relevant in determining whether a departure from the Guideline ranges could be warranted. However, age may be taken into consideration in combination with other offender characteristics as from a typical case. *See* USSG §5H1.1.

In *U.S. v. Carter*, 538 F.3d 784 (7th Cir. 2008) the court affirmed a 24 month sentence where the Guideline range was 87-108 months based on the defendant's age. The court reasoned that the defendant's offense was not part of the heartland of money

laundering cases. A sentencing court may consider an offender's age when sentencing within the Guideline range. In *United States v. Wadena*, 470 F.3d 735 (8th Cir. 2006), the court considered other §3553(a) factors as well as age when it granted the defendant's request for variance. In *U.S. v Smith*, 909 F.2d 1164 (8th Cir. 1990), the court reduced the sentence of a defendant because the defendant would likely have died in prison. A sentencing court may consider an offenders' age when sentencing within the Guideline range. *See*, *U.S. v. Locklear*, 631 F.3d 364 (6th Cir. 2011).

The central issue here is this Court's authority to exercise its discretion for a downward departure or variance from the Guidelines. Here, Guideline §5H1.1 permits downward departures or variance based on Adnan Farah's youth, age and other factors previously enumerated like ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In *U.S. v. Smith*, 909 F.2d 1164 (8th Cir. 1990), the court reasoned that the defendant's offense was not part of the heartland of money laundering. It is noted that the instant case is a serious terrorism offense and not a money-laundering case; nonetheless, Adnan Farah actions in this conspiracy do not fit that of a typical terrorism fighter case where the fighter actually participated in terrorist military actions. Adnan's words alone could not have taken him to Syria. Judging Adnan Farah's words makes it clear that it was implausible that he would have reached Syria because he was still tied to his parents' apron strings. Adnan Farah did not take meaningful steps to travel other than attempting to procure passports. Owning a passport alone does not guarantee one's ability to travel to Syria. Compared to other defendants in this case and around the country, Adnan Farah's criminal

culpability is not very extensive. Therefore, the Court should consider his youthful age as well as other factors as bases for a downward departure or variance from the Guideline ranges.

There are more facts that the Court could consider in deciding to implement a downward departure or variance from the Guidelines. Those facts include Adnan Farah's immediate acceptance of responsibility for his offense; thereby, he reduced the cost of administration of justice in this case. He also expeditiously pled guilty. This action alone conserved judicial, as well as prosecutorial, resources. Adnan Farah showed superior acceptance of responsibility when he pled guilty despite opposition from ████████████████████ His conduct has benefited the administration of justice in this case. *See, e.g., United States v. Davis*, 797 F. Supp. 672, 677 (N.D. Ind. 1992); *United States v. Bennett*, 9 F. Supp. 2d 513, 525-26 (E.D. Pa. 1998). He has also shown extreme remorse, and this Court may take into consideration the fact that Adnan Farah showed great remorse even though he has already received an adjustment for acceptance of responsibility. *See, United States v. Fagan*, 162 F.3d 1280, 1284-85 (10th Cir. 1998); *United States v. Jaroszenko*, 92 F.3d 486, 490-91 (7th Cir. 1996).

3.     Analogous Terrorism Cases

There are no analogous terrorism cases of a young defendant with such limited involvement as Adnan Farah in the United States. However, *United States v. Shannon Conley, 1:14-CR-00163-RM (ECF Doc. 663 Filed 09/29/16 Page 14of 18)* may be instructive. In *United States v. Shannon Conley,* The defendant, who was mentally ill and cooperated with the Government, met with ISIL recruiters online and prepared to

join and fight for ISIL. In the process, Shannon Conley joined a U.S. Army-sponsored explorer scout group and obtained first aid training and took firearms training. The Government, through FBI agents, met and persuaded her on multiple occasions against trying to travel to Syria to join ISIL. She refused. She was later arrested at the Denver airport as she tried to board a flight to Turkey on her way to Syria. At sentencing, the Honorable Judge Raymond P. Moore sentenced her to 48 months in federal prison. (*See ECF Doc. 663, Filed 09/29/16/ Page 14*).

Other than talking about his desire to travel to Syria and "hanging out" with his co-conspirators, Adnan Farah's only concrete criminal act was purchasing a fake passport to enable him to travel to Syria. He never actually traveled to Syria. In fact, his efforts to travel to Syria were impractical compared to Shannon Conley. Correctly, the Court in *Shannon Conley* sentenced her to 48 months in prison. Here, Adnan Farah made no practical steps to travel. He did not even purchase a plane ticket. His travel plans were limited to trying to purchase a fake passport after his legitimate U.S. Passport was confiscated by his parents. This Court should take the above-referenced facts into consideration and sentence Adnan Farah to a very short term in a halfway house to allow him to participate in the Heartland Democracy program in Minnesota.

## CONCLUSION

For all of the above reasons, Adnan Farah respectfully requests that this Court grant him a downward departure or variance, and sentence him to a term reflecting the acknowledgement that his involvement in the offense was influenced by his youthful age and the fact that his attempt to travel to Syria was impractical and anemic. Adnan Farah has publicly disavowed ISIL and other terrorist organizations. His rehabilitation is evidenced by his willingness to work with the Government to discourage others from joining ISIL or any other terrorist organizations. Adan Farah's request is based on his youth, his level of involvement in the conspiracy, and his remorse. His request is consistent with the spirit of 18 U.S.C. § 3553(a). As such, this Court has the authority to sentence Adnan Farah to a term that would allow him to receive counseling and participate in a Heartland Democracy de-radicalization program.

Respectfully Submitted

**KENNETH UBONG UDOIBOK, P.A.**

November 3, 2016.

s/Kenneth U. Udoibok
Kenneth U. Udoibok (#0262523)
Flour Exchange Building, Suite 5010
310 Fourth Ave. S.
Minneapolis, MN 55415
Phone: (612)808-6031
Fax: (612)808-6031
k@kenulaw.com

**ATTORNEY FOR DEFENDANT**
**ADNAN ABDIHAMID FARAH**