UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 15-049 (05) (MJD/FLN)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **SENTENCING POSITION OF THE** |
| v. | ) | **UNITED STATES OF AMERICA** |
| | ) | |
| ZACHARIA ABDURAHMAN, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, through its attorneys, Andrew M. Luger, United States Attorney for the District of Minnesota, and Assistant United States Attorneys John Docherty, Andrew R. Winter, and Julie E. Allyn, respectfully submits its Sentencing Position in this case. After consideration of all the facts of this case, as well as the United States Sentencing Guidelines (hereinafter referred to as the "U.S.S.G."), and the factors set forth at Title 18, United States Code, Section 3553(a), the United States believes a sentence of fifteen years' imprisonment is sufficient, but not greater than necessary, to achieve justice in the sentencing of this defendant.

## I.   INTRODUCTION

In a Superseding Indictment returned on May 18, 2015 (Docket No. 65), a grand jury of this district charged defendant Abdurahman with:  Count One, Conspiracy to Provide Material Support to a Designated Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B; and Count Three, Attempting to Provide Material Support to a Designated Foreign Terrorist Organization, also in violation of 18 U.S.C. § 2339B.  On

September 17, 2015, defendant Abdurahman appeared before this Court and entered a negotiated plea of guilty to Count One of the Superseding Indictment. The United States has agreed to dismiss Count Three at sentencing.

## II.   THE FACTS OF THE CASE AGAINST DEFENDANT ZACHARIA ABDURAHMAN

Defendant Abdurahman has ten co-defendants, five of whom resolved their cases in advance of trial, three of whom went to trial, and two of whom are fugitives (one of the two fugitives, Abdi Nur, is presumed deceased). Evidence at the three-week trial of his three coconspirators often illuminated defendant Abdurahman's role in this conspiracy. This is particularly true of the recorded conversations made by FBI Confidential Human Source ("CHS") Abdirahman Bashir. Although only a small percentage of these recordings were played in open court, all of them were admitted into evidence. In addition, trial testimony from CHS Bashir, and from cooperating defendants Abdullahi Yusuf and Abdirizak Warsame concerned, in part, defendant Abdurahman. Finally, two written summaries of the case have been prepared post-trial, both of which are helpful in elucidating defendant Abdurahman's acts and role. The first is the "offense conduct" section of the Report of Presentence Investigation prepared by U.S. Probation and Pretrial Services, and the second is Common Appendix A, written by the prosecution. Common Appendix A goes into detail about some of the matters covered only briefly in the PSR, chiefly the context of the Syrian conflict and the rise of ISIL, as testified to by the government's expert trial witness, Charles R. Lister of the Washington, D.C.-based Middle East Institute.

2

The evidence paints a troubling picture of defendant Abdurahman's willing participation in a conspiracy to commit exceptionally serious crimes that threatened both public safety and national security.   Defendant Abdurahman's participation in this conspiracy was long-standing, beginning in the Spring of 2014 and ending only with defendant Abdurahman's arrest on April 19, 2015.   During that time, defendant Abdurahman attempted to travel to Syria via New York City's John F. Kennedy International Airport on November 8, 2014, and participated, in the Spring of 2015, in a plot to reach Syria via Mexico (although he ultimately backed out of that particular plan).

## A. Defendant Abdurahman's Participation in the Conspiracy During the Spring of 2014

In March of 2014 Hanad Mohallim left for Syria and joined ISIL.  (Bashir Tr. 5/19/16, pp. 8-9).[1]  Hanad Mohallim was the cousin of CHS Abdirahman Bashir, and after Mohallim left for Syria, Bashir noticed that many people who formerly did not associate with him began trying to hang out with him and talk to him.  These people who were newly-interested in Bashir included defendant Abdurahman.  (Bashir Tr. 5/19/16, pp. 8-9).   As described in Common Appendix A, the Spring of 2014 plot included a plan for Bashir, together with Yusuf Jama and defendant Guled Omar, to drive a rented car from Minnesota to San Diego in order to reach Syria from Mexico.  Before this attempt (which was foiled by defendant Omar's family), the three hopeful travelers went shopping for clothes for their

---

[1] Trial transcripts are formatted with the last name of the witness, followed by the date of their testimony, followed by page numbers for the transcript of that witness, on that date. The transcript cite which accompanies this footnote, "Bashir Tr. 5/19/16 at pages 8-9" therefore indicates a cite to pages 8 and 9 of the transcript of the May 19, 2016 trial testimony of CHS Abdirahman Bashir.

3

trip. They were joined on this shopping trip by defendants Abdirizak Warsame and Abdurahman. (Bashir Tr. 5/19/16, pp. 26-27).

Later, in a conversation with defendant Guled Ali Omar and CHS Bashir that started on March 15, 2015, and continued past midnight into March 16, 2015, and that was recorded by CHS Bashir, defendant Abdurahman returned to the topic of the Spring of 2014 attempt to leave via Mexico, and indicated that he had had an alternate plan:

> GAO: What do you think about how we's, how we could get there?
> CHS: Huh?
> **ZA:  From here to Cali?**
> CHS: Yeah
> GAO: We could get from here to Cali easily.
> CHS: We do the same shit (UNI).
> GAO: Wallahi.
> CHS: Remember last time?
> GAO: When we were about to drive?
> CHS: Yeah.
> GAO: When Yusuf rented the car.
> **ZA:  I told these guys, bro.  I told these guys Somali truck driver.  Just pay Somali truck driver, go in the back.  Wallahi Billahi, he'll be going bro, from money.[2]**

Defendant Abdurahman also had detailed information about how to get from

Mexico on to Turkey:

> Bashir:  What's the easiest way to get to Turkey?
> **ZA:  It's easy bro.  At the end of the day, the only thing is that you got to be low key (UNI).  My uncle told me there's a camp in El Salvador.**
> GAO: (on telephone) Ladies, single ladies, and there's no (UNI)
> **ZA:  Yo, listen, my uncle told me there's a camp in El Salvador or Guatemala, right after Mexico when {you cross Mexico}(UNI).  There's a camp Somali {full of Somalis}.  Somali everything.  There's a station there.  They're all trying to come to America, but most of them just stay there, they got work permits, they can**

---

[2] Trial Exhibits 203 (audio) and 204 (transcript), pages 63 and 64

**stay in country. Yo go there, you say ha man America didn't work out for me. You know? I'm trying to go back to my country. Where you come from? South Africa. Cause you know they're going to tell, they, you know really don't know Somali. Why South Africa? Because South Africa speak English. Show me the last smuggler who brought you. You go to that guy. That guy. Come on, bro. It's like a connection dots, bro. That guy going to be like where you want to go? Brazil. They have everything, bro.**[3]

### B. During the Summer of 2014, defendant Abdurahman Watches ISIL Propaganda Videos and Makes Plans with his Coconspirators to Travel to Syria to Join ISIL

In the summer of 2014, after being thwarted in his attempt to leave in a rented car for Mexico, Bashir remained in the Twin Cities. He identified defendant Abdurahman as one of the people he spent time with that summer. (Bashir Tr. 5/19/16, p. 46). Bashir also identified defendant Abdurahman as one of several people with whom he discussed his plans to join ISIL. (Bashir Tr. 5/19/16, pp. 47-48). Also during the summer of 2014, defendant Abdurahman watched, and talked about, the ISIL propaganda video "Upon the Prophetic Methodology." (Bashir Tr. 5/19/16 p. 54). This is a horrific video, in evidence as Government Exhibit 178, in which hundreds of captured Shi'a military recruits are slaughtered by ISIL executioners, either by being shot in the head as they lie in a ditch, or by being shot in the head on the banks of the River Tigris, their bodies then being dumped into the river's waters. Defendant Abdurahman was apparently quite impressed with "On the Prophetic Methodology"; he recommended it to cooperating defendant Abdirizak Warsame. (Warsame Tr. 5/25/16 p. 15). During the summer of 2014, defendant

---

[3] Trial exhibits 203 (audio) and 204 (transcript) at page 44.

Abdurahman also watched other ISIL propaganda videos with Bashir.  (Bashir Tr. 5/19/16 p. 56-57).

