UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case File No. 15-CR-49 (MJD/FLN)

United States of America,

    Plaintiff,

v.

Zacharia Yusuf Abdurahman,

    Defendant.

**DEFENDANT ZACHARIA YUSUF ABDURAHMAN'S RESPONSE TO THE SENTENCING POSITION OF THE UNITED STATES**

Defendant Zacharia Yusuf Abdurahman, by and through his attorneys Jon M. Hopeman and Marnie E. Fearon of Felhaber Larson, respectfully submits this Response to the Sentencing Position of the United States, pursuant to Rule 83.10(g) of the Local Rules of the United States District Court.

## INTRODUCTION

Zacharia Abdurahman does not deny his activities.  He does not dispute that over a period of time he became radicalized.  He does not dispute that he said some horrible things.  He does not contest the atrocities depicted in the propaganda videos disseminated by ISIS.  However, the government appears to urge this Court to punish Mr. Abdurahman for not only his own conduct, but for all of the horrific acts perpetrated in the name of ISIS.  In requesting a 15 year sentence with a lifetime of supervised release, the government urges a blanket approach, ignoring Mr. Abdurahman's individual characteristics, ignoring his post-arrest actions, and ignoring the findings and recommendations of Daniel Koehler.  This the Court cannot do.  18 U.S.C. §3553(a)

requires the Court to look at each defendant as an individual and, in doing so, it is apparent that a downward departure and downward variance is appropriate.

## GOVERNMENT'S RECITATION OF THE EVIDENCE AGAINST MR. ABDURAHMAN

For the most part, Mr. Abdurahman does not have any basis to dispute the recitation of facts contained in the United States' Sentencing Position. There are a couple of points that require clarification as outlined below:

- At pages 11 and 12 of Common Appendix A, the government mistakenly identifies Hanad Musse as the individual that was not interviewed by the FBI at the JFK airport when, in fact, it was Mr. Abdurahman that was not interviewed at the airport. When Mr. Abdurahman attempted to check in for his flight, he was told he would not be allowed to fly. After conversing with the ticket agent, he left the airport and returned to the bus station. He did not come into contact with law enforcement at any time before he returned to Minnesota and was not informed that law enforcement wished to speak to him. He was interviewed by federal agents when he returned to his home and at that time he lied to them about his activities.

- At page 13-14 of its Sentencing Position, the government characterizes Mr. Abdurahman's recorded statement as "reveling in the status that being a potential fighter for ISIL has given them." The statement was made four months after receiving a target letter and after two of his co-defendants were arrested. Rather than "reveling" in a status, by describing them as "hot boys on the block," Mr. Abdurahman was recounting how he

2

and his co-defendants were under heavy FBI surveillance, a topic they frequently discussed.

It is also important to put all of Mr. Abdurahman's recorded statements in perspective in terms of their timing. In November of 2014, Mr. Abdurahman was turned away at the airport and told he would not be allowed to fly. When he returned to Minnesota, he was visited by FBI agents and given a target letter. Shortly thereafter, his co-defendant Hamza Ahmed was arrested. A couple of months after that, his co-defendant Abdullahi Yusuf was arrested. The recordings were made at the height of Mr. Abdurahman's radicalization and the walls were closing in on him. He was feeling desperate.

Mr. Abdurahman does not offer any excuse for what he said in the recordings cited by the government. He does not deny the extent of his involvement in the conspiracy. However the recordings, taken over the course of a couple months at the end of his involvement in the conspiracy, are the culmination of a process that progressed gradually over the course of a year, a process that ended in April of 2015 when the FBI arrested him, saving his life.

## ARGUMENT

### A.   The Guidelines.

The government is correct in that the terrorism adjustments are properly applied given the conduct in this case. The government cites case law setting forth Congress' rationale for determining that the adjustments are appropriate. See e.g., United States v. Meskini, 319 F.3d 88, 92 (2nd Cir. 2003)(subsequent history omitted); United States v.

