## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

UNITED STATES OF AMERICA,

                  Plaintiff,        **AMENDED SENTENCING**

v.                              **MEMORANDUM AND OPINION**

                                Criminal File No. 15-49 (05) (MJD/FLN)

ZACHARIA YUSUF ABDURAHMAN,

                  Defendant.

_____

John Docherty, Andrew Winter and Julie Allyn, Assistant United States Attorneys, Counsel for Plaintiff.

Jon M. Hopeman and Marnie E. Fearon, Felhaber Larson, Counsel for Defendant.
_____

## I.	SUMMARY OF SENTENCING DECISION

The Defendant pleaded guilty to Count 1 of the Superseding Indictment which charged Conspiracy to Provide Material Support to a Designated Terrorist Organization, in violation of 18 U.S.C. § 2339B(a)(1).  When imposing a sentence in any criminal case, this Court must take into consideration the applicable guideline range calculated pursuant to the United States Sentencing Guidelines ("USSG") and the statutory sentencing factors set forth in Title 18 U.S.C. §

3553(a).

The Court has carefully considered all of these factors and finds that a variance from the applicable sentencing guideline range of 180 months is warranted.  Accordingly, the Court finds that a sentence of one hundred-twenty (120) months is sufficient, but not greater than necessary, to comply with the sentencing purposes set forth in both § 3553(a) and the relevant guidelines.

## II.    INTRODUCTION

Crimes that involve acts of terrorism "represent[] a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal [] thus [] terrorists and their supporters should be incapacitated for a longer period of time."  United States v. Meskini, 319 F.3d 88, 92 (2d Cir. 2003).

In 2014, the Defendant agreed to conspire with others to join one of the most dangerous and violent terrorist organizations the world has ever known, the Islamic State of Iraq and the Levant ("ISIL").  By joining this conspiracy, the Defendant agreed to be part of the largest group of committed ISIL travelers from Minnesota; an ISIL terrorist cell that, left unchecked, could have caused immense destruction and the loss of many lives, both here and abroad.

2

As part of this cell, the Defendant watched some of the horrific propaganda videos produced by ISIL.  These videos depict ISIL members killing innocent victims in the most violent and despicable manner, such as mass beheadings, shootings and in one case, a Jordanian pilot that was burned alive.

Each member of the conspiracy took affirmative steps to travel overseas to join and fight with ISIL.  Some of the conspirators successfully traveled to Syria and joined ISIL; most of whom have since been killed.

The evidence at trial clearly demonstrated that each member of the conspiracy knew that what they were doing was wrong.  To avoid the scrutiny of their families, friends and most importantly, law enforcement, they followed the ISIL playbook, which counseled "fake it till you make it."  This strategy required the conspirators to remain under the radar by going to school, working to provide financial assistance to their families, attending the Mosque, and remaining otherwise law-abiding.  This strategy also provided that if confronted by law enforcement, they should loudly complain that they were being profiled because they were Muslim.  In order to carry out this strategy, however, the conspirators had to lie to their parents and family, to the FBI agents investigating this case, to the grand jury and to the prosecutors.

3

The members of the conspiracy were deeply committed to the violent jihadist ideology of ISIL. Because of this commitment, they were **not** deterred when subpoenaed to testify before the grand jury or when they received a target letter[1] from the United States Attorney's Office. Members were **not** deterred when physically prevented from boarding flights here in Minneapolis or in New York City in their effort to join ISIL in Syria. They were **not** deterred when confronted by their parents, grandparents or siblings.

Despite all of the obstacles put in their way, the members of this conspiracy continued the march toward their admitted objective; to be a committed jihadi warrior, and to travel to Syria to fight, kill and become a martyr.

## III.   FINDINGS OF FACT

The Court adopts the factual statements contained in the presentence report ("PSR") as its findings of fact. In addition, the Court adopts those facts set forth in Common Appendix A to the Government's Position on Sentencing [Doc. No. 717] and attached hereto as Common Appendix A.

---

[1]A target letter is sent from the United States Attorney's Office informing the recipient that he/she is a target of a federal criminal investigation.

## IV.    APPLICATION OF THE GUIDELINES

The Court found the applicable guideline range was based on a total offense level of 35 and a criminal history category VI, which results in a guideline range of 292 to 365 months.  However, because the crime of conviction carries a statutory maximum sentence of 15 years (180 months), the guideline range is adjusted to 180 months.

### A.    Downward Departure Based on Criminal History Category

The Defendant argued that a criminal history category VI over-represents his criminal history and the likelihood he will reoffend.  He argued that because the terrorism enhancement is universally and mechanically applied, it does not take into consideration any offender characteristics, such as a lack of prior criminal history, no history of violence, no possession of a weapon, or no threats against law enforcement or plans of domestic terrorism.

