UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 15-49(5) (MJD/HB)

UNITED STATES OF AMERICA,

                Plaintiff,

                v.

ZACHARIAH YUSUF ABDURAHMAN,

                Defendant.

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE UNDER 18 U.S.C. § 3582(c)(1)(A)**

Defendant Zachariah Yusuf Abdurahman has filed a motion (Docket No. 958), asking this Court to reduce his sentence of imprisonment under 18 U.S.C. § 3582(c)(1)(A) and order his immediate release, relying on the threat posed by the COVID-19 pandemic, his good record while incarcerated, and his claim that he needs to provide care for his grandmother. Defendant presented to BOP his COVID-19 claim and his claim about his good record while incarcerated, but not his claim that he should be released to care for his grandmother. The warden of the facility in which Defendant is incarcerated denied his COVID-19 and good record-based claims.

The United States respectfully opposes the motion. This Court should deny Defendant's COVID-19 and good record claims with prejudice because Defendant has not met his burden of establishing that a sentence reduction is warranted under the statute. This Court should deny defendant's family circumstances-based claim without prejudice, because Defendant failed to exhaust his administrative remedies as to that claim. If the Court should reach the merits of the family-based claim, that claim should, like the

COVID-19 based claim, be denied with prejudice because Defendant has failed to meet his burden of establishing that a sentence reduction is warranted under the statute.

## Factual Background

Defendant pleaded guilty to conspiring to provide material support and resources to a designated foreign terrorist organization, the Islamic State of Iraq and the Levant, in violation of 18 U.S.C. § 2339B. Tr. of Change of Plea, p. 26. On November 14, 2016, the Defendant was sentenced by this Court to 120 months in prison. Judgment and Commitment, Docket No. 787. As of this writing, Defendant has served 63 months of his sentence (as of his sentencing date, Defendant had substantial time already served in a local jail). Assuming good time, Defendant's projected release date is November 21, 2023, leaving Defendant with approximately 39 months, as of this writing, of his sentence still to serve. Bureau of Prisons Inmate Locator, https://www.bop.gov/mobile/find_inmate/index.jsp#inmate_results (last accessed Sept. 3, 2020). He now moves under 18 U.S.C. § 3582(c)(1)(A) for a sentence reduction resulting in his immediate release from the custody of the Bureau of Prisons (BOP).

## I.    BOP's Response to the COVID-19 Pandemic

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and has resulted in massive disruption to our society and economy. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge.

BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a multi-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id*. at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

BOP's operations are presently governed by Phase Seven of the Action Plan. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent

possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain suspended at this time, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be

codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. As of the date of this filing, BOP has transferred 7,660 inmates to home confinement. *See* Federal Bureau of Prisons, *COVID-19 Home Confinement Information*, *at* https://www.bop.gov/coronavirus/ (last accessed Sept. 4, 2020).

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead. But BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released

6

(at a time that the Probation Office has necessarily cut back on home visits and supervision).

## II.      Defendant's Conviction and Request for a Sentence Reduction

Defendant was part of a group of young men who during 2014 and 2015 conspired to travel to Syria to join, fight for, and kill for, the Islamic State in Iraq and the Levant, or "ISIL," a designated foreign terrorist organization. Members of the conspiracy made multiple attempts to reach Syria, and some conspirators succeeded, while others, including Defendant, were stopped by the FBI at airports as they attempted to board their flights. The social media messages the successful conspirators sent from Syria, showing them as ISIL fighters, inspired those still in Minnesota to keep trying. The conspiracy was brought to a halt in April 2015 with multiple arrests in both Minnesota and California, and eventually eleven conspirators were federally charged in this district.