Later, in a conversation recorded by CHS Bashir, defendant Abdurahman joined defendant Mohamed Farah in praising "On the Prophetic Methodology."  (It is in this conversation that defendant Mohamed Farah laughs at the killings and cruelty on display in that video):

> **ZA:** **How about when Dawlah [ISIL] took over the training camp? And {the river}.**
> MF: Oh, man!
> **ZA:** **The video, [UI]**
>
> MF: Subhanallah.
> **ZA:** **Abu Israfil.  That's why he's like, "[w]e are going to get revenge in Tikrit." For the, that's where they got killed, Tikrit.**
> MF: Oh that's, that's where the bodies went!
> **ZA:** **{Martyrs} [said in Arabic] [UI]something like that….**
> MF: A thousand [UI]
> **ZA:** **A thousand in the training camp, {all of them}, one by one.**
> MF: [singing] {Allah is great.  [OV] Victory is certain} [said in Arabic]
> **ZA:** **You didn't see the whole video?**
> MF: I know, remember.
> **ZA:** **And then the last guy he killed, [gun noise] and he just walked away.**
> MF: [Laughs] That was so hard core wallahi.  Wallah, that's some hard-core stuff, wallah.
> **ZA:** **{The mother of all believers, Aisha} [said in Arabic]**
> MF: [Laughing]
> **ZA:** **[Makes noise of a gun firing] {The river}**
> MF: Subhanallah, and then you see their blood.
> CHS: Nigga, that was a, that was a scary movie scene, nigga.  [OV][UI] You know all the Western, you know what they are saying?  Dawlah's playing psychological war with the Shia.
> MF: Of course.
> CHS: Cuz of that nigga..that was deadly. That whole river is bodies and blood.
> MF: No.. you know what…uh…
> MF: Baghdad.

CHS:  It was psychological.

MF:    Walahi, that's some crazy stuff!

CHS:  Psychological.

**ZA:     There was like hundreds of dead bodies, and then the last guy.**[4]



**An unknown Iraqi Shi'a military recruit begs for his life shortly before he is murdered by ISIL.  This screenshot is from the video at time 33:14 in Government Exhibit 178, ISIL Propaganda Video "On the Prophetic Methodology."  This is the video whose memory reduced defendant Mohamed Farah to laughter.  In the right center of the picture, a man is removing a ring from his finger.  In the next few seconds of the video he is seen offering the ring to an ISIL guard, perhaps in the hope that in exchange for this valuable, his life will be spared.**

---

[4] Trial exhibits 232 (audio) and 233 (transcript), at pages 121-122.



At time mark 34:04 of Government Exhibit 178, ISIL executioners systematically murder unarmed Shi'a prisoners by shooting them in the head with automatic infantry assault rifles.



Another screen shot from Government Exhibit 178, this one at time mark 35:26. An unarmed Shi'a prisoner is about to be shot in the head by a hooded, pistol-wielding ISIL executioner. This is "the river" to which defendant Mohamed Farah referred in the tape-recorded conversation of April 3, 2015, in evidence as Government Exhibits 232 (audio) and 233 (transcript). Defendant Mohamed Farah's statement

**"{Glory to God} and then you see their blood" may be a reference to the stone visible at the very bottom of the screen, which is slick with the copious amounts of blood already spilled by prisoners who were shot earlier.  Note the masked man in the foreground carrying an ISIL flag.**

During the summer of 2014, defendant Abdurahman, together with many other members of the conspiracy, worked at a private mail and package facility in Mendota Heights through a temporary employment agency.  During their time at the mail and package facility, defendant Abdurahman and his coconspirators talked about their plans to go to Syria to join ISIL.  (Bashir Tr. 5/19/16 p. 62.)  The mail and package job was not merely a means of earning a paycheck, it was an integral part of the plot to go to Syria to join ISIL.  In one recording defendant Guled Omar reminisced with defendant Abdurahman, stating "[w]hen we were working at [name of the staffing agency] everything was going perfect…We were working, the *kuffar* [non-believers; heretics] were not, they didn't even know we worked together, they didn't even know nothing, bro."[5]  Bashir testified that he and other members of the conspiracy discussed plans to travel to Syria while processing mail, while on break, and when they went outside the mail facility to pray.  Further, the men discussed the fact that they needed to save up money from their jobs to "cut their tickets to Turkey" (Bashir Tr. 5/19/16 p. 63).

At other meetings in the summer of 2014, defendant Abdurahman described his plan for reaching Syria.  He intended to go to Egypt, because his parents would allow him to travel to Egypt.  From Egypt, defendant Abdurahman would travel to Turkey.  (Bashir Tr. 5/19/16 p. 69).

---

[5] Trial exhibits 203 (audio) and 204 (transcript), at page 123

In August of 2014, defendant Abdurahman joined his coconspirators in playing paintball, in preparation for fighting with ISIL in Syria.  (Warsame Tr. 5/24/16 p. 46).  In addition to the single paintball session which both defendant Abdurahman and cooperating defendant Warsame seem to have gone to together, defendant Abdurahman also stated, in a conversation tape-recorded by CHS Bashir, that "*wallahi,* I think I went like ten times, bro."[6]  In this conversation, defendant Abdurahman stated that "paintball was amazing," to which defendant Guled Ali Omar responded "[w]e was literally treating it like it was real war, bro."[7]

### C. Defendant Abdurahman Attempts to Leave for Syria from New York City's JFK International Airport

In the Fall of 2014, Bashir heard from three ISIL fighters inside Syria - Abdi Nur, who had left Minnesota for Syria on May 29, 2014; Hersi Kariye, Hanad Mohallim's Canadian cousin; and Hanad Mohallim - that "the brothers" (the coconspirators) were leaving soon.  The ISIL fighters urged Bashir not to be left behind.  (This call demonstrates that the so-called "JFK Four" had coordinated their plans with ISIL fighters in Syria.)  The effect of this call from Syria on Bashir was to make him "hasty" and to feel left out of the planning. (Bashir Tr. 5/19/16 pp. 98-100).  Bashir drove to Dar Al-Farooq Como, where he found defendant Abdurahman.

In the ensuing conversation, defendant Abdurahman told Bashir that he and others "were leaving right now, really soon, in about a week or two."  (Bashir Tr. 5/19/16 p. 101).

---

[6] Trial Exhibits 203 (audio) and 204 (transcript), at page 84
[7] Trial exhibits 203 (audio) and 204 (transcript), at page 87

Trial testimony in the form of travel documents, credit card receipts, airline booking documents, and the testimony of FBI Special Agent Michael Lewis of the FBI's New York Field Office, showed that Zacharia Abdurahman, together with his coconspirators Hamza Ahmed, Hanad Musse, and Mohamed Farah, all took Greyhound buses from Minneapolis to New York City on November 6 and 7, 2014, and that on the morning of November 8, 2014, all four went online and booked tickets for various destinations that either placed them close to Turkey (Sofia, Bulgaria and Athens, Greece) or else involved a change of planes in Istanbul.  Defendant Abdurahman was booked from JFK to Moscow, and then was to catch a connecting flight from Moscow to Athens, where he would arrive on November 9, 2014.  After a mere three days in Athens, defendant Abdurahman's itinerary had him leaving Athens on November 13, 2014 to return to New York (again via Moscow), where he would arrive on November 14, 2014.  Government Exhibit 78.

After being denied boarding at JFK, the four conspirators returned to Minnesota via Greyhound.  On the way back, defendant Abdurahman stopped over in Chicago for a few days and visited cooperating defendant Abdirizak Warsame.  While in Chicago, defendant Abdurahman described what had happened at JFK, and also related that he had planned to go to Turkey, then Syria, and join ISIL.  Defendant Abdurahman was going to meet defendant Abdi Nur in Syria.  (Warsame Tr. 5/25/16 pp. 23-24).

Following the failed JFK attempt, the conspirators, including defendant Abdurahman, had a meeting at Dar al-Farooq Como to discuss what had gone wrong.  (Bashir Tr. 5/19/2016 p. 114).  In this meeting, one of defendant Abdurahman's specific suggestions was that the conspirators had to reduce their social media visibility. (Id.)