Stewart, 590 F.3d 93, 143 (2nd Cir. 2009). In both cases, the Second Circuit emphasized that the Court always has the discretion to depart from the guidelines when the Court finds that the resulting criminal history "over-represents 'the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes.'" Meskini, 319 F.3d at 92 (finding that such a circumstance did not exist in that case because of the defendant's extensive history of fraud and the defendant's admission that he was a "semi-retired con man, . . .a two-bit thief."). In Stewart, the Court noted that there may be a wide variety of culpability amongst defendants. Id. at 143 (citing United States v. Cavera, 550 F.3d 180, 192 (2nd Cir. 2008)). "Perhaps all who merit this enhancement are culpable and dangerous – but some among them are more culpable, more dangerous, with crimes more serious than others. It is the district court that is primarily charged with the responsibility for making such distinctions." Id.

The government ignores the relative culpability of each of the defendants as well as the individual defendant characteristics and asks this Court to sentence Mr. Abdurahman to the statutory maximum. The government's approach is inconsistent with the requirements of the Sentencing Guidelines and 18 U.S.C. §3553(a).

    B.    **18 U.S.C. §3553(a).**

        1.    **The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant.**

Mr. Abdurahman's path towards ISIS did not begin with an attraction to violence or a fondness for the brutalities committed by its members. Rather it began with empathy for the women, children, elderly and disabled that were targeted by the Assad Regime.

Mr. Abdurahman saw videos and photographs of women and children with torn limbs and of dead bodies, murdered by Assad's soldiers. He watched videos of women and children pleading for the help of their fellow Muslims.

At the same time, he struggled to find a place of belonging. As described in Mr. Abdurahman's position on sentencing (Dkt No. 706) and the Joint Sentencing Memorandum (Dkt No. 703), Mr. Abdurahman did not identify fully as "Somali" and did not identify fully as "American." Mr. Abdurahman's struggle was exacerbated by the hatred and prejudice directed at him and members of the Somali community, simply as a result of being Somali or Muslim. For example, as Mr. Abdurahman's father recalls, Mr. Abdurahman was spit at while at a local McDonald's and told to go back where he came from. That is just one example of Mr. Abdurahman's personal experiences.

A cursory review of media accounts reveals that such bigotry and hatred remain commonplace.

- *Midwestern Somali Restaurant Set Ablaze After Nazi Symbols Found*, TPM Livewire, December 8, 2015 (http://talkingpointsmemo.com/livewire/juba-coffee-fire-hate-crime) - A Somali restaurant in Grand Forks, North Dakota was set ablaze in the middle of the night.

- *Threat to Somali woman investigated as hate crime*, Kare 11, August 19, 2016 (http://www.kare11.com/news/threat-to-somali-woman-investigated-as-hate-crime/302770811) – Men threatened to burn down Somali woman's home if she and her family did not leave in the latest in a string of anti-Muslim incidents in central Minnesota in the last year.

- *Univ. of Minnesota Muslim group's sign tagged with ISIS graffiti*, fox9, November 3, 2016 (http://www.fox9.com/news/215330200-story) – A sign belonging to the Muslim student group was defaced leading Counsel on American-Islamic Relations executive director Hussein to "voice[] concern over recent incidents across the country targeting Muslims and Islamic Institutions, including the violent attack of a Muslim man at a San Diego

5

restaurant, the vandalism of a Florida mosque, and plots to attack mosques in Los Angeles and Kansas."

- *Saudi college student in Wisconsin dies after assault*, The Washington Post, November 1, 2016 (https://www.washingtonpost.com/news/morning-mix/wp/2016/11/01/saudi-college-student-in-wisconsin-dies-after-assault/) – A Saudi student at the University of Wisconsin – Stout was attacked near campus and later died of his injuries, stoking fears that the assault may have been racially motivated.

United States Attorney Andrew Luger described this identity crisis in an interview with 60 Minutes. See *In God's Name*, 60 Minutes aired October 30, 2016. In that interview Mr. Luger said:

> There's a pull and a push. And the pull is this ideology that says, "We're building the perfect world. You belong with us. Come join it." And the push is "They're not gonna treat you like we will. You're always gonna be an outsider."
>
> * * *
>
> You listen to these young men, and they're hearing a message that says, "You're not wanted in the West." So when a mother is beaten in a restaurant, which happened last year here simply because she was Somali, had a beer mug smashed across her face and told, "Go Home" in front of little kids that helps that ISIL narrative.