The Court recognized that it has the discretion to depart downward under § 4A1.3 if it finds that the terrorism enhancement over-represents the seriousness of the defendant's past criminal conduct or the likelihood he would reoffend. The Court declined to exercise that discretion in this case, given the nature of the offenses of conviction, which involved traveling overseas to join and fight with

ISIL, one of the most dangerous and violent terrorist organizations the world has

ever known.  See Meskini, 319 F.3d at 92 (recognizing that "even terrorists with

no prior criminal behavior are unique among criminals in the likelihood of

recidivism, the difficulty of rehabilitation and the need for incapacitation.").

**B.     Downward Departure Based on Age § 5H1.1**

The Sentencing Guidelines consider age to be a factor for departure where

considerations based on age, individually or in combination with other offender

characteristics, are present to an unusual degree and distinguish the case from

the typical cases covered by the guidelines.  U.S.S.G. § 5H1.1.

Citing to numerous studies and court decisions that discuss the physical

brain maturation process in the criminal sentencing context, the Defendant

argued this Court can consider his young age when imposing sentence.  In

support, he cited to the decision of the United States Supreme Court in Miller v.

Alabama, 132 S.Ct. 2455 (2012).  In Miller, the Court held that "the Eighth

Amendment forbids a sentencing scheme that mandates life in prison without

possibility of parole for juvenile offenders."  Id., 132 S. Ct. at 2469.  The Court

found that a mandatory sentencing scheme of life in prison was unconstitutional

because it did not allow the sentencing court to consider that children are

constitutionally different from adults for purposes of sentencing.  "Because

juveniles have diminished culpability and greater prospects for reform, we

explained 'they are less deserving of the most severe punishments.'" Id., at 2464

(citations omitted).  In reaching this conclusion, the Court also recognized that

children "lack [] maturity and [have] an underdeveloped sense of responsibility,

leading to recklessness, impulsivity, and heedless risk-taking"; are more

susceptible to peer pressure and have a limited control over their own

environment; and their character is not well-formed and their "actions [are] less

likely to be evidence of irretrievable depravity."  Id.  Because of these attributes,

the Court held that "the penological justifications for imposing the harshest

sentence" on juveniles are diminished, "even when they commit terrible crimes."

Id. at 2465.

    The Court has previously addressed the issue of youth as a factor in

sentencing in United States v. Robert James Jefferson.  In that case, the Court re-

sentenced the defendant who had previously been sentenced to a mandatory life

term of imprisonment for murders committed when he was sixteen years old,

pursuant to the Miller decision.  Applying the principles set forth in Miller, and

specifically as to whether the crimes of conviction involved reckless or impulsive

behavior due to a lack of maturity in the <u>Jefferson</u> case, this Court found that

> [w]hile the criminal conduct at issue here is certainly reckless, the Court finds that such criminal conduct did not involve rash or impulsive behavior.  The fire bombing of the Coppage home involved planning, the creation of molotov cocktails and then waiting until dark to set the house on fire.  Jefferson had plenty of time to consider what he was doing and the consequences of starting a home on fire.  He had plenty of time to back out of the plan, but he did not do so.

<u>United States v. Jefferson</u>, No. 97-276, 2015 WL 501968, at * 5 (D. Minn. Feb. 5, 2015).

Applying the principles set forth in <u>Miller</u> in this case, the Court finds that the Defendant has not demonstrated that a downward departure from the statutory sentence of 180 months based on age is warranted.  As conceded by the Defendant, he was not a juvenile at the time he committed the offense of conviction, and was a member of the charged conspiracy since its inception. Following his failed attempt to travel in November 2014, the Defendant continued to participate in discussions to plan future attempts to travel.

In addition, there is nothing impulsive about the offense of conviction.  The conspiracy took place over the course of a year during which the Defendant participated in multiple meetings to discuss the situation in Syria, to plan travel routes, and discuss plans to raise funds for travel costs.  Even after his failed

attempt to travel in November 2014, his participation in the conspiracy

continued.  The record demonstrates that the Defendant had many opportunities

to leave the conspiracy, but he failed to do so.  Accordingly, the Court will deny

the Defendant's motion for downward departure pursuant to § 5H1.1.

## V.    SENTENCE

The Defendant is sentenced to a term of imprisonment for one hundred-

twenty (120) months, followed by a twenty (20) year term of supervised release.

Based on the Defendant's current economic condition, the Court did not impose a

fine, but did impose a special assessment in the amount of $100.

## VI.    STATEMENT OF REASONS

Pursuant to the Supreme Court decision in <u>United States v. Booker</u>, 543

U.S. 220 (2005), the United States Sentencing Guidelines are no longer

mandatory.  The Court is nonetheless required to take into account the applicable

Guideline range and the pertinent Sentencing Commission policy statements.  In

addition, the Court must impose a sentence sufficient, but not greater than

necessary, to comply with the following sentencing purposes:

(A) to reflect the seriousness of the offense, to promote respect for
the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a).