### A. Planning Meetings And Attempted Travel In The Spring Of 2014

Defendant was part of a group of young men who met at a mosque in suburban Minneapolis, beginning in the spring of 2014, to watch extremely violent ISIL propaganda videos and make plans to reach Syria so they could fight and kill for ISIL. Report of Pre-Sentence Investigation ("PSR," Docket No. 683), ¶¶ 22-24, 81.[1] The videos included grisly depictions of beheadings, of prisoners being forced to dig their own graves, of mass

---

[1] At Defendant's sentencing hearing on November 14, 2016, the Court adopted the factual findings of the PSR, after defense counsel and the prosecutor both stated they had no objections to the facts as recounted in the PSR. Transcript of Sentencing Hearing, p. 2.

executions by shooting, and of the murder of a captured Royal Jordanian Air Force officer who was burned alive. PSR, ¶¶ 80-85. In a tape recording made surreptitiously by a conspirator who was cooperating with the FBI, Defendant characterized his own viewing of ISIL propaganda videos as "daily, bro." PSR, ¶ 80. One video that defendant specifically watched was *On The Prophetic Methodology*, which shows the mass murder of captured Shia troops. PSR, ¶ 81. One group of prisoners is machine-gunned as they lie face down in a sandy area; another group of prisoners is led, one at a time, to a river bank where a masked ISIL executioner shoots them point-blank in the head. PSR, ¶ 81. Other ISIL members then toss or kick each corpse into the river. PSR, ¶ 81.[2]

Also during the spring of 2014, three conspirators (not including Defendant) attempted to reach Syria by first driving to Mexico, but they were stopped by the family of Defendant's co-conspirator, Guled Ali Omar. PSR, ¶¶ 35-38. Four days later, conspirator and, later, cooperating defendant Abdullahi Yusuf attempted to board a flight at the Minneapolis-Saint Paul Airport that was to be the first leg of a trip to Istanbul, where he would rendezvous with ISIL members who would smuggle him over the border to Syria. However, Yusuf's behavior when he applied for an expedited U.S. passport had aroused suspicion, and he was stopped by two FBI Agents at the airport and not allowed to board his flight. PSR, ¶¶ 29-32. The following day Abdi Nur, who had not aroused suspicion, succeeded in leaving Minnesota, and eventually reached Syria. PSR, ¶ 33.

---

[2] For an account of the massacre depicted in *On The Prophetic Methodology*, in which approximately 1,500 Shia prisoners were murdered by ISIL, *see* James Verini, *They Will Have to Die Now: Mosul and the Fall of the Caliphate* 121-22 (2019).

The last event of significance in the spring of 2014 occurred in early June, when one of the men who had been part of the failed attempt to drive to Mexico with Guled Ali Omar took a Greyhound bus to New York City, where he took a flight from John F. Kennedy International Airport to Istanbul. PSR, ¶ 38. This man, too, eventually reached Syria. PSR, ¶ 39. This success apparently gave other members of the conspiracy the idea of eluding law enforcement by flying from airports outside Minnesota. PSR, ¶ 47.

**B. Defendant Travels Cross-Country To New York City In An Attempt To Reach ISIL In Syria**

During the summer of 2014 Defendant and his co-conspirators continued to meet to watch propaganda videos and plot their travel to Syria. PSR, ¶ 43. On November 6 and 7, following several weeks of planning and preparing, Defendant and three other conspirators boarded buses to New York City. PSR, ¶ 55. Conspirator Guled Ali Omar simultaneously attempted to fly to San Diego, from where he planned to cross into Mexico, then make his way to Syria. PSR, ¶ 54. Omar was stopped at the Minneapolis airport and not permitted to travel. PSR, ¶ 54.

On the morning of November 8, as his bus arrived in New York, Defendant went online and bought a round-trip ticket from New York to Athens. PSR, ¶ 56. At his change of plea hearing, Defendant admitted that he was not really going to Athens, and that his plan was to "cross into Syria through Turkey" in order to join ISIL. Change of Plea Transcript, pp. 34-35. Defendant also stated that when planning his trip, he had been in contact with ISIL members inside Syria who gave him and his companions advice on how to reach Syria. Change of Plea Transcript, p. 34.