11

Defendant Abdurahman also blamed his co-defendant Abdirahman Daud for the JFK failure, stating that "Daud made us hasty, bro."   Finally, defendant Abdurahman recommended more centralized planning of any future attempts, pointing out that the JFK plot had not had an emir.

After returning to Minnesota, defendant Abdurahman was interviewed by FBI Agents.   The interview took place in the security of defendant Abdurahman's home, in the presence of his family.   The interview was tape-recorded.   In that interview, defendant Abdurahman, like all the other conspirators, stuck to his absurd claims that he had planned a vacation in Greece (of three days' duration), that he knew nobody else who had tried to travel out of JFK on November 8, and that he had been traveling alone.   Defendant Abdurahman claimed he had been denied boarding because he was "profiled," and, as evidence of his innocence, pointed out that he had not been going straight to Istanbul, but instead, to Athens.   If he had been planning to join ISIL, he said "I would have gone straight to Istanbul, if I had wanted that."   Annoyed that the agents kept interviewing him, defendant Abdurahman brought the interview to a halt by asking the agents "is it a crime to travel to Greece?"

### D. Defendant Abdurahman and Others Plot, in the Spring of 2015, to Reach Syria by Traveling Through Mexico on a Fake Passport

During planning to leave in the Spring of 2015, defendant Abdurahman was recorded discussing ISIL's military tactics, and boasting about the terrorist organization's success against Iraqi forces – most of whom, like the hundreds of men seen being killed on Government Exhibit 178, the ISIL propaganda video "On the Prophetic Methodology," were Shi'a Muslims. Referring to ISIL's original capture of the city of Tikrit in June of 2014, Abdurahman stated, "You guys seen Tikrit {how they humiliated the Shia}? Twenty-five thousand troops. They went to the suburbs and the city, waiting for reinforcements, against four thousand guys, bro. Guess how many guys are lost already? Four thousand, five hundred in ten days fight. They lost four hundred thousand five hundred guys {the Shia}."[8] In response, co-defendant Omar concurred that ISIL was "trying to break the city down." Abdurahman continued, "[b]ro, {they killed them with mostly suicide operations,} I think fifty guys did it bro, in ten days. That's crazy, bro." When later discussing the then-current battle for Kobane, Defendant Abdurahman commented, "[ISIL] is smart. They did a tactical retreat in Kobane and now they're going back."[9]

### E. Defendant Abdurahman Enjoys Status as a Result of Potentially Being an ISIL Fighter

In a conversation on March 15, 2015, that was tape-recorded by CHS Bashir, the conspirators telephoned Abdi Nur, who was in Syria. During the call, defendant Abdurahman is heard reveling in the status that being a potential fighter for ISIL has given

---

[8] Trial exhibits 203 (audio) and 204 (transcript), at page 48
[9] Trial exhibits 203 (audio) and 204 (transcript), at page 93

them: "we are the hot boys on the block now, bro. Yeah, bro, all eyes on us, bro. {That is normal man;} it's all good. {I swear thanks to God bro;} everything is good bro."[10] Abdurahman then assured Nur, "[e]verybody's good, bro. {And God willing, we haven't given up bro,} we gonna be with you, bro; soon either in jannah or in the dunya,[11] bro."

After the call with Nur was finished, defendant Abdurahman spoke with defendant Omar about a future life alongside defendant Abdi Nur in Syria:

> GAO: He said, "Fifty brothers that were, uh, that were in our, um, that were in our {battalion,} [said in Arabic] out of all of them they chose me."
> **ZA:  And he became Emir.**
> GAO: He said they're training him to become a Emir.
> **ZA:  And soon {he's gonna become?}**
> GAO: Yeah, yeah.
> **ZA:  Subhan Allah.[12]**
> GAO: So when they, when they go out for battles, when they go out for battles he's going to be leading the, uh,
> **ZA:  The battles.**
> GAO: The caravan. Yeah.
> **ZA:  He's probably going to have Ansari brother showing him around.**
> GAO: Because he's already, he's already learning Arabic.
> CHS: I wanna be led by him wallahi.
> GAO: He said I'm already- he's, Abdi right. Wallahi.
> **ZA:  Wallahi Billahi, we gotta be his foot soldiers.[13]**

On March 22nd, 2015, defendant Abdurahman quizzed CHS Bashir about the fake passport contact in California: "are these passports official?", "does it work?", "does he know?", "what did he say?", "once we get there, he give it to us right away?" and "is he going to make the names and age, everything? Cause I want

---

[10] Trial exhibits 203 (audio) and 204 (transcript) at page 101
[11] Trial exhibits 203 (audio) and 204(transcript), at page 101. "Jannah" means "heaven," while "dunya" means the material, non-divine world of mundane, everyday life.
[12] "God willing"
[13] Trial exhibits 203 (audio) and 204 (transcript), at pages 114-115

to be a 22 year-old, I don't want to be 19 and shit."[14]  Defendant Abdurahman

emphasized to Bashir and others his desire to leave the U.S. right away, rather than

waiting (as co-conspirator Omar had suggested): "[i]t's a race to jannah [heaven]

bro.  At the end of the day if you stay behind it's up to you.   How long have you

been waiting and you still trying to wait?  Subhanallah.  What the hell?  I don't

understand that concept bro."[15]

Abdurahman and Omar continued debating the timing of their next attempt

to join ISIL, Omar counseling patience, defendant Abdurahman demanding

immediate action:

> GAO:  (UNI) I have a question (UNI). What if Dabiq[16]  already started?
> CHS:  Then I'm out. I'm out.
> **ZA:  Next spring break, Dabiq bro.  {And then you over here talking about…..(laughs)}**
> CHS:  Next spring break, nigger, we'll all be behind bars.
> **ZA:  Wallahi next spring break we'll be behind bars.  The U.S. is going to go in.  It's going to be tight, bro.  All your bros going to be green birds [martyrs].  You gonna have no connections.  What you all saying tho, Libya, bro. You start a new front there, bro.[17]**

During this same recording, Defendant Abdurahman again stressed his point:

"…I'm not waiting for winter.  What the heck?  What's wrong with this guy [Omar]?

Exactly what I want to hear.  I'm not talking to you nothing, bro.  I'm gonna be in a cell.

---

[14] Abdurahman's questions to CHS Bashir about the passports are found in trial exhibits 203 (audio) and 204 (transcript), beginning at page 4, then recurring at pages 30 and 31
[15] Trial exhibits 212 (audio) and 213 (transcript), at page 24
[16] Dabiq is a Syrian village, northeast of Aleppo, where ISIL believes the final, end-of-the-world battle between believers and non-believers will occur.  Lister Tr. 5/12/16 at pages 106-107
[17] Trial exhibits 203 (audio) and 204 (transcript), at page 46

Wallahi, I'm telling you that… I got a damn target letter.  What the hell's wrong with this guy?"[18]

Later in the recording, defendant Abdurahman again stressed the diminishing window of opportunity for leaving the U.S. undetected.  Referring to the FBI, he stated, "they can do whatever they want.  They'll just come knock, come {right?} They got the authority to do whatever they want.  And you don't know when that day is.   So bro,… {that winter plan It's not like they're going to tell you, 'Yo you got two weeks to hand yourself in.'  They're not going to do that.   You talking about. I don't know about that.}...real talk, bro. . . . I'm looking at a month.  Half a month."[19]

When the conversation turned to financing travel, Defendant Abdurahman discussed a fund-raising tactic used by his cousin when joining al-Shabaab: "[m]y cousin and them, they're broke as hell, you know what they did to go to ALS?   They went to Cedar.  Carried balaki donation for people, ah, with disease and everything.  'You gonna, you gonna donate?'  {Money.}  Everybody paid {money} donation.  They made their money with that."[20]

As part of transiting across a border with a fake passport, Defendant Abdurahman discussed leveraging the fact that law enforcement would be concerned about accusations of profiling: "{People tried that before bro.}  They have fake passports, but they just overconfident that nobody can stop them.  How they smile, how they act, how they talk to

---

[18] Trial exhibits 203 (audio) and 204 (transcript), at pages 62-63
[19] Trial exhibits 203 (audio) and 204 (transcript), at pages 124-125
[20] Trial exhibits 203 (audio) and 204 (transcript), at pages 77-78

them.  Yeah… That people even feel embarrassed, the employees feel embarrassed to stop them because they know they're going to get sued.  They're like 'yo, we can't question this guy.'"[21]

Referring to the previous success of Minnesota-based al-Shabaab fighters who traveled to Somalia by way of Mexico, Abdurahman said, in a conversation of March 22 into March 23, 2015, "[i]nshallah bro, we're not the first people who did it from [Minnesota] wallahi.  (UNI) got to Mexico and then to Somalia.  How'd they do it?  They did it."[22]  Defendant Abdurahman echoed his own sentiment in a recording made on March 24, 2015, when he said, "I think we would have not done it if those brothers never did it.  Like you know those brothers that did it in Mexico thing?...[W]e would never have known about it."[23]

After discussing ISIL's military success, Defendant Abdurahman contemplated falsely blaming the FBI for his radicalization and departure from the U.S.: "{I'm a turn it towards the Feds, bro}.  The whole thing.  I left this country because of them.  I, I was followed day and night, so…".