Not only did Mr. Abdurahman experience and witness prejudice from the broader community, there was division even within the Somali community itself. Although the Minnesota Somali community is united in many ways out of necessity and convenience, it is also divided. The community is a melting pot of individuals from different tribes – tribes that were at war back in Somalia. See e.g., *Somali-Americans who fled civil war confront tribalism in new home*, MPR News, June 5, 2014 (https://www.mprnews.org/story/2014/06/05/somali-anti-tribalism).

6

By the time Mr. Abdurahman viewed the more violent videos, he was already invested in the belief that ISIS was helping fight the Assad Regime, the idea that the Western media's accounts of ISIS' activities were simply wrong, and the idea that ISIS offered a place of belonging for Muslims, regardless of where you came from. He was also led to believe that the people being killed in those videos are the same people that brutalized the women, children, elderly and disabled he saw crying for help.

Mr. Abdurahman was fortunate that he was stopped by the FBI. He is fortunate to be alive and is fortunate to have a second chance. As detailed in Mr. Abdurahman's Sentencing Position he has already started to take advantage of that second chance. These things should be considered in imposing a sentence.

### 2. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

In arguing that a 15 year sentence is necessary to promote respect for the law, the government cites incidents that took place during the trial of three of Mr. Abdurahman's co-defendants. The government's attempt to somehow hold Mr. Abdurahman responsible for those incidents through a 15 year sentence is misplaced. Mr. Abdurahman did not go to trial. Mr. Abdurahman accepted responsibility for his actions and pled guilty almost eight full months before the trial began. The government has not and cannot tie the incidents that took place during trial to Mr. Abdurahman. Rather, Mr. Abdurahman himself was the victim of such intimidation techniques as outlined in the declaration submitted by Jon Hopeman describing the conduct of Hassan Jami. In addition, Mr. Abdurahman's father, who continues to actively speak out regarding terror

recruiting in Minnesota's Somali community, has experienced blowback from certain members of the community.

### 3. The need for the sentence to afford adequate deterrence to criminal conduct, and the need for the sentence imposed to protect the public from future crimes of this defendant.

The government argues that a 15 year sentence is necessary to protect the public from "defendant Abdurahman's deeply held desire to become an ISIL fighter." In so arguing, the government ignores Mr. Abdurahman's credible departure from that "deeply held desire." The government focuses solely on statements made by Mr. Abdurahman in March and April of 2014 at a time when he was most radicalized and most committed to joining ISIS. The government's analysis does not account for the intervening year and a half since his arrest. It does not take into account (1) Mr. Abdurahman's guilty plea, (2) Mr. Abdurahman's assistance in getting Hassan Jami removed from this case, facilitating the guilty pleas of two additional defendants, (3) Mr. Abdurahman's credible remorse as described by Daniel Koehler, (4) Mr. Abdurahman's public statements countering the narrative that the defendants were entrapped, and (5) Mr. Abdurahman's support of anti-ISIS messages. While a 15 year sentence may have been necessary to protect the public in April of 2015, it is no longer necessary in the case of Mr. Abdurahman.

Not only has Mr. Abdurahman intentionally turned away from ISIS, by doing so he has eliminated any ability to return, negating any argument that he will go back to that activity. From his plea hearing to his role in addressing Hassan Jami's involvement to public submissions made on his behalf, Mr. Abdurahman has renounced ISIS. ISIS very publicly tortures and kills anyone suspected of being disloyal. See *ISIS Crucifies*

8

*Defectors on Electrical Poles Amid Mass Islamic State Crackdown in Raqqa Stronghold*, International Business Times, April 4, 2016 (http://www.ibtimes.com/isis-crucifies-defectors-electrical-poles-amid-mass-islamic-state-crackdown-raqqa-2347855).

The government further argues that terrorist activity has increased since Mr. Abdurahman first became involved in the conspiracy and attacks by terrorists have claimed hundreds of lives making "manifest the need to protect the public from the deeds of people like this defendant." Again, the government would like Mr. Abdurahman punished not just for his own actions, but held responsible for the actions of others which is directly contrary to the statutory mandate that the Court consider the need for the sentence imposed to protect the public "from future crimes of **this** defendant." Incapacitating Mr. Abdurahman will not stop ISIS. It is a sad reality that acts of terrorism have only increased. This is true even though Mr. Abdurahman has been in custody for the past year and a half.