The Court also considers the nature and circumstances of the offense and the history and characteristics of the defendant; the kinds of sentences available; the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.

A.     Section 3553(a) Factors

1.     Nature and Circumstances of the Offense

In November 2014, the Defendant attempted to travel overseas to join and fight with ISIL; the most dangerous and violent terrorist organization in existence.  He and three co-defendants took a bus to JFK Airport, and once there, booked a ticket to Athens, Greece.  He was stopped from boarding his plane by law enforcement, and then lied to FBI Agents about his travel plans and whether he knew the co-conspirators that traveled to New York City with him.

On his way back from New York, the Defendant stopped in Chicago and visited with Warsame.  He told Warsame what had happened in New York, and that he had planned to join ISIL in Syria and meet up with Abdi Nur.  When he returned to Minneapolis, he spoke with FBI agents in his home in the presence of his family.  During that interview, he again lied and stated he was planning to travel to Greece for vacation and that he was traveling alone.  The Defendant told the FBI that he believed he was prevented from traveling because he was profiled.  At one point, he angrily challenged the agents, asking if it was illegal to travel to Greece.

The Defendant was recorded in a later conversation stating that he would falsely blame the FBI for his radicalization and departure, "{I'm a turn it towards the Feds, bro}.  The whole thing.  I left the country because of them.  I, I was followed day and night, so . . " (Gov. Tr. Exs. 203 and 204.)

After the failed November 2014 attempt, the Defendant participated in several meetings in Minnesota during the winter and spring of 2015 in order to plan future travel.  At one of these meetings, the Defendant suggested that they reduce their social media visibility and that they conduct more centralized planning for future travel attempts.  During these meetings, the conspirators

planned a trip that required traveling to Mexico, then to Syria.  As part of this plan, they discussed obtaining false passports.  The Defendant provided a passport photograph to be used in a false passport, but he changed his mind a few days later and asked for the photograph back.

In conversations recorded by the government informant, Abdirahman Bashir, the Defendant spoke at length about how to best prepare a fraudulent passport, what cover stories could be used to travel internationally, alternative routes, the penalties the co-conspirators would face if caught and that they likely would not be afforded de-radicalization programming because of their committed beliefs.

In another recorded conversation, the Defendant spoke with Abdi Nur, who was in Syria at the time.  During the call the Defendant boasted about his status as a potential traveler.  "We are the hot boys on the block now, bro.  Yeah, bro, all eyes on us, bro {That is normal man} it's all good. {I swear thanks to God bro}." (Gov. Tr. Exs 203, 204.)  The Defendant also assured Nur that they would be with him soon "either in jannah [heaven] or in the dunya [material, non-divine world of the mundane], bro." (Id.)  After the call with Nur ended, the Defendant and others talked about the fact that Nur was being trained to be an "emir" and

that when they got to Syria, the Defendant said "we gotta be his foot soldiers."

(Id.)

## 2.    History and Characteristics of the Defendant

The Defendant was born in Minnesota.  His parents divorced when he was

14, but they maintain an amicable relationship.  Prior to his arrest, the Defendant

resided with his mother and his six younger siblings.  Being the oldest of seven

children, the Defendant was responsible for taking care of his younger siblings

while his mother was at work.  He also helped the family financially, by working

at night.

The Defendant graduated high school and attended Minneapolis

Community and Technical College for two semesters.  After his failed travel

attempt in November 2014, he worked as a security guard at a woman's shelter.

While the Defendant was going to school and working, however, the

Defendant was enthusiastically talking with his co-conspirators about joining

ISIL in Syria and taking part in their savagery.  He was recorded praising an ISIL

propaganda video that depicts the brutal killing of unarmed people and other

deplorable cruelty, and recommended the video to Abdirizak Warsame.  He also

watched them repeatedly, sometimes during work.

The evidence at trial also demonstrated that this Defendant was very eager to travel.  In March 2015, he stated "It's a race to jannah bro.  At the end of the day if you stay behind it's up to you.  How long have you been waiting and you still trying to wait?  Subhanallah.  What the hell?  I don't understand that concept bro."  (Gov. Tr. Exs. 212 and 213.)   He also described himself as a "lone wolf" and that he must think like a criminal.  (Gov. Tr. Exs. 232 and 233.)  He further expressed his interests in bomb-making, referring to an ISIL fighter who advised his followers how to conduct terrorist attacks in non-Muslim lands.