The FBI prevented Defendant and his three companions from boarding their flights at JFK that morning. PSR, ¶ 57. Although the other three travelers were interviewed, Defendant managed to slip away from the airport without being questioned by law enforcement. PSR, ¶ 62. Back in Minneapolis, Defendant was interviewed by the FBI in the presence of his father, and falsely told FBI Agents he had intended to vacation, alone, in Greece. PSR, ¶ 62.

### C. Conspirators Attempt To Travel To Syria Via Mexico Using Fake Passports; Defendant Is Arrested

One of the conspirators began cooperating with the FBI in late 2014 and began wearing covert recording equipment. PSR, ¶ 88. Later, acting at the direction of law enforcement, the cooperator told the conspirators he had located a source for fake passports. PSR, ¶ 97. This idea had originally been floated by Abdi Nur who, from inside Syria, was still in communication with the group. PSR, ¶ 97. Nur told the group he had a contact for fake passports, and with those fake passports, the conspirators could travel to Syria via Mexico. PSR, ¶ 97. Nur never provided further information, but the cooperator was able to build on Nur's original idea. PSR, ¶ 97.

Defendant greeted the news that the cooperator had a source for fake passports with enthusiasm, calling the opportunity "extraordinary." PSR, ¶ 98. Although he later had doubts about the trustworthiness of the cooperator's contact, and declined to obtain a fake passport, Defendant's declination occurred only after he had provided a passport photograph to the cooperator, to be used in making a fake passport for Defendant. PSR, ¶ 107. Defendant also helped pay for another conspirator's passport, researched the

possibility of traveling through Dubai, and spoke with other conspirators about how governmental corruption in Mexico could work to the conspirators' advantage. PSR, ¶¶ 101, 102. Defendant's decision not to go ahead was not based on any cooling of his ardor for joining ISIL, but only on his assessment that obtaining a fake passport from the cooperator's source, and traveling in a group, was unacceptably risky. PSR, ¶ 107. Indeed, Defendant continued plotting to go to Syria, and even expressed a willingness to rob a bank, if necessary, to get the funds needed for travel. PSR, ¶ 124.

Later, speaking of consequences if they were caught, Defendant ruled himself out as a candidate for a deradicalization program, saying the authorities would realize he could not be changed, and so he would "straight up serve time . . . straight up prison." PSR, ¶ 117. Defendant also stated that his parents were aware of his plans to travel to Syria. PSR, ¶ 122.

Two conspirators, plus the cooperator, drove to San Diego in order to purchase their fake passports. PSR, ¶ 127. They arrived on April 19, 2015, and, in a warehouse near the Mexican border, met a man known to them as "Miguel" (actually an undercover law enforcement officer) who sold them fake Canadian passports. PSR, ¶¶ 125, 128. Upon accepting the passports, waiting FBI Agents entered the warehouse and arrested the two conspirators. PSR, ¶ 128. Shortly afterwards, law enforcement in Minnesota arrested the conspirators who were in this district, including Defendant. PSR, ¶ 128.

### D. Litigation History

Defendant pleaded guilty pursuant to a written plea agreement. (Docket No. 280). He did not appeal his conviction or his sentence, nor has he previously filed any petitions pursuant to 28 U.S.C. § 2255 or any other statute. Defendant requested compassionate

release from the warden of FCI-Pekin on June 17, 2020. In that request, Defendant stated, without elaboration, "I am seeking this [compassionate release] due to COVID-19 pandemic." Defendant also stated that he had a good record in prison. The warden denied the request on June 29, 2020. In the compassionate release motion he filed in this Court, Defendant has repeated his claim that he should be granted compassionate release because of the COVID-19 pandemic, but Defendant has also added a claim that he should be released in order to care for his grandmother. That claim was never presented to the BOP. Defendant has exhausted his administrative remedies, as required by 18 U.S.C. § 3582(c)(1)(A), but only as to that portion of the pending motion that is based on apprehension about COVID-19 and about his prison record. As to his claim that he should be released to care for his grandmother, Defendant has not exhausted his administrative remedies, and this Court should not consider that ground.