Abdurahman then introduced Omar and Bashir to "the new Wilaya video". [24]  The defendant discussed in detail his admiration for an ISIL fighter who, in the video, is shot

---

[21] Trial exhibits 203 (audio) and 204 (transcript), at page 71
[22] Trial exhibits 212 (audio) and 213 (transcript), at page 33
[23] Trial exhibits 216 (audio) and 217 (transcript), at page 3
[24] Trial exhibits 203 (audio) and 204 (transcript), at page 51 (blaming departure on "the Feds").  Wilaya video discussion is at page 53, same exhibit.  CHS Bashir later confirmed that the video being referred to was "Al Baraka State: Battlefield Lions," introduced at trial as Government Exhibit 206.

in the stomach during battle, then tells the viewer "we didn't leave our homes except for this…".[25]

During the March 15, 2015, recording, Defendant Abdurahman compared his, Ahmed's, Mohamed Farah's, and Musse's allegiance to ISIL as being far deeper than that of their co-conspirator Yusuf:

> **ZA:    Abdullahi's in way, Abdullahi's in a way better situation than Hamza.**
> GAO:  Why you say that?
> **ZA:    First of all, college student, {he is}. This guy, Abdullahi (UNI), he goes to high school.  ISIS wasn't a big deal to him. {But us} four people…They, they know that, uh, this is not no radicalization. They know like somehow we believe it.**[26]

On April 3, 2015, Abdurahman plotted with Mohamed Farah and Bashir:

> **ZA:    You gotta be smart, think like a criminal ahki.**
> CHS:  I'm not. You are.
> **ZA:    Of course, {ok} just think like the average Joe and then you gonna get locked up.**[27]

And later on the same page of transcript, Abdurahman stated "(UI) I'm a lone wolf." P. 149 of Exhibit 233.

As the conversation progressed, Abdurahman, Mohamed Farah, RW (an unindicted co-conspirator), and Bashir viewed the social media accounts of ISIL fighters. Abdurahman took pains to point out one particular ISIL member – a bomb-making specialist who advises his followers how to conduct terrorist attacks in non-Muslim lands:

---

[25] Also at page 53 of trial exhibit 204
[26] Trial exhibits 203 (audio) and 204 (transcript), at pages 82-83
[27] Trial exhibits 232 (audio) and 233 (transcript), at page 147

**ZA:**    **He was in Birmingham. That's where (UI), and he walked 7 months to Sham. He be making all this, how to do attacks in Dar al Kuffar.[28]**

RW:    Yeah, he freaking [OV]

**ZA:**    **Wallah, anybody, whoever, who wants it.**

RW:    He followed me.

**ZA:**    **He's a bomb specialist. [29]**

This was not defendant Abdurahman's only statement indicative of a fondness for violence.  Discussing a fighter who had left ISIL to join its rival organization, Jabhat al-Nusra, defendant Abdurahman said on April 9, 2015, "That guy's fitna [corrupt] bro.  He needs to be beheaded."   To this proclamation, defendant Mohamed Farah stated only that he thought this Jabhat al-Nusra member was "locked up".[30]

On April 1, 2015, defendant Abdurahman gave a passport photograph of himself to CHS Bashir, intending CHS Bashir to use that photograph in the production of a fake passport for defendant Abdurahman.  (Abdurahman plea agreement, at page four).  Later, on April 6, 2015, defendants Musse and Abdurahman met with CHS Bashir to discuss the pending plot to travel to Syria using the fake passports.  During this recorded meeting, the CHS showed both Musse and Abdurahman a photograph of a sample fake passport.  (A photograph of this fake British passport is in evidence as Trial Exhibit 183.)[31]  Musse carefully examined the handiwork and compared it to his own real passport, noting that both contained seventeen digits and a similar barcode.  Later that day, co-defendant

---

[28] "Dar al Kuffar," the land of the unbelievers (as opposed to "Dar al Islam," the land of the believers).

[29] Trial exhibits 232 (audio) and 233 (transcript), at page 154-155

[30] Trial exhibits 241 (audio) and 242 (transcript), at page 96

[31] Trial exhibits 237 (audio) and 238 (transcript), at page 5

Abdurahman asked for his passport photograph back from Bashir, and Bashir returned the photograph to Abdurahman.  (Bashir Tr. 5/23/16 p. 23)

Defendant Abdurahman was apprehensive about the legitimacy of the fake passport connect in California.  During the April 6, 2015 meeting, defendant Musse and defendant Abdurahman asked CHS Bashir a series of questions about the fake passport connect in California designed to alleviate defendant Abdurahman's suspicions.  Defendant Musse wanted to know "exactly word for word" what the passport connect had told the CHS.[32] CHS Bashir told defendant Musse and defendant Abdurahman that he had "told him the situation.  What's going on.  Like eight niggers.. trying to be out."  To this, defendant Musse inquired, "[a]nd you said that they're terrorists?" [33]

Also during this conversation, Defendants Musse and Abdurahman talked of the urgent need to get out of the country due to the February 2, 2015 arrest of co-defendant Hamza Ahmed.  Musse surmised that if his co-conspirator Ahmed decided to cooperate with the government, he and Abdurahman would be immediately arrested:  "[i]f [Ahmed] gives a deal right now we'd probably get locked up the next day."

Musse also encouraged the CHS to tell his California cousin that "there's more coming, they're just afraid…that these three niggers want to do it right now and they don't care what consequences come with it… if I get locked up for this one bro [praise be to

---

[32] Trial exhibits 237 (audio) and 238 (transcript0, at page 11.
[33] Trial exhibits 237 (audio) and 238 (transcript), at page 12.

Allah].  I tried my best.  You know I have no problem with it, facing the consequences. Facing the music." [34]

Defendant Musse, Abdurahman and the CHS also discussed the jihad-inspired departures of two of their friends – Nur and Mohallim – and compared the impact on members of the conspiracy of those actions.  Mohallim, a/k/a Sayf, was discussed by both Musse and Abdurahman as having a significant impact on their desire to join ISIL. Defendant Musse was particularly motivated by the departure of Mohallim, stating "Sayf is amazing.  He had good intentions.  So pure, bro.  He didn't tell no one." [35]

Musse also revealed to defendant Abdurahman his intentions to leave for Syria immediately after Nur and how he begged Omar, then emir, to give him the go-ahead. Musse told the CHS and Abdurahman, "…after Curry [Nur], exactly I was about to leave. I told [Guled Omar], 'yo, give me the green go.'  You know he was still emir, right?  He was the emir of all of us…Told him 'yo, do I got the green go?" [36]

On April 19, 2016, defendant Abdurahman was arrested in Minneapolis after his coconspirators Daud and Mohamed Farah had been arrested in San Diego attempting to purchase fake passports from their passport connect, who was, true to defendant Abdurahman's earlier-stated apprehensions, an employee of the FBI who was working undercover.  This prosecution, guilty plea, and sentencing followed.