The government wants nothing more than for the Court to <u>ignore</u> the individual characteristics of this defendant in sentencing and focus on terrorism as a whole. It is telling that the government claims a 15 year sentence will, if nothing else, incapacitate Mr. Abdurahman for 15 years "during which time it will be impossible for him to hurt anyone else." Mr. Abdurahman committed a serious crime in that he attempted to join a terrorist organization. Members of his conspiracy were successful in their efforts. However, Mr. Abdurahman, himself, has never hurt anyone and the government has no evidence to the contrary. There is no question that members of ISIS have hurt thousands of people. There is also no question that Mr. Abdurahman has not.

9
1724141.v1

> **4.** **The need for the sentence to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

Contrary to the government's position, Mr. Koehler has identified programming that, in his expert opinion, will benefit Mr. Abdurahman. Mr. Koehler feels so strongly about this belief that he has recommended a reduced prison sentence for Mr. Abdurahman and, if necessary, confinement to a half-way house where Mr. Abdurahman can fully participate in recommend programming. The government makes no attempt to articulate why Mr. Koehler's recommendations would be ineffective or should not be followed.

The government argues, as it has repeatedly in the past, that Mr. Abdurahman has articulated that he cannot be deradicalized. The government's characterization of Mr. Abdurahman's statement is simply wrong. Rather, Mr. Abdurahman's comments reflected his belief that he would not be given the opportunity to participate in a deradicalization program.

> *ZA: I think Bones is going to be an experiment (UNI).*
> *CHS: Oh*
> *ZA: Deradicalization program.*
> *CHS: Didn't he like admit guilt?*
> *ZA: Yeah, he did acknowledge. Even if they give him time it's not going to be long (UNI). With me, all of us, we're hopeless, we're not gonna be in a program, bro. We will straight up serve time.*
> *CHS: Why?*
> *ZA: Cause we're not, first of all Bones was a high school student. (UNI) Radicalization (UNI) it wasn't that big deal. But the program is for anyone or Radicalized right now. Like ----.*
> *ZA: Not for us, bro. Straight up prison. Yeah.*
> *ZA: Cause you're already, they know they cannot change you. Because you're an adult you know. The program is for people like Ahmed. Stuff like that.*

10

When the government asked Mr. Koehler about this statement, he agreed that it meant "he thinks others, the government, will assess him as highly radical and irreformable so that no one would actually try that." Tr. Sept. 20, 2016 at p. 189.

In addition, although the Bureau of Prisons does not offer specific "deradicalization" programming at this time, it does offer programming in some of the core areas identified by Mr. Koehler as important foundations for a deradicalization program. *See* Programming described on the Bureau of Prisons' website, https://www.bop.gov/inmates/custody_and_care.jsp (The Bureau offers mental health treatment, Adult Continuing Education, and religious programming). Although far from ideal, Mr. Abdurahman's participation in such programming can begin the work of the deradicalization program and form the foundations for the comprehensive program recommended by Mr. Koehler. Moreover, there is nothing that prohibits counselors or mentors from visiting Mr. Abdurahman in prison and beginning to implement an individualized deradicalization program. See Federal Bureau of Prisons General Visiting Information (https://www.bop.gov/inmates/visiting.jsp)("By law an inmate gets at least four hours of visiting time per month but usually the prison can provide more.").

### 5. The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

Finally, the government ignores completely the requirement that the Court consider sentences of other defendants. The government makes no effort to analyze the sentences of other defendants or identify other defendants will similar conduct. As set

11

forth in detail at pages 20-29 of Mr. Abdurahman's Sentencing Position (Dkt No. 706), an analysis of those sentences reveals that a departure is warranted in this case to avoid a disparity with sentences of other defendants who have engaged in similar conduct.

## CONCLUSION

Based upon the foregoing, along with Mr. Abdurahman's Sentencing Position, the record, pleadings, and argument at sentencing, Mr. Abdurahman respectfully requests that this Court grant his motion for downward departure and downward variance based upon the factors set forth in 18 U.S.C. §3553(a).

Dated: November 7, 2016                    FELHABER LARSON

                                                                By: *s/ Marnie E. Fearon*_____
                                                                     Jon M. Hopeman, #47065
                                                                     Marnie E. Fearon, #305078
                                                220 South Sixth Street, Suite 2200
                                                Minneapolis, Minnesota 55402
                                                Telephone: (612) 339-6321

                                                **ATTORNEYS FOR ZACHARIA ABDURAHMAN**

1724141.v1