Despite the fact that this Defendant admitted to the Court that he is a terrorist - an admission that is clearly supported in the record - the Court also acknowledges that the Defendant, his family and lawyers were instrumental in removing from this case a member of another defendant's defense team who may have compromised the independence of the decision-making of co-defendants Adnan Farah and Hamza Ahmed, and that his removal facilitated their pleas of guilty.  The Court has taken this into account in fashioning an appropriate sentence for the Defendant that results in a variance from the applicable guideline range of 180 months.

### 3.      Seriousness of the Offense, Respect for the Law and Just Punishment, Deterrence and Protection of the Public

The atrocities committed by members of ISIL are well-known, and were known to this Defendant when he made the decision to join ISIL in Syria.  The fact that the Defendant took affirmative steps to join ISIL - getting a passport, buying an airline ticket to Greece, and traveling to the JFK airport to make that journey - is of paramount concern given that other young men from Minnesota and elsewhere have left the country and joined either ISIL or al Shabaab and have since died while engaging in terrorist acts for these groups.

The Court finds that a downward variance from the applicable guideline range of 180 months will nonetheless reflect the seriousness of the offense, promote respect for the law, protection of the public and deterrence.  He has taken responsibility by admitting to his criminal conduct and admitting that he is a terrorist.  In addition, the Defendant's parents have come forward and publicly spoken against Jihadi extremism.

### 4.      Unwarranted Sentencing Disparities

The government has filed reports on national terrorism sentencings that summarize sentencing data from cases around the country in which one or more

defendants have been convicted of charges involving the provision of material

support and resources to a designated foreign terrorist organization.

The report includes information on 26 defendants.  Of these, 20 have been

convicted of charges under § 2339B, either standing alone or combined with other

charges, and 13 were sentenced to a term of imprisonment of 180 months or

more.

The Court has reviewed the information concerning these terrorism

sentencings and determined that of the 20 defendants convicted of violating §

2339B, 10 defendants pleaded guilty to at least one count of violating § 2339B,

and their criminal conduct underlying the criminal charges is somewhat similar

to the Defendant in this case in that the defendant attempted to travel to join a

terror group or they recruited and/or assisted others to join a terror group.  For

these 10 defendants, the sentences ranged from 82 months to 180 months.

Based on this data, the count of conviction and the Defendant's history and

characteristics, the Court finds that a sentence of ten years avoids unwarranted

sentencing disparities.

5.      **To Provide Needed Educational/Vocational Training,
        Medical Care or other Correctional Treatment in the Most
        Effective Manner**

The Defendant submitted to a presentence examination and study to

provide the Court a risk assessment evaluation and recommendations as to

intervention needs for de-radicalization of defendants involved in terrorism

related cases.  The Court appointed Daniel Koehler, Director of the German

Institute on Radicalization and De-radicalization Studies, to conduct this

examination.[2]

Koehler has provided the Court a report of his risk assessment evaluation

and recommendations as to intervention needs for de-radicalization.[3]  His

findings are based on interviews with the Defendant, family members, one of the

prosecutors and a probation officer, his review of transcripts, court filings,

excerpts from the PSR, a letter from the Defendant's mother and open source

information.  The bases and reasons for Koehler's findings and opinions

_____

[2]Koehler has extensive experience working with individuals involved with terror
groups, including Somali jihadists and violent neo-nazi extremists.  He has counseled
approximately 200 cases in the last six years, and is working to develop programs for the
successful de-radicalization of those involved in terrorism related cases.

[3]Koehler also testified during a two day hearing concerning his reports as to each
defendant, and was subjected to cross examination by the Court, the government and the
defense.

represent an overall qualitative assessment that includes elements of the VERA2 or ERG22+ protocols, and is based on Koehler's case worker experience.

In his report, Koehler found that based on his structured risk assessment, the Defendant displayed a medium to high risk of future offending and a comparatively advanced stage of radicalization.  Koehler stressed that the current risk level for future re-radicalization depends on the quality and coherence of the counseling provided.

Based on this Court's experience handling a high number of terror cases, and imposing sentences on a number of defendants convicted of terrorism crimes, the Court substantially agreed with Koehler's analysis of this Defendant.

The Court also notes that Congress and the courts have recognized that an "act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time." Meskini, 319 F.3d at 92.  Because of the risks of re-radicalization for defendants convicted of terrorism offenses, and the fact that no program exists, either within or outside of the federal prison system, that meets

the standards of a qualified disengagement and deradicalization program[4], the

Court finds this factor does not support a more substantial variance from the

applicable guideline range.

### 6.    Conclusion

Taking into account all of the above, the Court finds that a sentence of one

hundred-twenty (120) months is sufficient, but not greater than necessary, to

comply with the sentencing purposes set forth in both § 3553(a) and the relevant

guidelines.

Date: December 12, 2016


s/Michael J. Davis
Michael J. Davis
United States District Court

---

[4]Koehler has suggested that such a program should involve expert personnel in the areas of religion, psychology, education and socialization.