Defendant's disciplinary record in prison consists of an infraction for possession of contraband in April 2018 and a more serious infraction, for fighting, in May of 2018. Defendant is currently incarcerated at FCI-Pekin, in Illinois. Two inmates at the facility have tested positive for COVID-19. As of the date of this filing, one of those inmates is noted as having recovered, leaving one active case reported in the inmate population. https://www.bop.gov/coronavirus/ (last accessed Sept. 4, 2020). Pekin's inmate population numbers 1,137. https://www.bop.gov/locations/institutions/pek/. (last accessed, Sept. 4, 2020). Four members of staff are also noted as having recovered from COVID-19. There are no reported active cases among Pekin staff at this time. https://www.bop.gov/coronavirus/ (last accessed Sept. 4, 2020).

On July 28, 2020, Defendant filed a motion with this Court seeking compassionate release under 18 U.S.C. § 3582(c)(1)(A) on the grounds of generalized apprehension of COVID-19; the asserted need for him to provide care to his grandmother; and his record in prison.

## III.    Legal Framework

Under 18 U.S.C. § 3582(c)(1)(A), this Court may, in certain circumstances, grant a defendant's motion to reduce his or her term of imprisonment. Before filing that motion, however, the defendant must first request that BOP file such a motion on his or her behalf. § 3582(c)(1)(A). A court may grant the defendant's own motion for a reduction in his sentence only if the motion was filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after 30 days have passed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

The government maintains that the 30-day exhaustion requirement is jurisdictional. But even if the exhaustion requirement of § 3582(c)(1)(A) is not jurisdictional, it is at least a mandatory claim-processing rule and must be enforced if a party "properly raise[s]" it. *Eberhart v. United States*, 546 U.S. 12, 16 (2005) (per curiam) (holding that Fed. R. Crim. P. 33, which permits a defendant to move for a new trial within 14 days of the verdict, is nonjurisdictional, but nonetheless mandatory as a claim-processing rule). The government raises the rule here, and it must be enforced.

If that exhaustion requirement is met, a court may reduce the defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the Court finds, as relevant here, that (i) "extraordinary and compelling reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A)(i). As the movant, the defendant bears the burden to establish that he or she is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

The Sentencing Commission has issued a policy statement addressing reduction of sentences under § 3582(c)(1)(A). As relevant here, the policy statement provides that a court may reduce the term of imprisonment after considering the § 3553(a) factors if the Court finds that (i) "extraordinary and compelling reasons warrant the reduction;" (ii) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g);" and (iii) "the reduction is consistent with this policy statement." USSG § 1B1.13.[3]

---

[3] The policy statement refers only to motions filed by the BOP Director. That is because the policy statement was last amended on November 1, 2018, and until the enactment of the First Step Act on December 21, 2018, defendants were not entitled to file motions under § 3582(c). *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; *cf.* 18 U.S.C. § 3582(c) (2012). In light of the statutory command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), and the lack of any plausible reason to treat motions filed by defendants differently from motions filed by BOP, the policy statement applies to motions filed by defendants as well.

The policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons." First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." USSG § 1B1.13, cmt. n.1(A)(i). Second, the standard is met if the defendant is:

> (I) suffering from a serious physical or medical condition,
>
> (II) suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

USSG § 1B1.13, cmt. n.1(A)(ii). The application note also sets out conditions and characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's family circumstances: "(i) the death or incapacitation of the caregiver of the defendant's minor child or minor children" or "(ii) the incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner." USSG § 1B1.13, cmt. n. 1(C).

A defendant's rehabilitation, standing alone, is not recognized as an "extraordinary and compelling reason" justifying compassionate release. USSG § 1B1.13, cmt. n. 3.

Finally, the note recognizes the possibility that the BOP could identify other grounds that amount to "extraordinary and compelling reasons." USSG § 1B1.13, cmt. n.1(D).