---

[34] Trial exhibits 237 (audio) and 238 (transcript), at page 20.
[35] Trial exhibits 237 (audio) and 238 (transcript), at page 35
[36] Trial exhibits 237 (audio) and 238 (transcript), at page 41

III.    ARGUMENT

In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court described the sequence of a properly-conducted sentencing hearing:  the district court calculates the advisory Guidelines range, and then, after hearing from both parties, considers the 18 U.S.C. § 3553(a) factors, and imposes sentence.  552 U.S. at 49-50; *United States v. Ruvalcava-Perez*, 561 F.3d 883, 886 (8th Cir. 2009) ("In sentencing a defendant, the district court should first determine the appropriate Guidelines range, then evaluate whether a traditional departure is warranted, and finally decide whether or not to impose a guideline sentence after considering all the § 3553(a) factors").

Defendant Abdurahman should be sentenced to a term of imprisonment of 180 months, or 15 years.  Defendant Abdurahman's sentence as calculated under the advisory Sentencing Guidelines is actually 292 to 365 months; however, because his crime of conviction carries a 15-year statutory maximum penalty, his advisory Sentencing Guidelines sentence is capped at 180 months, or 15 years.

### A.  The Report of Presentence Investigation

The United States has no objections to the factual statements contained in the Report of Presentence Investigation prepared by the United States Probation and Pretrial Services Office.

### B.  The Sentencing Guidelines

The U.S. Probation Office's Report of Presentence Investigation correctly calculated defendant Abdurahman's adjusted offense level as 35, and correctly placed him

in criminal history category VI.  The resulting advisory guidelines sentence is 292 to 365 months' imprisonment, and is found in Zone D of the guidelines sentencing chart.

At sentencing, the United States will ask for a three level reduction in offense level for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1.  The United States will also dismiss Count Three of the Superseding Indictment at sentencing.

The adjusted offense level and criminal history score are both as high as they are for this defendant in part because of the application of the terrorism enhancement at U.S.S.G. § 3A1.4.  This victim-related, Chapter Three adjustment recognizes that "an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time."  *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir.) *cert. denied sub nom. Haouari v. United States*, 538 U.S. 1068 (2003).  "We have recognized that 'Congress and the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under [U.S.S.G.] § 3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation."  *United States v. Stewart*, 590 F.3d 93, 143 (2d Cir. 2009) (*quoting Meskini, supra,* 319 F.3d at 92).

### C.  18 U.S.C. § 3553(a)

The factors that a district court should take into account in fashioning an appropriate sentence are listed at 18 U.S.C. § 3553(a).

### (1) The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant.

The nature and circumstances of the offense are set forth in Common Appendix A. The defendant stands convicted of conspiring to provide material support to one of the most dangerous and violent terrorist organizations in existence.  ISIL has, within the past two years, carried out mass casualty terrorist attacks in Beirut, Paris, Brussels, Nice, and San Bernardino, while a man claiming to be acting on ISIL's behalf has carried out a mass shooting, killing 50 persons, at a nightclub in Orlando.

As to the characteristics of defendant Abdurahman himself, he is 21 years old, and the eldest of seven children.  In the Fall of 2014 he tried to reach Syria to join ISIL, and he was heavily involved in the Spring of 2015 plot, until he decided against trying to reach Syria at that time.  His decision not to go forward in the Spring of 2015 was not in any way a renunciation of ISIL and all it stands for, but was, rather, a pragmatic decision based on the likelihood of getting caught.

As the CHS recordings quoted above in this Sentencing Position illustrate, the defendant was enthusiastic about the possibility of joining ISIL and taking part in its savagery.  Nor did being cautioned by the FBI affect defendant Abdurahman in the least.  On November 8, 2014, after being sent home from New York, in an interview with FBI Agents at his own kitchen table, defendant Abdurahman angrily challenged the agents to tell him what was illegal about trying to go on vacation in Greece, and accused law enforcement of profiling him because of his religion.   Defendant Abdurahman then immediately began plotting, yet again, how to leave the United States, reach Syria, and join

ISIL.  Together with his co-conspirators, defendant Abdurahman resurrected an old plan that had been discussed in the Spring of 2014, and they all began plotting to travel to Syria via Mexico using fake passports.  On April 19, 2015, of course, defendant Abdurahman was arrested, and that, and that alone, was enough to finally bring his terrorist plotting to a stop.

The defendant has not been convicted of an isolated, impulsive act. Even though his convictions in this case represent his first criminal convictions, the defendant took multiple steps, over nearly a year, to try and travel to Syria where he would join ISIL.

The government acknowledges that defendant Abdurahman, his family (particularly, but not exclusively, his father), and his lawyers were instrumental in removing from this case a paralegal member of another defendant's defense team who apparently had compromised the independence of the decision-making of defendant Adnan Farah and potentially Hamza Ahmed.  Subsequent to the removal of this paralegal, defendants Adnan Farah and Hamza Ahmed entered pleas of guilty.  It is impossible for the government, which stands outside the attorney-client relationship that exists between defendant Abdurahman and his lawyers, to know the scope of defendant Abdurahman's responsibility for bringing about the removal of the paralegal and the resulting guilty pleas. Defendant Abdurahman's role could have been anywhere on a continuum from passively authorizing his attorneys to take action, to being actively and comprehensively involved in these matters.

Upon receipt of information that describes defendant Abdurahman's own role in these matters, the government will be in a position to appropriately respond

### (2) The need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.

The defendant stands before the court convicted of one of the most serious crimes in the federal criminal code.  Three people, at least, have died in Syria as a result of this conspiracy – Douglas McAuthur McCain, Abdi Nur, and Yusuf Jama.  The offense's seriousness is adequately reflected in a fifteen-year sentence, as is respect for the law and just punishment.

Respect for the law is a particularly important factor in this case.  No trial in the aggregate memory of the U.S. Attorney's Office has been conducted in more of an atmosphere of intimidation, harassment, and incipient violence than the trial of this case.  The families of cooperating defendants were harassed in the courtroom, in full view of the testifying witness; there was a fistfight in the corridor outside the courtroom; multiple individuals had to be ejected from the courtroom for not following the Court's reasonable, non-onerous rules of behavior.  A significant sentence is needed to promote respect for the law, to demonstrate clearly that this is a nation of laws.

### (3)  The Need for the Sentence to Afford Adequate Deterrence to Criminal Conduct, and the Need for the Sentence Imposed to Protect the Public from Future Crimes of This Defendant.

A significant sentence in this case is needed for individual and general deterrence. It is also needed to protect the public from defendant Abdurahman. Individual deterrence discourages a defendant from committing such a crime again.  General deterrence is necessary to deter other people from committing similar crimes.  "Congress specifically made general deterrence an appropriate consideration . . . and we have described it as 'one

of the key purposes of sentencing.' " *Ferguson v. United States*, 623 F.3d 627, 632 (8th Cir. 2010) (*quoting United States v. Medearis*, 451 F.3d 918, 920 (8th Cir. 2006)).

Not too long ago, Minnesota suffered a wave of young men traveling to join al Shabaab, and presumably many of those young men are now dead. Despite these deaths and the surrounding investigation and prosecutions, here yet another group of Minnesota men attempted to leave the United States to become terrorists. As the Court witnessed in the Courtroom and surrounding press coverage, despite the gravity of the charges, the defendants had significant community support. General deterrence is necessary to impress upon the greater community that no matter your age, religion, or politics, trying to become a terrorist has serious, dire consequences.

The case for individual deterrence, and the case for a sentence that protects the public from further crimes of the defendant, was extensively laid out above in this position pleading. The details of this defendant's extensive, persistent, and long-lasting role in this crime speak for themselves as an explanation of defendant Zacharia Abdurahman's threat to both public safety and national security. The fifteen-year sentence sought by the government is justified to protect the public from defendant Abdurahman's deeply held desire to become an ISIL fighter.

Terrorist activity by ISIL has only increased since defendant Abdurahman first began plotting to leave for Syria. ISIL attacks in Paris, Nice, Beirut, Brussels, and San Bernardino have all occurred since defendant Abdurahman began plotting to leave for Syria. Those attacks have claimed hundreds of lives and have made manifest the need to protect the public from the deeds of people like this defendant.