Compassionate release requests are claim-specific. "The exhaustion requirement dictates that, if a prisoner believes that a particular circumstance provides extraordinary and compelling reasons for release, the prisoner must first bring that circumstance to the attention of the BOP." *United States v. Fiorito*, CR. No. 07-212 (PJS/JSM) at p. 16 (D. Minn. July 20, 2020); *see also United States v. Jenkins*, 2020 WL 1872568, at *1 (D. Neb. Apr. 14, 2020) ("the Court does not view the administrative exhaustion of an initial request for compassionate release as serving to discharge that requirement for subsequent requests based on different evidence and argument. Simply put, the Court cannot consider a motion for compassionate release that is based on evidence or arguments that weren't presented to the Bureau of Prisons first."); *United States v. Mogavero*, 2020 WL 1853754, at *2 (D. Nev. Apr. 13, 2020) ("Proper exhaustion necessarily requires the inmate to present the same factual basis for the compassionate-release request to the warden. Indeed, 28 C.F.R. § 571.61, which outlines the process for submitting a § 3582(c)(1)(A) request to the warden, requires the request to contain, 'at a minimum . . . [t]he extraordinary or compelling circumstances that the inmate believes warrant consideration.' Mogavero's motion is based on cancer plus COVID-19 exposure risks—and not merely her cancer diagnosis—but this new calculus was not presented to the warden. Mogavero has thus failed to properly exhaust the administrative process with the warden before submitting this motion, and this deficiency alone justifies denying her motion." (footnote omitted)); *United States v. Valenta*, 2020 WL 1689786, at *1 (W.D. Pa. Apr. 7, 2020).

## Argument

The Court should deny Abdurahman's motion for several reasons. First, the Court is without jurisdiction to consider any claim outside Abdurahman's generalized apprehension of COVID-19 and purported good record while in prison. Second, Abdurahman has not established that "extraordinary and compelling reasons" support a sentence reduction for those claims. Third, Abdurahman would pose a danger to the community if released; Fourth and finally, the relevant § 3553(a) factors strongly weigh against release.

I.     **The Court Lacks Jurisdiction Over Any Claim Outside Abdurahman's Generalized, Non-Specific Apprehensions About Contracting COVID-19 In Prison And His Disciplinary Record.**

The only claims Abdurahman presented to the Warden of FCI Pekin were that he was concerned about catching COVID-19 in prison, and his assertion that he had a good disciplinary record. However, his motion attempts to bootstrap a new claim, that he is needed to care for his grandmother.  Doc. No, 958 at 3. Abdurahman presents no evidence that he made this claim to the Warden of FCI Pekin, and the Court is therefore without jurisdiction over it.

As explained above, compassionate release requests are claim-specific. The BOP must have the opportunity to consider matters before the inmate files a motion. *United States v. Mollica*, 2020 WL 1914956, at *6 (N.D. Ala. Apr. 20, 2020) ("For a prisoner to file a motion for compassionate release under § 3582, the prisoner must first exhaust administrative remedies by seeking relief from the warden and having such relief either

17

declined or ignored. 18 U.S.C. § 3582(c)(1)(A). While Ms. Mollica properly pursued administrative relief before she filed her first motion for compassionate release based on her transabdominal mesh and fibroid, she has provided no indication that she exhausted her administrative remedies regarding her complaint about COVID-19. Therefore, she cannot properly bring her motion to this court."). Because Abdurahman never presented his claim based on a family situation to the BOP, the Court should dismiss it, or at a minimum stay its ruling on that issue until Abdurahman can prove he has met the statutory exhaustion requirement for the claim he wishes the Court to consider.

It is worth noting that even if Abdurahman's family circumstances claim were properly before the Court, it would not constitute an extraordinary and compelling reason to grant relief. As noted above, the Sentencing Guidelines Commission has promulgated a policy statement, set out at USSG § 1B1.13, explaining what circumstances rise to the level of "extraordinary and compelling." The family circumstances that meet this criterion are described at USSG § 1B1.13, n.1(C). Grandparents are not so much as listed.