A substantial sentence is also needed to deter individuals from supporting designated foreign terrorist organizations such as ISIL, and from providing ISIL with material support.  As the Supreme Court has noted:

> "Material support" is a valuable resource by definition.  Such support frees up other resources within the organization that may be put to violent ends.  It also importantly helps lend legitimacy to foreign terrorist groups – legitimacy that makes it easier for those groups to persist, to recruit members, and to raise funds – all of which facilitate more terrorist attacks.

*Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2725 (2010)

Terrorism, being motivated by fanaticism, is difficult to deter.  The effort must nevertheless be made.  However, if deterrence should be unavailing, then a fifteen-year sentence is amply justified as a means of incapacitating the defendant.

The most important objective of any government is the physical safety of the people.  Physical safety is the necessary precondition to the exercise of all other rights, such as freedom of expression, of religion, and of the press, to name only a few.  Defendant Zacharia Abdurahman's November 8, 2014 attempt to reach Syria, and his chilling statements, reproduced above, of enthusiasm for ISIL's violence, make him dangerous.  A fifteen-year sentence will, if nothing else, incapacitate the defendant for fifteen years, during which time it will be impossible for him to hurt anyone else.

### (4) The Need for the Sentence to Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner.

At this time, it is difficult to identify any particular programming that will benefit defendant Zacharia Abdurahman.  The defendant himself is deeply pessimistic about the effectiveness of deradicalization programming, at least for him.  On March 15, 2015,

Defendant Abdurahman spoke with CHS Bashir about the fact that "Bones" (a nickname for Abdullahi Yusuf) was in a deradicalization program.  As to his own prospects for deradicalization, defendant Abdurahman said "[w]ith me, all of us, we're hopeless, we're not gonna be in a program, bro.  We will straight up serve time."[37]  On another occasion, speaking to codefendant Hamza Ahmed, defendant Abdurahman spoke of how a stretch in prison would actually make him stronger:   "Don't be scared of the {non-Muslims.} Willahi, billahi, how many people in prison? We are not the first, bro, throughout history, bro.  Come on, bro. Yeah, they threatening you with fifteen years, bro.  Fifteen years, you got a long life after that, bro, even if they give it to you.   {God forbid.} but even if they give it you bro, ***it's not like it's going to deter you*** unless, yeah. And it will make you stronger. . . . How are they going to teach you? You are reading your books; you become more close to Allah." [38]  (emphasis added)

Even if defendant Abdurahman was more enthusiastic about deradicalization programming, and less enthusiastic about the benefits of prison, there is, as noted by the Court during the hearing held to present the assessments of the court's expert, Daniel Koehler, no counter-radicalization programming presently offered by the Bureau of Prisons.  This particular 3553(a) factor appears to be inapplicable to this defendant, though should that change during his term of imprisonment, the government will of course not stand in the way of defendant Abdurahman receiving any programming that will reduce the risk he currently represents to the safety of the public.

---

[37] Trial exhibits 203 (audio) and 204 (transcript), at page 8
[38] Trial exhibits 216 (audio) and 217 (transcript), pages 22 and 23

### (5) The Kinds of Sentence Available

The United States has submitted a Report concerning sentences imposed on defendants who have traveled overseas, or attempted to travel overseas, in the past two years in support of a designated foreign terrorist organization. *See,* Docket No. 698.

A review of the sentences imposed is telling. Of 20 defendants, in 14 cases, convicted of an 18 U.S.C. § 2339B violation, 14 of those defendants, or nearly three-quarters, were sentenced to the statutory maximum sentence of fifteen years' imprisonment. Only four of these convictions followed trial; the rest were all the result of guilty pleas. In short, courts are imposing the maximum sentences allowed by law in 2339B cases, even when defendants have admitted to their wrongdoing and initiated the rehabilitative process by pleading guilty.

The sentence of fifteen years' imprisonment requested by the government is consistent with the national sentencing pattern in similar cases.

IV.    CONCLUSION

For all these reasons, the United States respectfully asks this Court to sentence defendant Zacharia Abdurahman to a term of imprisonment of fifteen years, followed by a lifetime term of supervised release.


Dated: November 3, 2016                Respectfully Submitted,

                                       ANDREW M. LUGER
                                       United States Attorney

                                       *s/ John Docherty*

                                       BY:   JOHN DOCHERTY
                                       Assistant United States Attorney
                                       Attorney Reg. No. 017516X

                                       ANDREW R. WINTER
                                       Assistant United States Attorney
                                       Attorney Reg. No. 232531

                                       JULIE E. ALLYN
                                       Assistant United States Attorney
                                       Attorney Reg. No. 256511

## COMMON APPENDIX A – THE SYRIAN INSURRECTION AND ISIL

This Appendix A to the Government's Sentencing Positions describes (a) historical and Syrian current affairs context that is common to all nine Sentencing Positions being submitted to the Court by the government, and (b) a capsule summary of the facts proven at trial. This Appendix is reproduced in each of the government's sentencing positions, and is identical in each. No attempt has been made to write a factual summary that is more comprehensive than the very thorough Reports of Pre-Sentence Investigation written in this case by United States Probation officers. However, this Common Appendix A does go into more detail than the PSRs about the history of the Syrian insurrection, and the role in that insurrection of the designated foreign terrorist organization the Islamic State in Iraq and the Levant, or "ISIL." If there is interplay between events in Syria and events in Minnesota, Common Appendix A tries to correlate events in Syria with significant events that were happening in this case, here in Minnesota, at about the same time as the events in Syria.

As to the first part of Common Appendix A, history and current events, Common Appendix A relies upon the trial testimony of the government's expert witness, Charles R. Lister, Senior Fellow at the Middle East Institute, Washington, D.C. Common Appendix A does not summarize all of Mr. Lister's testimony. Instead, it highlights those parts of his testimony which are important to understanding the issues in these sentencings. These matters are a short history of the Syrian insurrection, the origins of ISIL, as well as ISIL's extraordinary brutality and the part such brutality plays in ISIL's recruitment of foreign fighters. Finally, this Common Appendix A concludes with a brief description of ISIL's

1

understanding of the importance, to what in ISIL's view would be an observant Muslim, of participating in the fighting now taking place in Syria.

The second part of Common Appendix A seeks to provide an overview of the facts of the case, and to provide a description of the facts of the case that can be referred to in all of the government's sentencing position papers.

The facts concerning historical background and Syrian current events in Common Appendix A are taken from a transcript of the trial testimony of the government's expert witness, Charles R. Lister, Senior Fellow at the Middle East Institute, Washington, D.C. As to other trial facts, which have not yet been transcribed, Common Appendix A relies on the contemporaneous notes of Assistant U.S. Attorneys and FBI Special Agents.

**Developments in Syria from the Arab Spring (2011) to 2013 Abu Musab al-Zarqawi's founding of ISIL (2013)**

Syrian President Bashar al-Assad took power in 2000, continuing the reign of his father, Hafez al-Assad. Between them, the two Presidents al-Assad have ruled Syria as a dictatorship for more than forty years. Bashar al-Assad has used brutal repression against his political opponents, including extensive and intrusive police surveillance followed by arrest, torture, and execution. The efforts of ordinary citizens, during the "Arab Spring," to protest against the regime, were met by the Assad regime with violence.

The Arab Spring began at the end of 2011, and was triggered by a Tunisian man who burned himself to death in a desperate act of protest after being humiliated by the police. The Arab Spring anti-dictatorship movement spread across North Africa and the Middle East in the months that followed.

2

In Syria, the wealthy had for decades been supporters of the regime.  After Bashar al-Assad took power in 2000, this increased, and the gap between rich and poor in Syria became even more stark than it had been.   When Bashar al-Assad introduced economic liberalization measures, with support given to small businesses, it turned out that the small businesses that received assistance were the small businesses of regime supporters.