## II.    Abdurahman Has Not Identified Any "Extraordinary And Compelling Circumstances" Justifying Compassionate Release.

Abdurahman's two claims that are properly before the Court are his claims that he is apprehensive about catching COVID-19 while in prison, and that he has a good disciplinary record. Neither is "extraordinary and compelling" and therefore neither justified compassionate relief.

As explained above, under the relevant provision of § 3582(c), a court can grant a sentence reduction only if it determines that "extraordinary and compelling reasons" justify

the reduction and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i); *see also United States v. Bellamy*, 2019 WL 3340699 (D. Minn. July 25, 2019). The Sentencing Commission's policy statement defines "extraordinary and compelling reasons" to include, as relevant here, certain specified categories of medical conditions. USSG § 1B1.13, cmt. n.1(A).

For that reason, to state a cognizable basis for a sentence reduction based on a medical condition, a defendant first must establish that his condition falls within one of the categories listed in the policy statement. Those categories include, as particularly relevant here, (i) any terminal illness, and (ii) any "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG § 1B1.13, cmt. n.1(A). If a defendant's medical condition does not fall within one of the categories specified in the application note (and no other part of the application note applies), his or her motion must be denied.

Abdurahman identifies no underlying medical conditions at all, much less one that is on the Policy Statement's list of conditions. He simply makes the unadorned statement that he is seeking release because of COVID-19, and that, in his opinion, the pandemic is not being well managed within his institution. But as described above, the BOP has mounted an aggressive program of mitigating COVID-19 within its institutions, and at Pekin, this program has apparently worked, as there is only one reported case of COVID-

19 currently in an inmate population of over 1,100, and no reported active cases among staff.

Abdurahman's BOP medical records show no underlying conditions that increase his COVID-19 risk. He needs glasses, and he has some dental issues, but otherwise, no medical conditions are identified. His temperature was taken frequently in May of this year, but there is no reason given for this, and it is most likely that this was part of BOP's efforts to detect COVID-19 cases early. In any event, all of Abdurahman's temperature readings were normal.

This leaves only Abdurahman's concern about COVID-19. The risk of COVID-19 by itself is not an extraordinary and compelling reason allowing compassionate release. As the Court of Appeals for the Third Circuit correctly stated, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). As Judge Susan Richard Nelson of this District likewise held:

> [T]he Court agrees with the findings of several courts that "mere speculation of the possibility of contracting the virus" is insufficient to justify release under § 3582(c)(1)(A). *United States v. Fry*, No. 11-cr-141 (PAM/KMM), 2020 WL 1923218, at *1 (D. Minn. Apr. 21, 2020) (*citing United States v. Hamilton*, No. 19-cr-54, 2020 WL 1323036, at *2 (E.D.N.Y. Mar. 20, 2020)); *see also Raia*, 954 F.3d at 957 ("the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate

release."). Rather, district courts require, in the context of the general danger presented by COVID-19, that an inmate demonstrate both "a particularized susceptibility to the disease" and "a particularized risk of contracting the disease at his prison facility." *United States v. Feiling*, 2020 WL 1821457, at *7 (E.D. Va. Apr. 10, 2020) (collecting cases); *Ramirez*, 2020 WL 2404858, at *3; *Shamilov*, 2020 WL 2029600, at *3.

*United States v. Arafat*, No. 12CR00045SRNJJG, 2020 WL 3790727, at *6 (D. Minn. July 7, 2020).