On March 6, 2011, the Syrian internal security services arrested 15 schoolboys in the southern Syrian city of Deraa, alleging that they had been chanting revolutionary songs as they walked home from school.  All the boys were tortured, and several of them were killed.  Peaceful protests of the boys' arrest were met by the regime with live ammunition, resulting in several deaths.  Over the next few days, protests spread to numerous Syrian cities.  The arrest and torture of these schoolboys in Deraa, and the regime's heavy-handed response to it, marks the beginning of the Syrian insurrection against President Bashar al-Assad.  The insurrection soon transitioned from peaceful protest to armed revolt against the Assad regime.

The reaction of the Bashar al-Assad regime to the events in Deraa was consistent with the reaction to opposition of President Bashar al-Assad's father, Hafez al-Assad, during the time he had been Syria's president.  For example, in the 1980s a splinter faction of the Muslim Brotherhood tried to rise up in arms against President Hafez al-Assad in the Syrian city of Hamaa.  President Hafez al-Assad responded with months of artillery shelling of Hamaa, which killed between 10,000 and 40,000 of the city's inhabitants.

As protests and fighting spread across Syria during 2011, the United States expressed sympathy for Syrians engaged in peaceful, anti-Assad protests.   U.S.

3

Ambassador to Syria Robert Ford attended several anti-regime protests, a clear signal of U.S. government support.  The regime responded by physically threatening the U.S. Embassy, and at one point withdrew security personnel from around the embassy and allowed pro-regime thugs to ransack the building.  The United States then withdrew its diplomats from Syria.  The United States has had no diplomatic or consular representation in Syria since 2011.

Arab Spring opposition to the Assad regime spanned all sectors of Syrian society. One component of the anti-regime opposition was a specifically religious, Islamic opposition.  For a time following the U.S. invasion of Iraq, President Bashar al-Assad was able to neutralize the Islamic opposition within Syria by busing Islamic fighters over the border into Iraq, where they could fight Americans and their Iraqi allies.  Eventually some of these Islamic fighters returned from Iraq (or Lebanon, another place to which the Assad regime had sent them) to Syria.

## I.  THE SYRIAN HISTORICAL AND CURRENT EVENTS CONTEXT OF THIS CASE.

### A.  Abu Musab al-Zarqawi, the Origins of ISIL, and the Roots of ISIL's Extreme Violence

In 1999, Abu Musab al-Zarqawi was released from the Jordanian prison where he had been serving a sentence for support of a terrorist organization.  Shortly after his release from prison, Zarqawi traveled to Afghanistan, where he made contact with the senior leadership of al-Qaeda.  With $200,000 of al-Qaeda's money, and a plot of land donated by the Taliban, Zarqawi established a terrorist training camp in Afghanistan.  In 2000, Zarqawi and the organization he had founded attempted to perpetrate the "millennium

plot," which included attacks on the Radisson Hotel in Amman, and several other western hotels in Amman.  The plot was foiled.

When the U.S. invaded Afghanistan following the attacks of September 11, 2001, Zarqawi fought for a short while, but then fled Afghanistan, going first to Iran, and then on to northern Iraq.  Following the U.S. invasion of Iraq, Zarqawi and his organization conducted a campaign of bombings against the United States military and other targets, including the United Nations and the Jordanian embassy. At this time, Zarqawi did not have any official relations with al-Qaeda, but in late 2003 and on into 2004 Zarqawi reached out to al-Qaeda in an effort to have his organization and al-Qaeda work together. In May of 2004, Zarqawi conducted his first videotaped beheading, of U.S. hostage Nicholas Berg.  Several months after this atrocity, in October of 2004, Zarqawi "made *baya*" (swore allegiance) to al-Qaeda. Zarqawi's organization took the name "al-Qaeda in Iraq," and became al-Qaeda's first international affiliate.

Zarqawi was ferociously anti-Shiah, and his organization in turn became deeply anti-Shiah. Zarqawi believed the Shiah had to be fought until they were all exterminated. Zarqawi dispatched his own father to carry out a suicide bombing at a Shiah shrine in the Shiah holy city of Qatib, in southern Iraq, which killed a Shiah ayatollah.  Shiah were referred to by the insulting term "rafidi" which means "one who refuses," specifically, one who refuses to recognize the legitimacy of the line of succession from the prophet that is recognized by Sunni Islam.  The Assad regime, although its top members are Alawites, gets support from Iran, the dominant Shiah power in the middle east, and opposition or

5

support for the Assad regime tends to fall along Shiah-Sunni lines, with Shiah in support of the regime, and Sunni in opposition to it.

Following the pledge of *baya*, tension between Zarqawi and al-Qaeda persisted, primarily over the issue of brutality and the killing of Muslims.  Zarqawi's bombing campaign in Iraq may have targeted non-Muslims, but the bombs were very powerful, were often detonated in public places, and as a result they killed many Muslims.  In Zarqawi's view, such deaths were acceptable, because Zarqawi believed Iraqi society needed to be thoroughly cleansed of all western and secular influences.  To al-Qaeda, however, Zarqawi's bombings were a catastrophe in terms of al-Qaeda's ability to maintain the support of ordinary Muslims.  There was an exchange of letters between al-Qaeda and Zarqawi over this issue, at the end of which al-Qaeda ordered Zarqaqi to be more discriminating in his bombing.  In response, Zarqawi's behavior, if anything, actually got worse.

Zarqawi was killed by American military action in June of 2006.  In October of 2006 one of his successors as the leader of al-Qaeda in Iraq renamed the organization "the Islamic State in Iraq."  After some years in which it was not clear whether the Islamic State in Iraq was or was not still part of al Qaeda, the two organizations formally split in 2013.

Before the split, in May through August of 2011, discussion began about opening a Syrian wing of the Islamic State in Iraq.  In August of 2011, seven senior members of the organization crossed into Syria, and activated a dormant network of safehouses in northeastern Syria.  In Syria, this group went by the name Jabhat al-Nusra, the "support group."  When the split between the Islamic State and al-Qaeda occurred in 2013, Jabhat

al-Nusra remained a part of al-Qaeda, while the Islamic State went on its own, independent path.

In June of 2014, abu Bakr al-Baghdadi, then leader of what had become the Islamic State in Iraq and the Levant, or "ISIL," mounted the steps of the pulpit in a mosque in Mosul, Iraq and proclaimed the re-establishment of a caliphate, a supreme Islamic religious and political entity that had a legitimate claim to the loyalty of every Muslim in the world.

### B. ISIL's Need for, and Recruitment of, Foreign Fighters

Several factors drove ISIL to need foreign fighters to fill its ranks.

First, as testified to by Mr. Lister, ISIL did not govern populations so much as it controlled them.  Its theological rulings were bizzare (the sale of ice cream was forbidden because ice cream did not exist in the prophet's time, and the sale of cucumbers was forbidden because cucumbers were sexually suggestive, for example), and its punishments for even minor infractions were extraordinarily sadistic and carried out in public. ISIL could recruit from the local population only through fear, and as a result local recruits understandably tended not to be good fighters.  Second, from August of 2013 until July of 2014, ISIL did not fight the Assad regime; instead, it waged war on other anti-regime opposition groups.  Of the 7,000 people killed in combat by ISIL during the first six months of 2014, not one was an Assad regime soldier.  At this same time, the Assad regime stopped fighting ISIL, probably because the regime recognized that ISIL was doing the regime's work for it.  These facts made it impossible for ISIL to augment its numbers by allying with other opposition groups.

7

In response, ISIL recruited very heavily from abroad, relying on three different recruiting messages.

First, abu Bakr al-Baghdadi, in his role as caliph and leader of the faithful, claimed that it was the duty of all Muslims throughout the world to come and join the Islamic State, and to fight for that state.  Second, ISIL used its extreme brutality as a recruiting tool.  To do so, ISIL characterized its actions to a local audience as expressions of power and dominance over a Shiah-dominated Iraqi government, and to an international audience as an organization that was bringing power back to Sunni Islam by showing no mercy to the enemies of Sunni Islam.  To publicize its brutal acts, ISIL has proven very savvy at using electronic media.  As the evidence at trial showed, many ISIL propaganda videos were enthusiastically viewed by defendants in this case.