In fact, a rule allowing release if an inmate were merely concerned about COVID-19 – as opposed to being more than usually vulnerable to the virus for reasons unique to that inmate – would result in the release of all inmates, as the district court for the Western District of Louisiana pointed out: "The Court stresses that the rampant spread of the coronavirus and the conditions of confinement in jail, alone, are not sufficient grounds to justify a finding of extraordinary and compelling circumstances. Rather, those circumstances are applicable to all inmates who are currently imprisoned and hence are not unique to any one person. The Court cannot release every prisoner at risk of contracting COVID-19 because the Court would then be obligated to release every prisoner." *United States v. Wright*, 2020 WL 1976828, at *5 (W.D. La. Apr. 24, 2020).

Abdurahman cannot meet the test of showing both "a particularized susceptibility to the disease" and "a particularized risk of contracting the disease at his prison facility." He has not specified a single medical condition from which he suffers, and he is in a prison in which the pandemic appears to be as well-managed as possible. Courts have held that evidence that a facility is effectively managing COVID-19 militates against releasing an

inmate, and have used, as evidence of the degree to which the virus has infiltrated the facility, the facility's positive cases number. "To date, FCI-Sandstone has only one reported case of COVID-19....Thus, the facility appears to be largely successful at stopping any spread of the virus as of this writing." *Arafat*, 2020 WL 3790727, at *6 (D. Minn. July 7, 2020). "When prisons can keep the number of positive COVID-19 cases low or even at zero . . . the risk of exposure is too speculative to render the circumstances extraordinary and compelling." *United States v. Buckman*, 2020 WL 4201509, at *4 (E.D. Pa., July 22, 2020).

Abdurahman's claim that his prison record is so good as to justify compassionate release does not require extended discussion. "Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t). *See, United States v. Logan*, No. 97-CR-0099(3) (PJS/RLE), 2020 WL 2190423, at *1 (D. Minn., May 6, 2020) (Patrick J. Schiltz, J.) ("Logan also states that he has done well in prison, with a solid work history, participation in educational and other programming, and no disciplinary record. Logan's efforts at rehabilitation are commendable, but they cannot by themselves justify release under § 3582(c)(1)(A).").

Abdurahman's motion should be denied.

### III.   Even If This Court Reaches The Merits Of Abdurahman's Family Circumstances Claim, Those Circumstances Are Not "Extraordinary And Compelling."

Under the Policy Statement, care for grandparents is not an "extraordinary and compelling" circumstance. Even if it were, Abdurahman has not provided any information

about his grandmother's needs, what other resources are available for her care, or what, exactly, Abdurahman would do for his grandmother that others cannot.

The Policy Statement gives only two categories of family circumstances that justify compassionate release. One relates to minor children, the other to an inmate's spouse or registered partner. *United States v. Thorpe*, No. 1:08-cr-10027, 2019 WL 6119214, at *1-2 (C.D. Ill. Nov. 18, 2019) (inmate sought compassionate release to care for his ailing grandfather; request denied in part because "the family circumstances enumerated in the policy statement . . . do not apply").

Nor can the catch-all provision of the Policy Statement, USSG § 1B1.13, cmt. n. 1(D) be used to redeem this claim of Abdurahman's, for at least two reasons. First, "other reasons" that might qualify as "extraordinary and compelling" must be determined "by the Director of the Bureau of Prisons." Policy Statement, cmt. n. 1(D). Abddurahman has frustrated that procedure by not submitting to the BOP his claim that his grandmother's care needs justify compassionate release. But even if he had, it is difficult to see what the BOP would have done with the claim, when Abdurahman has failed to explain what his grandmother's care needs are, how Abdurahman will meet those needs, and why other people cannot care for Abdurahman's grandmother.

## IV. Abdurahman Presents A Serious Risk To The Community If He Is Released.

Abdurahman would present a serious risk to public safety if released. This Court can, and should, deny his compassionate release motion for that reason alone. Abdurahman sought to join one of the most violent and depraved terrorist groups ever known. ISIL's

record of on-camera beheadings and burnings, of massacres and the gruesome inventiveness with which ISIL devised new ways of inflicting pain, terror, and humiliation on its victims are well known. The ISIL propaganda videos Abdurahman watched, with "daily" (Abdurahman's word) frequency, are saturated with sadistic violence. *On The Prophetic Methodology*, to take just one video as an example, "celebrates" the massacre of 1,500 unarmed prisoners.