Third and finally, ISIL has adopted an apocalyptic ideology about the end times which places great value on dying as a martyr in Syria at this particular time in human history.  At the end of human history, ISIL preaches, Jesus will descend from heaven to the white minaret of the main mosque in Damascus, and from there will lead an army to the Syrian village of Dabiq, northeast of Aleppo, where the final battle between the forces of good and the forces of evil will be fought.  As Mr. Lister explained:

> . . . one of the reasons why ISIL has been so effective at recruiting so heavily from non-Syrian and Iraqi populations is because it has claimed to be operating in Syria within this broader mindset.  The idea that you can go and fight in Syria in order to contribute towards bringing about the end of the world is something that its ideology – its propaganda, sorry, has made very clear for a long time.  In fact, Dabiq was something that Abu Musab al-Zarqawi all the way back in the 2000s spoke about very clearly, our armies will one day reach Dabiq, and, you know, bring about the end of days.  So

8

it's a core tenet, it's a core principle of ISIL's belief.  And fundamentally, it's a core reason for why they wanted to operate in Syria all along.

When asked to link this ideology to the recruitment of a potential foreign fighter, Mr. Lister continued:

> I mean, generally speaking, there is a belief within these organizations that if you fight in the name of Allah, in the name of God, and you die as a martyr, you will automatically go to paradise.  I believe their understanding is that if you die in these battles, which ISIL claims to be bringing out the end of days, then you will obtain a, you know, a high place in paradise alongside God.  So the importance of fighting in Syria specifically, as I say, is of that utmost importance.

Finally, Mr. Lister pointed out in his testimony that some of the outrages perpetrated by ISIL, such as the beheadings of western hostages, were "trying to bait the west into intervening more," in order to precipitate the final battle between Muslims and non-believers.

As a result of all three factors, a vast majority of ISIL's forces at for example, the battle of Kobani, under the command of ISIL commander Omar al-Shishani, were foreigners, who sustained huge casualties.  Of note, the battle of Kobani pitted ISIL against Kurdish militia.  At no time, did the battle of Kobani involve combat between ISIL and Assad regime forces.

## II.   THE FACTS OF THIS CASE

The evidence at trial demonstrated the existence of a conspiracy among the defendants to travel to Syria via Turkey, cross the border into Syria, and there join, and fight for, ISIL.  There were three major efforts by the defendants to reach Syria, in the Spring of 2014, the Fall of 2014, and the Spring of 2015.

9

The Spring of 2014 effort had two components.  In one, defendant Guled Omar, together with Abdirahman Bashir (then a member of the conspiracy, later a cooperating human source for the FBI) and Yusuf Jama, attempted to drive to Mexico and travel onwards from Mexico to Turkey and then Syria.  In preparation for this attempt, defendant Omar withdrew $5,000 in cash using his federal student financial aid debit card.  Those funds were never repaid, and as a result of this financial behavior, defendant Omar was later found guilty of federal financial aid fraud, in violation of 20 U.S.C. § 1097.  The attempt at driving was thwarted by defendant Omar's family.  Later, however, on June 9, 2014, Yusuf Jama left the Twin Cities by Greyhound bus, traveled to New York City's John F. Kennedy International Airport (hereinafter "JFK"), and flew from there to Turkey and onwards to Syria.  Jama is believed to have later been killed in combat while fighting for ISIL and against Kurdish militia at the battle of Kobani.

The second component of the conspirators' Spring of 2014 effort involved cooperating defendant Abdullahi Yusuf's attempt to travel on May 28, 2014, and Abdi Nur's successful travel on May 29, 2014.  Yusuf was booked on an itinerary that would have taken him on the Russian airline Aeroflot from Minneapolis-Saint Paul to JFK, then on to Moscow, Russia, before taking an Aeroflot flight from Moscow to Istanbul.  However, when Yusuf applied for a passport on April 28, 2014, he aroused the suspicions of an alert passport specialist in the Minneapolis passport office.  The passport specialist relayed his suspicions to his supervisor, who told the FBI.  As a result, FBI Agents were waiting for Yusuf when he arrived at the Minneapolis – Saint Paul airport on May 28 to

catch his flight to JFK.  Yusuf was denied boarding, and after continuing to falsely claim to the FBI that he was going solo to Istanbul for vacation, sent home.

The Fall of 2014 effort also had two components. In the first, defendant Guled Ali Omar again tried to reach Mexico, this time by taking a flight from Minneapolis – Saint Paul to San Diego.  The FBI was told that defendant Omar had made a travel booking, and federal agents met Omar at the airport.  Omar arrived at the airport carrying no luggage, and in possession of his passport.  He was denied boarding and sent home.  After being turned away at the airport, defendant Omar telephoned defendant Hanad Musse, using "Magic Jack," an application that disguises one's telephone number. In that call, defendant Omar pleaded with defendant Musse to drop their own plans to travel to Syria.  In that telephone call, defendant Omar told defendant Musse that "I just got caught up."

The plans from which defendant Omar was trying to dissuade defendant Musse involved Musse and three other defendants – Mohamed Farah, Hamza Ahmed, and Zachariah Abdurahman – following the example of Yusuf Jama by taking Greyhound buses to JFK, and flying from there to various destinations in southeastern Europe, such as Athens, Istanbul, and Sofia, and then traveling on to Turkey and, ultimately, Syria.

Musse refused to drop the plans and "the JFK Four" continued to New York.  There, they were met by agents of the FBI and denied boarding.  Defendant Hamza Ahmed had boarded his flight, and was escorted off the aircraft by federal agents.  When three of the four were interviewed by the FBI in New York (defendant Hanad Musse left JFK without being interviewed; however, Mohamed Farah, Hamza Ahmed, and Zachariah Abdurahman were interviewed at JFK), they lied, claiming that they did not know each other, and that

they were all traveling to Europe, by themselves, for vacation.  In the case of defendant Mohamed Farah, this meant that he claimed to be traveling to Sofia, Bulgaria, in November, for a beach vacation lasting one day.  Upon return to Minnesota, each of the defendants was given a target letter from the U.S. Attorney's office, telling them they were targets of a federal criminal investigation into allegations of conspiracy to provide material support to a designated foreign terrorist organization.  The JFK Four were then again interviewed, this time by Minneapolis-based FBI agents.  They maintained the fictions they had given to the New York FBI agents.  (Defendant Hanad Musse had not been interviewed in New York.)

Later in November of 2014, defendant Abdullahi Yusuf, who had been at liberty since trying to leave in late May, was arrested on a criminal complaint charging him., together with Abdi Nur, with conspiring to provide material support and resources to ISIL, and with actually providing material support and resources to ISIL (the material support and resources provided was the person of Abdi Nur).  In February of 2015, defendant Hamza Ahmed was arrested, and detained pending trial.  Defendant Ahmed was therefore unable to conspire with his codefendants when, in the Spring of 2015, they began conspiring yet again to go to Syria to join ISIL.

The failure of the Fall 2014 attempt did not lead the defendants to drop their ambitions to travel to Syria.  In the Spring of 2015, they again began planning to leave the United States, go to Turkey, then go onwards into Syria to join, and fight for, ISIL.  Shortly after this third and final round of plotting began, Abdirahman Bashir decided to cooperate

12

with the FBI's investigation.  He wore a recording device and recorded many hours of incriminating conversations between March and April of 2015.

The defendants had hoped to make a connection in Tijuana, Mexico, with a source for false passports.  When this plan could not be completed, because Abdi Nur, in Syria, was unable to connect with the Mexican ISIL fighters who were to provide the contact information in Tijuana, Bashir, with the approval of the FBI, stated that he had a source for false passports in San Diego.

On April 17, 2015, Bashir, together with defendants Mohamed Farah and Abdirahman Daud, left home in defendant Daud's Honda Civic, bound for San Diego. Upon arrival in San Diego on Sunday, April 19, defendants Daud and Farah were arrested at a warehouse in San Diego when they took possession of fake passports from "Miguel," a San Diego police officer who had been acting the part of a procurer of fake passports. The arrests in San Diego were followed within minutes by the arrests in Minnesota of the remaining defendants:  Guled Ali Omar, Adnan Abdihamid Farah, Zachariah Yusuf Abdirahman, and Hanad Mustofe Musse.