Abdurahman could not be deterred. After being denied boarding in New York, after other members of his group were subpoenaed before the grand jury, after receiving a target letter formally telling him he was the target of a federal criminal investigation, Abdurahman continued to try to get to Syria, where he would join, fight for, and kill for, ISIL. He stated, in comments taped by the cooperator, that he would rob a bank if that were what it took to raise travel funds. And Abdurahman conceded he could not be rehabilitated when he said that although others might be accepted into a deradicalization program, he, himself, would "straight up serve time."

Abdurahman's record in prison, contrary to his own depiction, is not great. While Abdurahman claimed, in his compassionate release request to the warden of FCI-Pekin, to have only one disciplinary incident in jail, he actually has two, and one of them is for fighting. Aburahman apparently cannot refrain from violence even within the stringent environment of a correctional facility. What he will do when released, in light of this, is probably predictable.

This consideration takes on added urgency when one remembers that Abdurahman will live with, and work for, his father if released. As noted above in the Facts section of

this motion response, Abdurahman was one of two conspirators who stated, when they did not know they were being taped, that their parents knew of their plans to go to Syria. When Abdurahman returned from New York and was interviewed by FBI Agents (after receiving a formal target letter from the U.S. Attorney's Office), his father sat by his side as Abdurahman repeated his ridiculous story about going to Greece for a solo vacation in November. Constraints on Abdurahman's behavior are not going to be imposed by his family.

The risk to public safety presented by Abdurahman's release is unacceptably high. Because of this risk, Abdurahman's motion should be denied.

## V.   The Federal Sentencing Factors Strongly Weigh Against Abdurahman's Release.

Finally, the § 3553(a) factors strongly disfavor a sentence reduction. As part of its analysis, the Court must consider the sentencing factors provided in 18 U.S.C. § 3553(a) "to the extent that they are applicable" and determine whether they outweigh the asserted extraordinary and compelling reasons. See § 3582(c)(1)(A); *United States v. Hahn*, 2020 WL 980185 at *3 (D. Minn. Feb 28, 2020). Courts can deny release based solely on § 3553(a) factors. *United States v. Rodd*, 966 F.3d 740 (8th Cir. 2020). Here, the § 3553(a) factors strongly disfavor a sentence reduction.

Abdurahman's crime was very serious, implicating not only public safety – as all violent crimes, to a greater or lesser degree, do – but also the national security of the United States. The facts set out above regarding the nature of the terrorist organization he sought to join, and of his persistence in seeking to join that organization, could all be repeated

here, as part of the § 3553(a) analysis. Abdurahman seems unrepentant. His sentence was just punishment for the crime he committed, and even at ten years, is shorter than those of his three co-defendants who went to trial.

## CONCLUSION

For all the reasons set forth above, this Court should deny with prejudice Abdurahman's claim that either the COVID-19 virus, standing alone, or his prison record, justify his compassionate release from the sentence he is serving for a federal crime of terrorism. This Court should deny without prejudice Abdurahman's newly-raised claim that he should be granted compassionate release to care for his grandmother, or at the least, stay its decision as to that claim until such time as Abdurahman first presents it to the BOP.

Date:  September 4, 2020

Respectfully Submitted,

ERICA H. MacDONALD
United States Attorney

*s/ John Docherty*

BY: JOHN DOCHERTY
Assistant United States Attorney
Atty. Reg. No. 017516X

## CERTIFICATE OF SERVICE

I certify that a participant in the case is not CM/ECF user. I have mailed the document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days, to the following non-CM/ECF participants:

Zachariah Abdurahman
BOP Register Number 18507-041
Federal Correctional Institution – Pekin
2600 2nd Street
Pekin, IL 61554


*s/Rose L. Rohrbach*
BY: ROSE L. ROHRBACH
Paralegal Specialist